FILED

1 | T. Scott Tate (Bar No. 118427)
Gregory C. Nuti (Bar No. 151754)
2 | Melissa S. Lor (Bar No. 245515)
Schnader Harrison Segal & Lewis LLP
3 | One Montgomery Street, Suite 2200
San Francisco, CA  94104-5501
4 | E-mail:state@schnader.com
E-mail:gnuti@schnader.com
5 | E-mail:mlor@schnader.com
Telephone: 415-364-6700
6 | Facsimile: 415-364-6785

7 | Arlene M. Embrey (Fl Bar No. 125539)
Trial Attorney, Office of General Counsel
8 | U.S. Small Business Administration
409 3rd Street, S.W.
9 | Washington, D.C.  20416
Email: arlene.embrey@sba.gov
10 | Telephone (202) 205-6976
Facsimile (202) 481- 0324

11

12 | Attorneys for Plaintiff United States Small Business
Administration in its capacity as Receiver for GKM SBIC,
L.P.

2012 APR 20  PM 1: 20

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

13

UNITED STATES DISTRICT COURT

14

CENTRAL DISTRICT OF CALIFORNIA

15

WESTERN DIVISION

16 | UNITED STATES SMALL BUSINESS
ADMINISTRATION IN ITS CAPACITY AS
17 | RECEIVER FOR GKM SBIC, L.P.,

18 | Plaintiff,

19 | vs.

20 | GKM VENTURE PARTNERS, L.P., A
DELAWARE LIMITED PARTNERSHIP;
21 | BERG AND BERG ENTERPRISES, LLC;
BARRY BERGMAN; HJK PARTNERS,;
22 | SCOTT KINNEAR; LANG TRUST; JOHN J.
MCARDLE; NOLING FAMILY TRUST;
23 | PIKOVER FAMILY TRUST; B.N. REZNICK
HOLDINGS, LLC; ANDREW STERGIADES;
24 | VIVALDI, LLC; KIE, LLC; BENY ALAGEM;
APEX INVESTMENT FUND, LTD.; MARC
25 | JONES; PETER NEUWIRTH TRUST; WHITE
LYON & CO., INC.; GARY KREMENS;
26 | STEVEN HUMPHREYS, MARCIANO
FINANCIAL HOLDINGS II, LLC

27

28 | Defendants.

CV12  03446  DMG  (FFMx)

COMPLAINT FOR BREACH OF
CONTRACT

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

Plaintiff, the United States Small Business Administration ("SBA") in its capacity as Receiver for GKM SBIC, L.P. ("GKM SBIC") alleges as follows:

## PARTIES

1.    SBA is the duly appointed receiver for GKM SBIC ("Plaintiff" or "Receiver") pursuant to the terms of that certain Consent Order dated July 19, 2010 ("Consent Order") issued by this Court in the related action captioned *United States of America v. GKM SBIC, L.P.* case number CV 10-4316 CAS, pending in this Court ("Receivership Action").  A copy of the Consent Order is attached hereto as **Exhibit A** and incorporated herein by reference.

2.    The Receiver was appointed for the purpose of among other things pursuing claims and claimants of GKM SBIC.  The Receiver maintains its principal place of business at 1100 G Street, N.W., 11th Floor, Washington, D.C. 20005.

3.    GKM SBIC is a limited partnership formed under the laws of the State of Delaware pursuant to that certain Agreement of Limited Partnership dated and effective as of February 28, 2002, which agreement was amended by the "Amended and Restated Agreement of Limited Partnership," dated and effective as of June 17, 2002 (the "Amended Partnership Agreement").  A copy of the Amended Partnership Agreement is attached hereto as **Exhibit B**.

4.    Defendant GKM Venture Partners, L.P. ("GKM VP") is a Delaware limited partnership with its principal place of business located at 11150 Santa Monica Boulevard, Suite 800, Los Angeles, CA 90025.

5.    Defendant Berg & Berg Enterprises, LLC ("Berg") is a California limited liability company whose last known address is ████████████ Cupertino, CA 95014.

6.    Defendant Barry Bergman ("Bergman") is an individual whose last known address is ████████████ New York, NY 10128.

7.    Defendant HJK Partners ("HJK") is a California partnership whose last known address at ████████████ San Diego, CA 92103.

8.    Defendant Scott Kinnear ("Kinnear") is an individual whose last known address is ████████████ Boca Raton, FL 33428.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

9.      Defendant Lang Trust ("Lang Trust") is a trust set up under, upon information and belief, the laws of the State of California, whose last known address is attn.: Roger Lang, ▮▮▮ ▮▮▮ Woodside, California, 94062.

10.     Defendant John J. McArdle ("McArdle") is an individual whose last known address is ▮▮▮ San Francisco, CA 94109.

11.     Defendant Noling Family Trust ("Noling Trust") is a California trust whose last known address is c/o ThinGap Corporation, ▮▮▮ Santa Barbara, CA 93108.

12.     Defendant Pikover Family Trust ("Pikover Trust") is a California trust whose last known address is ▮▮▮ Malibu, CA 90265.

13.     Defendant B.N. Reznick Holdings, L.P. ("Reznick") is a limited partnership under the laws of the State of Florida whose last known address is c/o Boris Reznick, ▮▮▮ ▮▮▮ Miami, FL 33180.

14.     Defendant Andrew Stergiades ("Stergiades") is an individual whose last known address is c/o Vast Industrial Supply, ▮▮▮ Highland Beach, FL 33487.

15.     Defendant Vivaldi, LLC ("Vivaldi") is a California limited liability company whose last known address is c/o Lawrence Kuppin, ▮▮▮ Los Angeles, CA 90049.

16.     Defendant KIE, LLC ("KIE") is a limited liability company whose last known address is c/o Edmondo Schwartz, KIE/EMS Enterprises, ▮▮▮ New York, NY 10022.

17.     Defendant Beny Alagem ("Alagem") is an individual whose last known address is c/o Alagem Capital Group, ▮▮▮ Beverly Hills, CA 90210.

18.     Defendant Apex Investment Fund, Ltd. ("Apex") is a Bermuda Limited Partnership whose last known address is c/o Peter Schlesinger, ▮▮▮ West Los Angeles, CA 90049.

19.     Defendant Marc Jones ("Jones") is an individual whose last known address is c/o Jones Equity Partners, ▮▮▮ Santa Barbara, CA 93101.

3

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

20.     Defendant Peter Neuwirth Trust ("Neuwirth Trust") is a California trust whose last known address is ███████████ Los Angeles, CA 90077.

21.     Defendant Whyte Lyon & Co., Inc.  ("Whyte Lyon") is a Delaware partnership whose last known address is ████████████ New York, NY 10011.

22.     Defendant Gary Kremen ("Kremen") is an individual whose last known address is ████████ San Francisco, CA  94107.

23.     Defendant Steve Humphreys ("Humphreys") is an individual whose last known address is ███████ Portola Valley, CA 94028.

24.     Defendant Marciano Financial Holdings II, LLC ("MFH") is a California limited liability company whose last known address is ███████████████ Beverly Hills, CA  90212.

25.     This action arises under 15 U.S.C. § 687c, the Small Business Investment Act of 1958 (the "Act") as implemented by 13 CFR Part 107 (the "Regulations") and related state statutes.  The Court has jurisdiction over this action pursuant to the Consent Order, 28 U.S.C § 1331, 15 U.S.C. §§ 687c and 687h, 28 U.S.C. §§ 754, 1692 and 1367.  Those causes which arise under the laws of the States of California and Delaware are pendent or ancillary causes under 28 U.S.C. § 1367 to the Receivership Action referred to in Paragraph 1 above.

26.     Venue is proper in the Central District of California pursuant to 28 U.S.C. §1391 because the Defendants maintain offices, transact business, and reside within the District.  Venue is also proper pursuant to 28 U.S.C. § 754 as this action is ancillary to this Court's exclusive jurisdiction over the receivership estate of GKM SBIC.

## COMMON ALLEGATIONS

27.     Congress passed the Act to encourage the growth of small businesses by compensating for the difficulty they may have in obtaining financing from conventional lenders. To accomplish this objective, the Act authorizes the SBA to license Small Business Investment Companies ("SBICs") to provide capital to qualified small business concerns in strict conformance with the Act.  The Act authorizes the SBA to prescribe regulations governing the operations of SBICs, 15 U.S.C.§ 687(c).  SBA has exercised that authority and has promulgated

4

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

1 regulations reported in Part 107 of Title 13 of the Code of Federal Regulations (the

2 "Regulations").

3     28.    Under the Consent Order and consistent with the Act and Regulations, this Court

4 has charged the Receiver with pursuing and preserving all claims of GKM SBIC.  The Receiver

5 has determined that certain of the acts and omissions described herein provide private, civil

6 causes of action in favor of GKM SBIC.

7     29.    GKM SBIC was formed for the purpose of operating as a venture capital fund

8 licensed as a SBIC under the Act and the Regulations.  GKM SBIC at all relevant times obtained

9 and held U.S. Small Business Administration Small Business Investment Company License No.

10 09/79-044.

11     30.    At all relevant times, SBIC Management was GKM SBIC's managing general

12 partner.  The management and operations of GKM SBIC, including without limitation, the

13 formulation of the investment policy vested exclusively in SBIC Management, which authority

14 was governed by the Acts and the Regulations.

15     31.    At all relevant times, GKM SBIC comprised of the following parties: (1) SBIC

16 Management, its general partner; (2) the Private Limited Partners, and (3) the SBA, the preferred

17 limited partner.

18     32.    At all relevant times, the Private Limited Partners of GKM SBIC comprised of

19 Class A Limited Partners, Class B Limited Partners, and Back-Up Limited Partners, as identified

20 below.

21     33.    At all relevant times, Defendants GKM VP, Berg, Bergman, GV Trust, HJK,

22 Kinnear, Lang Trust, McArdle, Noling Trust, Pikover Trust, Reznick, Stergiades, Marciano

23 Financial Holdings II, LLC and Vivaldi were limited partners of GKM SBIC, also known as the

24 Class A Limited Partners.

25     34.    At all relevant times, Defendants KIE, Alagem, Apex, Jones, Neuwirth Trust, and

26 Whyte Lyon were GKM SBIC's Class B Limited Partners.

27     35.    At all times relevant, Defendants Kremens and Humphreys were GKM SBIC's

28 Back-Up Limited Partners.

5

36.    On or about June 17, 2002, SBIC Management, GKM VP, and the Private Limited Partners entered into the Amended Partnership Agreement.

37.    Under the terms of the Amended Partnership Agreement, each Defendant identified as a "Class A Limited Partner," among other things, (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Partnership Agreement, and (3) agreed to a specified capital commitment amount.

38.    Under the terms of the Amended Partnership Agreement, GKM VP, among other things, (1) agreed to be a Class A Limited Partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $15,000,000.00.

39.    Pursuant to the Amended Partnership Agreement, GKM SBIC was partially structured as a "drop down" SBIC fund, whereby GKM SBIC's limited partner, GKM VP, operated as the "Parent Fund"[1] that raised capital from its investors (limited partners), which in turn drops down some or all of the capital raised into the SBIC fund.

40.    The books and records of GKM SBIC reflect that each Class B Limited Partner received and executed the Agreement of Limited Partnership of GKM VP dated March 17, 2000, in which, among other things, the Class B Limited Partner agreed to be bound by its terms and agreed to have his or her signature page attached to the Amended Partnership Agreement of GKM SBIC.

41.    Article 5 of the Amended Partnership Agreement governs the Partners' Capital Contributions.

42.    Section 5.02 of the Amended Partnership Agreement provides that, "The Class A Limited Partners[2] will contribute to the capital of the Partnership in cash the aggregate amount

---

[1] Under the Amended Partnership Agreement, GKM VP is referred to as the "Parent Fund." *See* Section 1.01 "Definitions" of the Amended Partnership Agreement.

[2] Under the Amended Partnership Agreement, the "Class A Limited Partners" comprise of GKM VP and such other individuals and entities admitted to GKM SBIC after the date of the Amended Partnership Agreement. *See* Section 1.01 "Definitions" of the Amended Partnership Agreement.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

COMPLAINT

PHDATA 3729896_2

1    that is set forth opposite their respective names on Exhibit I payable in such installments, as

2    specified by the General Partner in its sole discretion, from time to time . . . ."

3        43.    Section 5.03 of the Amended Partnership Agreement provides:

> If at any time (and only at such time) the Parent Fund fails to make a Capital Contribution as required by this Agreement, then the Class B Limited Partners shall contribute to the capital of the Partnership in cash an amount equal to the Parent Fund Capital Contribution then in default, with each such Class B Limited Partner being required to contribute its Proportionate Share of the Capital Contribution then in default; provided, however, that the obligation of each Class B Limited Partner to contribute the capital of the Partnership shall be several, and not joint, and in no event shall any Class B Limited Partner be required to contribute to the Partnership an amount greater than the then unpaid amount that such Class B Limited Partner has agreed to contribute to the capital of the Parent Fund.

11       44.    The books and records of GKM SBIC reflect that GKM VP paid $9,846,453.00 to

12   the Partnership.  Therefore, the current balance of the unfunded capital commitment owed by

13   GKM VP as a Private Limited Partner is the amount of $5,153,547.00.

14       45.    Section 5.08 of the Amended Partnership Agreement provides that, where the

15   partnership is liquidated, the general and limited partners must make any unfunded capital

16   commitments if the assets of the partnership are insufficient to repay the partnership obligations

17   owed to the SBA.  Further, no general or limited partners has any right to delay, reduce or offset

18   any obligations to contribute capital to the partnership by reason of any counterclaim or right of

19   offset.

20       46.    Section 5.12 of the Amended Partnership Agreement provides that, "The

21   Partnership is entitled to enforce the obligations of each Partner to make the contributions of

22   capital specified in this Agreement.  The Partnership has all rights and remedies available at law

23   or equity if any such contribution is not so made."

24       47.    Further, section 5.13 of the Amended Partnership Agreement provides that the

25   general partner may commence legal proceedings against any defaulting partner to collect due

26   and unpaid capital commitments, including interest and attorneys' fees.

27       48.    The Receiver made demand pursuant to the Amended Partnership Agreement for

28   payment of the unfunded capital commitment from GKM VP.  Despite the Receiver's due

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

1    demand, no payment has been received from GKM VP.  Consequently, the Receiver issued a

2    default notice to GKM VP.  Copies of the Receiver's demand and default notice to GKM VP are

3    attached hereto as **Exhibit C**.

## COUNT I

### BREACH OF CONTRACT AGAINST GKM VENTURE PARTNERS, L.P.

6        49.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such

7    reference hereby incorporates and re-alleges them herein.

8        50.    On or about June 17, 2002, GKM Venture Partners, L.P. ("GKM VP") entered

9    into the Amended Partnership Agreement.

10       51.    The Receiver and GKM SBIC have performed all conditions, covenants and

11   promises required of them under the Amended Partnership Agreement, except where

12   performance was prevented or excused by GKM VP's conduct.

13       52.    GKM VP breached the terms of the Amended Partnership Agreement by, among

14   other things, failing and refusing to pay to GKM SBIC the remaining unfunded capital

15   commitment balance of $5,153,547.00.

16       53.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused

17   by GKM VP's breach of the Amended Partnership Agreement as alleged herein, including, but

18   not limited to monetary damages of not less than $5,153,547.00 plus interest recoverable

19   pursuant to the terms of the Amended Partnership Agreement.

20       54.    By the terms of the Amended Partnership Agreement, GKM VP has agreed to pay

21   reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.

22   By reason of GKM VP's defaults it has become necessary for the Receiver to employ the

23   undersigned counsel to commence and prosecute this action and the Receiver is entitled to

24   recover its attorneys' fees and costs incurred herein.

25       Wherefore, the Receiver prays for a judgment as set forth below.

26   / / /

27   / / /

28   / / /

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

**COMPLAINT**

PHDATA 3729896_2

## COUNT II

## BREACH OF CONTRACT AGAINST BERG & BERG ENTERPRISES LLC

55.     Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

56.     The books and records of GKM SBIC reflect that on or about December 15, 2003, Berg & Berg Enterprises LLC ("Berg") executed a Subscription Agreement, wherein, among other things, Berg agreed to become a limited partner of GKM SBIC.

57.     GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Berg and is referenced in the Subscription Agreement.

58.     Under the terms of the Amended Partnership Agreement, Berg, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $2,912,000.00.

59.     The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Berg.

60.     Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Berg for its remaining unfunded capital commitment, at the time totaling $1,648,582.00, and gave Berg until November 15, 2010 to pay the amount in full.  Berg failed to do so.

61.     Via letter dated December 22, 2010, the Receiver notified Berg that it was in default for failure to pay its remaining unfunded capital commitment.

62.     Berg breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the unfunded capital commitment as demanded.

63.     The books and records of GKM SBIC reflect that Berg is currently in default in the amount of $1,648,582.00.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

COMPLAINT

PHDATA 3729896_2

64.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Berg's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $1,648,582.00plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

65.    By the terms of the Amended Partnership Agreement, Defendant has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

## COUNT III

## BREACH OF CONTRACT AGAINST BARRY BERGMAN

66.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

67.    The books and records of GKM SBIC reflect that on or about December 22, 2003, Barry Bergman ("Bergman") executed a Subscription Agreement, wherein, among other things, Bergman agreed to become a limited partner of GKM SBIC.

68.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Bergman and is referenced in the Subscription Agreement.

69.    Under the terms of the Amended Partnership Agreement, Bergman, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $166,400.00.

70.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Bergman.

71.    Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Bergman for its remaining

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

1   unfunded capital commitment, at the time totaling $94,206.00, and gave Bergman until

2   November 15, 2010 to pay the amount in full.  Bergman failed to do so.

3       72.    Via letter dated December 22, 2010, the Receiver notified Bergman that it was in

4   default for failure to pay its remaining unfunded capital commitment.

5       73.    Bergman breached the terms of the Amended Partnership Agreement by, among

6   other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the

7   unfunded capital commitment as demanded.

8       74.    The books and records of GKM SBIC reflect that Bergman is currently in default

9   in the amount of $94,206.00.

10      75.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused

11  by Bergman's breach of the Amended Partnership Agreement as alleged herein, including, but

12  not limited to monetary damages of not less than $94,206.00 plus interest recoverable pursuant to

13  the terms of the Amended Partnership Agreement.

14      76.    By the terms of the Amended Partnership Agreement, Defendant has agreed to

15  pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights

16  thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to

17  employ the undersigned counsel to commence and prosecute this action and the Receiver is

18  entitled to recover its attorneys' fees and costs incurred herein.

19                          **COUNT IV**

20          **BREACH OF CONTRACT AGAINST HJK PARTNERS**

21      77.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such

22  reference hereby incorporates and re-alleges them herein.

23      78.    The books and records of GKM SBIC reflect that on or about December 15, 2003,

24  HJK Partners ("HJK") executed a Subscription Agreement, wherein, among other things, HJK

25  agreed to become a limited partner of GKM SBIC.

26      79.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or

27  substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to HJK

28  and is referenced in the Subscription Agreement.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

COMPLAINT

PHDATA 3729896_2

80.     Under the terms of the Amended Partnership Agreement, HJK, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $ 208,000.00.

81.     The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of HJK.

82.     Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon HJK for its remaining unfunded capital commitment, at the time totaling $113,656.00, and gave HJK until November 15, 2010 to pay the amount in full.  HJK failed to do so.

83.     Via letter dated December 22, 2010, the Receiver notified HJK that it was in default for failure to pay its remaining unfunded capital commitment.

84.     HJK breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the unfunded capital commitment as demanded.

85.     The books and records of GKM SBIC reflect that HJK is currently in default in the amount of $113,656.00.

86.     As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by HJK's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $113,656.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

87.     By the terms of the Amended Partnership Agreement, Defendant has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

/ / /

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

12

## COUNT V

### BREACH OF CONTRACT AGAINST SCOTT KINNEAR

88.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

89.    The books and records of GKM SBIC reflect that on or about December 11, 2003, Scott Kinnear ("Kinnear") executed a Subscription Agreement, wherein, among other things, Kinnear agreed to become a limited partner of GKM SBIC.

90.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Kinnear and is referenced in the Subscription Agreement.

91.    Under the terms of the Amended Partnership Agreement, Kinnear, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $208,000.00.

92.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Kinnear.

93.    Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Kinnear for its remaining unfunded capital commitment, at the time totaling $117,755.00, and gave Kinnear until November 15, 2010 to pay the amount in full.  Kinnear failed to do so.

94.    Via letter dated December 22, 2010, the Receiver notified Kinnear that it was in default for failure to pay its remaining unfunded capital commitment.

95.    Kinnear breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the unfunded capital commitment as demanded.

96.    The books and records of GKM SBIC reflect that Kinnear is currently in default in the amount of $117,755.00.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

COMPLAINT

PHDATA 3729896_2

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

97.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Kinnear's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $117,755.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

98.    By the terms of the Amended Partnership Agreement, Defendant has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

## COUNT VI

## BREACH OF CONTRACT AGAINST LANG TRUST

99.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

100.    The books and records of GKM SBIC reflect that on or about January 5, 2004, Lang Trust ("Lang Trust") executed a Subscription Agreement, wherein, among other things, Lang agreed to become a limited partner of GKM SBIC.

101.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Lang Trust and is referenced in the Subscription Agreement.

102.    Under the terms of the Amended Partnership Agreement, Lang Trust, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $416,000.00.

103.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Lang Trust.

104.    Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Lang Trust for its remaining

14

1    unfunded capital commitment, at the time totaling $176,589.00 and gave Lang Trust until

2    November 15, 2010 to pay the amount in full.  Lang Trust failed to do so.

3        105.    Via letter dated December 22, 2010, the Receiver notified Lang Trust that it was

4    in default for failure to pay its remaining unfunded capital commitment.

5        106.    Lang Trust breached the terms of the Amended Partnership Agreement by, among

6    other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the

7    unfunded capital commitment as demanded.

8        107.    The books and records of GKM SBIC reflect that Lang Trust is currently in

9    default in the amount of $176,589.00.

10       108.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused

11   by Lang Trust's breach of the Amended Partnership Agreement as alleged herein, including, but

12   not limited to monetary damages of not less than $176,589.00 plus interest recoverable pursuant

13   to the terms of the Amended Partnership Agreement.

14       109.    By the terms of the Amended Partnership Agreement, Defendant has agreed to

15   pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights

16   thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to

17   employ the undersigned counsel to commence and prosecute this action and the Receiver is

18   entitled to recover its attorneys' fees and costs incurred herein.

19                                **COUNT VII**

20                **BREACH OF CONTRACT AGAINST JOHN MCARDLE**

21       110.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such

22   reference hereby incorporates and re-alleges them herein.

23       111.    The books and records of GKM SBIC reflect that on or about January 9, 2004,

24   John McArdle ("McArdle") executed a Subscription Agreement, wherein, among other things,

25   McArdle agreed to become a limited partner of GKM SBIC.

26       112.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or

27   substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to

28   McArdle and is referenced in the Subscription Agreement.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

15

113.    Under the terms of the Amended Partnership Agreement, McArdle, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $104,000.00.

114.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of McArdle.

115.    Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon McArdle for its remaining unfunded capital commitment, at the time totaling $58,878.00, and gave McArdle until November 15, 2010 to pay the amount in full.  McArdle failed to do so.

116.    Via letter dated December 22, 2010, the Receiver notified McArdle that it was in default for failure to pay its remaining unfunded capital commitment.

117.    McArdle breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the unfunded capital commitment as demanded.

118.    The books and records of GKM SBIC reflect that McArdle is currently in default in the amount of $58,878.00.

119.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by McArdle's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $58,878.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

120.    By the terms of the Amended Partnership Agreement, Defendant has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

/ / /

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

## COUNT VIII

### BREACH OF CONTRACT AGAINST NOLING FAMILY TRUST

121.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

122.    The books and records of GKM SBIC reflect that on or about December 20, 2003, Noling Family Trust ("Noling Trust") executed a Subscription Agreement, wherein, among other things, Noling Trust agreed to become a limited partner of GKM SBIC.

123.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Noling Trust and is referenced in the Subscription Agreement.

124.    Under the terms of the Amended Partnership Agreement, Noling Trust, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $104,000.00.

125.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Noling Trust.

126.    Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Noling Trust for its remaining unfunded capital commitment, at the time totaling $58,878.00, and gave Noling Trust until November 15, 2010 to pay the amount in full.  Noling Trust failed to do so.

127.    Via letter dated December 22, 2010, the Receiver notified Noling Trust that it was in default for failure to pay its remaining unfunded capital commitment.

128.    Noling Trust breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the unfunded capital commitment as demanded.

129.    The books and records of GKM SBIC reflect that Noling Trust is currently in default in the amount of $58,878.00.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

17

130.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Noling Trust's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $58,878.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

131.    By the terms of the Amended Partnership Agreement, Defendant has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

## COUNT IX

## BREACH OF CONTRACT AGAINST PIKOVER FAMILY TRUST DATED 5/18/96

132.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

133.    The books and records of GKM SBIC reflect that on or about December 19, 2003, Pikover Family Trust dated 5/18/96 ("Pikover Trust") executed a Subscription Agreement, wherein, among other things, Pikover Trust agreed to become a limited partner of GKM SBIC.

134.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Pikover Trust and is referenced in the Subscription Agreement.

135.    Under the terms of the Amended Partnership Agreement, Pikover Trust, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $208,000.00.

136.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Pikover Trust.

137.    Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Pikover Trust for its

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

remaining unfunded capital commitment, at the time totaling $117,755.00, and gave Pikover Trust until November 15, 2010 to pay the amount in full. Pikover Trust failed to do so.

138.    Via letter dated December 22, 2010, the Receiver notified Pikover Trust that it was in default for failure to pay its remaining unfunded capital commitment.

139.    Pikover Trust breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the unfunded capital commitment as demanded.

140.    The books and records of GKM SBIC reflect that Pikover Trust is currently in default in the amount of $117,755.00.

141.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Pikover Trust's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $117,755.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

142.    By the terms of the Amended Partnership Agreement, Defendant has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder. By reason of Defendant's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

## COUNT X

## BREACH OF CONTRACT AGAINST B.N. REZNIK HOLDINGS LP

143.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

144.    The books and records of GKM SBIC reflect that on or about December 15, 2003, B.N. Reznik Holdings LP ("Reznik") executed a Subscription Agreement, wherein, among other things, Reznik agreed to become a limited partner of GKM SBIC.

145.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Reznik and is referenced in the Subscription Agreement.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

19

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

146.    Under the terms of the Amended Partnership Agreement, Reznik, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $104,000.00.

147.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Reznik.

148.    Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Reznik for its remaining unfunded capital commitment, at the time totaling $58,878.00, and gave Reznik until November 15, 2010 to pay the amount in full.  Reznik failed to do so.

149.    Via letter dated December 22, 2010, the Receiver notified Reznik that it was in default for failure to pay its remaining unfunded capital commitment.

150.    Reznik breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the unfunded capital commitment as demanded.

151.    The books and records of GKM SBIC reflect that Reznik is currently in default in the amount of $58,878.00.

152.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Reznik's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $58,878.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

153.    By the terms of the Amended Partnership Agreement, Defendant has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

/ / /

20

## COUNT XI

### BREACH OF CONTRACT AGAINST ANDREW STERGIADES

154.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

155.    The books and records of GKM SBIC reflect that on or about January 6, 2004, Andrew Stergiades ("Stergiades") executed a Subscription Agreement, wherein, among other things, Stergiades agreed to become a limited partner of GKM SBIC.

156.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Stergiades and is referenced in the Subscription Agreement.

157.    Under the terms of the Amended Partnership Agreement, Stergiades, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $208,000.00.

158.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Stergiades.

159.    Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Stergiades for its remaining unfunded capital commitment, at the time totaling $117,755.00, and gave Stergiades until November 15, 2010 to pay the amount in full.  Stergiades failed to do so.

160.    Via letter dated December 22, 2010, the Receiver notified Stergiades that it was in default for failure to pay its remaining unfunded capital commitment.

161.    Stergiades breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the unfunded capital commitment as demanded.

162.    The books and records of GKM SBIC reflect that Stergiades is currently in default in the amount of $117,755.00.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

**COMPLAINT**

PHDATA 3729896_2

163.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Stergiades' breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $117,755.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

164.    By the terms of the Amended Partnership Agreement, Defendant has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

## COUNT XII

## BREACH OF CONTRACT AGAINST VIVALDI LLC

165.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

166.    The books and records of GKM SBIC reflect that on or about December 15, 2003, Vivaldi LLC ("Vivaldi") executed a Subscription Agreement, wherein, among other things, Vivaldi agreed to become a limited partner of GKM SBIC.

167.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Vivaldi and is referenced in the Subscription Agreement.

168.    Under the terms of the Amended Partnership Agreement, Vivaldi, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $832,000.00.

169.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Vivaldi.

170.    Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Vivaldi for its remaining

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

1    unfunded capital commitment, at the time totaling $471,022.00, and gave Vivaldi until

2    November 15, 2010 to pay the amount in full.  Vivaldi failed to do so.

3        171.    Via letter dated December 22, 2010, the Receiver notified Vivaldi that it was in

4    default for failure to pay its remaining unfunded capital commitment.

5        172.    Vivaldi breached the terms of the Amended Partnership Agreement by, among

6    other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the

7    unfunded capital commitment as demanded.

8        173.    The books and records of GKM SBIC reflect that Vivaldi is currently in default in

9    the amount of $471,022.00.

10        174.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused

11    by Vivaldi's breach of the Amended Partnership Agreement as alleged herein, including, but not

12    limited to monetary damages of not less than $471,022.00 plus interest recoverable pursuant to

13    the terms of the Amended Partnership Agreement.

14        175.    By the terms of the Amended Partnership Agreement, Defendant has agreed to

15    pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights

16    thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to

17    employ the undersigned counsel to commence and prosecute this action and the Receiver is

18    entitled to recover its attorneys' fees and costs incurred herein.

19    ## COUNT XIII

20    ## BREACH OF CONTRACT AGAINST KIE, LLC

21        176.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such

22    reference hereby incorporates and re-alleges them herein.

23        177.    The books and records of GKM SBIC reflect that on or about January 16, 2001,

24    KIE, LLC ("KIE") executed the Agreement of Limited Partnership of GKM VP.

25        178.    The books and records of GKM SBIC reflect that on or about November 30,

26    2000, KIE executed a Subscription Agreement, wherein, among other things, KIE agreed to

27    become a limited partner of GKM VP and agreed to a capital commitment of $2,000,000.00.

28    / / /

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

23

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

179.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to KIE and is referenced in the Agreement of Limited Partnership of GKM VP.

180.    The books and records of GKM SBIC reflect that KIE agreed to become a Class B Limited Partner of GKM SBIC.

181.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of KIE.

182.    The Receiver made demand pursuant to the Partnership Agreement for payment of the unfunded capital commitment from GKM SBIC's limited partner, GKM VP.  Despite the Receiver's demand for payment in full, GKM VP failed to do so.

183.    As a result of the failure of GKM VP to meet the Receiver's demand for payment in full, the Class B Limited Partners are each liable for his proportionate share of the unfunded capital commitment, pursuant to section 5.03 of the Amended Partnership Agreement.

184.    Via letter dated February 11, 2011, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon KIE for its remaining unfunded capital commitment, at the time totaling $1,011,672.00, and gave KIE until March 3, 2011 to pay the amount in full.  KIE failed to do so.

185.    KIE breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC its remaining proportional share of the unfunded capital commitment as demanded.

186.    The books and records of GKM SBIC reflect that KIE is currently in default in the amount of $1,011,672.00.

187.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by KIE'S breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $1,011,672.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

/ / /

24

188.   By the terms of the Amended Partnership Agreement, KIE has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder. By reason of KIE'S defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

Wherefore, the Receiver prays for a judgment as set forth below.

## COUNT XIV

## BREACH OF CONTRACT AGAINST BENY ALAGEM

189.   Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

190.   The books and records of GKM SBIC reflect that on or about December 5, 2001, Beny Alagem ("Alagem") executed the Agreement of Limited Partnership of GKM VP.

191.   The books and records of GKM SBIC reflect that on or about December 3, 2000, Alagem executed a Subscription Agreement, wherein, among other things, Alagem agreed to become a limited partner of GKM VP and agreed to a capital commitment of $500,000.00.

192.   GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Alagem and is referenced in the Agreement of Limited Partnership of GKM VP.

193.   The books and records of GKM SBIC reflect that Alagem agreed to become a Class B Limited Partner of GKM SBIC.

194.   The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Alagem.

195.   The Receiver made demand pursuant to the Partnership Agreement for payment of the unfunded capital commitment from GKM SBIC's limited partner, GKM VP. Despite the Receiver's demand for payment in full, GKM VP failed to do so.

/ / /

/ / /

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

25

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

196.    As a result of the failure of GKM VP to meet the Receiver's demand for payment in full, the Class B Limited Partners are each liable for his proportionate share of the unfunded capital commitment, pursuant to section 5.03 of the Amended Partnership Agreement.

197.    Via letter dated February 11, 2011, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Alagem for its remaining unfunded capital commitment, at the time totaling $288,625.00, and gave Alagem until March 3, 2011 to pay the amount in full.  Alagem failed to do so.

198.    Alagem breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC its remaining proportional share of the unfunded capital commitment as demanded.

199.    The books and records of GKM SBIC reflect that Alagem is currently in default in the amount of $288,625.00.

200.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Alagem's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $288,625.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

201.    By the terms of the Amended Partnership Agreement, Alagem has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder. By reason of Alagem's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

Wherefore, the Receiver prays for a judgment as set forth below.

## COUNT XV

## BREACH OF CONTRACT AGAINST MARCIANO FINANCIAL HOLDINGS II, LLC

202.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

COMPLAINT

PHDATA 3729896_2

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

203.   The books and records of GKM SBIC reflect that on or about December 17, 2003, Marciano Financial Holdings II, LLC ("MFH") executed a Subscription Agreement, wherein, among other things, MFH agreed to become a limited partner of GKM SBIC.

204.   GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to MFH and is referenced in the Subscription Agreement.

205.   Under the terms of the Amended Partnership Agreement, MFH, among other things (1) agreed to be a limited partner of GKM SBIC, (2) acknowledged and agreed to be bound by the terms of the Amended Partnership Agreement, and (3) agreed to a capital commitment of $2,496,000.00.

206.   The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of MFH.

207.   Via letter dated October 20, 2010, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon MFH for its remaining unfunded capital commitment, at the time totaling $1,413,071.00, and gave MFH until November 15, 2010 to pay the amount in full.  MFH failed to do so.

208.   Via letter dated December 22, 2010, the Receiver notified MFH that it was in default for failure to pay its remaining unfunded capital commitment.

209.   MFH breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC's its remaining proportional share of the unfunded capital commitment as demanded.

210.   The books and records of GKM SBIC reflect that MFH is currently in default in the amount of $1,413,071.00.

211.   As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by MFH's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $1,413,071.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

27

212.    By the terms of the Amended Partnership Agreement, Defendant has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Defendant's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

## COUNT XVI

## BREACH OF CONTRACT AGAINST WHYTE LYON & CO., INC.

213.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

214.    The books and records of GKM SBIC reflect that on or about January 31, 2001, Whyte Lyon & Co., Inc. ("Whyte Lyon") executed the Agreement of Limited Partnership of GKM VP.

215.    The books and records of GKM SBIC reflect that on or about January 31, 2001, Whyte Lyon executed a Subscription Agreement, wherein, among other things, Whyte Lyon agreed to become a limited partner of GKM VP and agreed to a capital commitment of $250,000.00.

216.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Whyte Lyon and is referenced in the Agreement of Limited Partnership of GKM VP.

217.    The books and records of GKM SBIC reflect that Whyte Lyon agreed to become a Class B Limited Partner of GKM SBIC.

218.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Whyte Lyon.

219.    The Receiver made demand pursuant to the Partnership Agreement for payment of the unfunded capital commitment from GKM SBIC's limited partner, GKM VP.  Despite the Receiver's demand for payment in full, GKM VP failed to do so.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

220.    As a result of the failure of GKM VP to meet the Receiver's demand for payment in full, the Class B Limited Partners are each liable for his proportionate share of the unfunded capital commitment, pursuant to section 5.03 of the Amended Partnership Agreement.

221.    Via letter dated February 11, 2011, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Whyte Lyon for its remaining unfunded capital commitment, at the time totaling $221,812.00, and gave Whyte Lyon until March 3, 2011 to pay the amount in full.  Whyte Lyon failed to do so.

222.    Whyte Lyon breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC its remaining proportional share of the unfunded capital commitment as demanded.

223.    The books and records of GKM SBIC reflect that Whyte Lyon is currently in default in the amount of $221,812.00.

224.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Whyte Lyon's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $221,812.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

225.    By the terms of the Amended Partnership Agreement, Whyte Lyon has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Whyte Lyon's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

Wherefore, the Receiver prays for a judgment as set forth below.

## COUNT XVII

## BREACH OF CONTRACT AGAINST PETER H. NEUWIRTH TRUST

226.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

/ / /

/ / /

29

227.    The books and records of GKM SBIC reflect that on or about February 6, 2001, Peter H. Neuwirth Trust ("Neuwirth Trust") executed the Agreement of Limited Partnership of GKM VP.

228.    The books and records of GKM SBIC reflect that on or about February 9, 2001, Neuwirth Trust executed a Subscription Agreement, wherein, among other things, Neuwirth Trust agreed to become a limited partner of GKM VP and agreed to a capital commitment of $100,000.00.

229.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Neuwirth Trust and is referenced in the Agreement of Limited Partnership of GKM VP.

230.    The books and records of GKM SBIC reflect that Neuwirth Trust agreed to become a Class B Limited Partner of GKM SBIC.

231.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Neuwirth Trust.

232.    The Receiver made demand pursuant to the Partnership Agreement for payment of the unfunded capital commitment from GKM SBIC's limited partner, GKM VP.  Despite the Receiver's demand for payment in full, GKM VP failed to do so.

233.    As a result of the failure of GKM VP to meet the Receiver's demand for payment in full, the Class B Limited Partners are each liable for his proportionate share of the unfunded capital commitment, pursuant to section 5.03 of the Amended Partnership Agreement.

234.    Via letter dated February 11, 2011, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Neuwirth Trust for its remaining unfunded capital commitment, at the time totaling $57,725.00, and gave Neuwirth Trust until March 3, 2011 to pay the amount in full.  Neuwirth Trust failed to do so.

235.    Neuwirth Trust breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC its remaining proportional share of the unfunded capital commitment as demanded.

30

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

236.    The books and records of GKM SBIC reflect that Neuwirth Trust is currently in default in the amount of $57,725.00.

237.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Neuwirth Trust's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $57,725.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

238.    By the terms of the Amended Partnership Agreement, Neuwirth Trust has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Neuwirth Trust's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

Wherefore, the Receiver prays for a judgment as set forth below.

## COUNT XVIII

## BREACH OF CONTRACT AGAINST MARC JONES

239.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

240.    The books and records of GKM SBIC reflect that on or about June 12, 2001, Marc Jones ("Jones") executed the Agreement of Limited Partnership of GKM VP.

241.    The books and records of GKM SBIC reflect that on or about June 12, 2001, Jones executed a Subscription Agreement, wherein, among other things, Jones agreed to become a limited partner of GKM VP and agreed to a capital commitment of $250,000.00.

242.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Jones and is referenced in the Agreement of Limited Partnership of GKM VP.

243.    The books and records of GKM SBIC reflect that Jones agreed to become a Class B Limited Partner of GKM SBIC.

/ / /

/ / /

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

244. The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Jones.

245. The Receiver made demand pursuant to the Partnership Agreement for payment of the unfunded capital commitment from GKM SBIC's limited partner, GKM VP. Despite the Receiver's demand for payment in full, GKM VP failed to do so.

246. As a result of the failure of GKM VP to meet the Receiver's demand for payment in full, the Class B Limited Partners are each liable for his proportionate share of the unfunded capital commitment, pursuant to section 5.03 of the Amended Partnership Agreement.

247. Via letter dated February 11, 2011, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Jones for its remaining unfunded capital commitment, at the time totaling $144,312.00, and gave Jones until March 3, 2011 to pay the amount in full. Jones failed to do so.

248. Jones breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC its remaining proportional share of the unfunded capital commitment as demanded.

249. The books and records of GKM SBIC reflect that Jones is currently in default in the amount of $144,312.00.

250. As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Jones' breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $144,312.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

251. By the terms of the Amended Partnership Agreement, Jones has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder. By reason of Jones' defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

Wherefore, the Receiver prays for a judgment as set forth below.

32

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

## COUNT XIX

## BREACH OF CONTRACT AGAINST APEX INVESTMENT FUND, LTD.

252.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

253.    The books and records of GKM SBIC reflect that on or about December 6, 2001, Apex Investment Fund, Ltd. ("Apex") executed the Agreement of Limited Partnership of GKM VP.

254.    The books and records of GKM SBIC reflect that on or about December 6, 2001, Apex executed a Subscription Agreement, wherein, among other things, Apex agreed to become a limited partner of GKM VP and agreed to a capital commitment of $50,000.00.

255.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Apex and is referenced in the Agreement of Limited Partnership of GKM VP.

256.    The books and records of GKM SBIC reflect that Apex agreed to become a Class B Limited Partner of GKM SBIC.

257.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Apex.

258.    The Receiver made demand pursuant to the Partnership Agreement for payment of the unfunded capital commitment from GKM SBIC's limited partner, GKM VP.  Despite the Receiver's demand for payment in full, GKM VP failed to do so.

259.    As a result of the failure of GKM VP to meet the Receiver's demand for payment in full, the Class B Limited Partners are each liable for his proportionate share of the unfunded capital commitment, pursuant to section 5.03 of the Amended Partnership Agreement.

260.    Via letter dated February 11, 2011, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Apex for its remaining unfunded capital commitment, at the time totaling $18,452.00, and gave Apex until March 3, 2011 to pay the amount in full.  Apex failed to do so.

33

261.    Apex breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC its remaining proportional share of the unfunded capital commitment as demanded.

262.    The books and records of GKM SBIC reflect that Apex is currently in default in the amount of $18,452.00.

263.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Apex's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $18,452.00 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

264.    By the terms of the Amended Partnership Agreement, Apex has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder. By reason of Apex's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

Wherefore, the Receiver prays for a judgment as set forth below.

## COUNT XX

### BREACH OF CONTRACT AGAINST GARY KREMEN

265.    Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

266.    The books and records reflect that on or about February 11, 2004, Gary Kremen ("Kremen") agreed that, in the event of default by primary partner, Defendant HJK Partners, Kremen would be obligated to pay the remaining unfunded capital commitment of HJK Partners, as the "Backup Limited Partner," under the Amended Partnership Agreement.

267.    GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Kremen.

/ / /

/ / /

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

268.    The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Kremen.

269.    The Receiver made demand pursuant to the Amended Partnership Agreement for payment of the unfunded capital commitment from Defendant HJK Partners.  Despite the Receiver's demand for payment in full, HJK Partners failed to do so.

270.    As a result of the failure of HJK Partners to meet the Receiver's demand for payment in full, the Backup Limited Partner, Kremen, is liable for the remaining unfunded capital commitment, pursuant to section 5.01 of the Amended Partnership Agreement.

271.    Via letter dated February 7, 2011, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Kremen for the remaining unfunded capital commitment, at the time totaling $113,656, and gave Kremen until February 21, 2011 to pay the amount in full.  Kremen failed to do so.

272.    Kremen breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC its remaining proportional share of the unfunded capital commitment as demanded.

273.    The books and records of GKM SBIC reflect that Kremen is currently in default in the amount of $113,656.

274.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Kremen's breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $113,656 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

275.    By the terms of the Amended Partnership Agreement, Kremen has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder. By reason of Kremen's defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

Wherefore, the Receiver prays for a judgment as set forth below.

35

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

COMPLAINT

PHDATA 3729896_2

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

## COUNT XXI

### BREACH OF CONTRACT AGAINST STEVE HUMPHREYS

276.  Plaintiff hereby refers to each of the preceding paragraphs, inclusive, and by such reference hereby incorporates and re-alleges them herein.

277.  The books and records reflect that on or about February 11, 2004, Steve Humphreys ("Humphreys") agreed that, in the event of default by primary partner, Defendant HJK Partners, Humphreys would be obligated to pay the remaining unfunded capital commitment of HJK Partners, as the "Backup Limited Partner," under the Amended Partnership Agreement.

278.  GKM SBIC's Amended Partnership Agreement, in a form identical to, or substantially similar to, GKM SBIC's Amended Partnership Agreement, was submitted to Humphreys.

279.  The Receiver and GKM SBIC have performed all conditions, covenants and promises required of them under the Amended Partnership Agreement, except where performance was prevented or excused by conduct of Humphreys.

280.  The Receiver made demand pursuant to the Amended Partnership Agreement for payment of the unfunded capital commitment from Defendant HJK Partners.  Despite the Receiver's demand for payment in full, HJK Partners failed to do so.

281.  As a result of the failure of HJK Partners to meet the Receiver's demand for payment in full, the Backup Limited Partner, Humphreys, is liable for the remaining unfunded capital commitment, pursuant to section 5.01 of the Amended Partnership Agreement.

282.  Via letter dated February 7, 2011, and in accordance with GKM SBIC's Amended Partnership Agreement, the Receiver made demand upon Humphreys for the remaining unfunded capital commitment, at the time totaling $113,656, and gave Humphreys until February 21, 2011 to pay the amount in full.  Humphreys failed to do so.

283.  Humphreys breached the terms of the Amended Partnership Agreement by, among other things, failing and refusing to pay to GKM SBIC its remaining proportional share of the unfunded capital commitment as demanded.

36

284.    The books and records of GKM SBIC reflect that Humphreys is currently in default in the amount of $113,656.

285.    As the Receiver of GKM SBIC, the Receiver has suffered damages legally caused by Humphreys' breach of the Amended Partnership Agreement as alleged herein, including, but not limited to monetary damages of not less than $113,656 plus interest recoverable pursuant to the terms of the Amended Partnership Agreement.

286.    By the terms of the Amended Partnership Agreement, Humphreys has agreed to pay reasonable attorneys' fees and costs incurred by the Receiver in enforcing its rights thereunder.  By reason of Humphreys' defaults it has become necessary for the Receiver to employ the undersigned counsel to commence and prosecute this action and the Receiver is entitled to recover its attorneys' fees and costs incurred herein.

Wherefore, the Receiver prays for a judgment as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court for a judgment in favor of the Plaintiff, as follows:

1.    On Count I:

    a.    Judgment against defendant GKM VP in the principal amount of $5,153,547;

    b.    Awarding prejudgment and post-judgment interest against GKM VP;

    c.    Awarding the Plaintiff reasonable attorneys' fees and its costs; and

    d.    For such other and further relief as this Court deems just and proper.

2.    On Count II:

    a.    Judgment against defendant Berg & Berg Enterprises LLC in the principal amount of $1,648,582.00;

    b.    Awarding prejudgment and post-judgment interest against Berg & Berg Enterprises LLC;

    c.    Awarding the Plaintiff reasonable attorneys' fees and its costs; and

    d.    For such other and further relief as this Court deems just and proper.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

37

3.    On Count III:

a.    Judgment against defendant Barry Bergman in the principal amount of $94,206.00;

b.    Awarding prejudgment and post-judgment interest against Barry Bergman;

c.    Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.    For such other and further relief as this Court deems just and proper.

4.    On Count IV:

a.    Judgment against defendant HJK Partners in the principal amount of $113,656.00;

b.    Awarding prejudgment and post-judgment interest against HJK Partners;

c.    Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.    For such other and further relief as this Court deems just and proper.

5.    On Count V:

a.    Judgment against defendant Scott Kinnear in the principal amount of $117,755.00;

b.    Awarding prejudgment and post-judgment interest against Scott Kinnear;

c.    Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.    For such other and further relief as this Court deems just and proper.

6.    On Count VI:

a.    Judgment against defendant Lang Trust in the principal amount of $176,589.00;

b.    Awarding prejudgment and post-judgment interest against Lang Trust;

c.    Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.    For such other and further relief as this Court deems just and proper.

7.    On Count VII:

a.    Judgment against defendant John McArdle in the principal amount of $58,878.00;

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

COMPLAINT

PHDATA 3729896_2

b.      Awarding prejudgment and post-judgment interest against John McArdle;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

8.      On Count VIII:

a.      Judgment against defendant Noling Family Trust in the principal amount of $58,878.00;

b.      Awarding prejudgment and post-judgment interest against Noling Family Trust;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

9.      On Count IX:

a.      Judgment against defendant Pikover Family Trust dated 5/18/96 in the principal amount of $117,755.00;

b.      Awarding prejudgment and post-judgment interest against Pikover Family Trust dated 5/18/96;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

10.     On Count X:

a.      Judgment against defendant B.N. Reznik Holdings LP in the principal amount of $58,878.00;

b.      Awarding prejudgment and post-judgment interest against B.N. Reznik Holdings LP;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

11.     On Count XI:

a.      Judgment against defendant Andrew Stergiades in the principal amount of $117,755.00;

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

COMPLAINT

PHDATA 3729896_2

b.      Awarding prejudgment and post-judgment interest against Andrew Stergiades;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

12.    On Count XII:

a.      Judgment against defendant Vivaldi LLC. in the principal amount of $471,022.00;

b.      Awarding prejudgment and post-judgment interest against Vivaldi LLC.;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

13.    On Count XIII:

a.      Judgment against defendant KIE, LLC. in the principal amount of $1,011,672.00;

b.      Awarding prejudgment and post-judgment interest against KIE, LLC.;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

14.    On Count XIV:

a.      Judgment against defendant Beny Alagem in the principal amount of $288,625.00;

b.      Awarding prejudgment and post-judgment interest against Beny Alagem;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

15.    On Count XV:

a.      Judgment against defendant Marciano Financial Holdings II LLC in the principal amount of $1,413,071.00;

b.      Awarding prejudgment and post-judgment interest against Marciano Financial Holdings II LLC;

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

COMPLAINT

PHDATA 3729896_2

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

16.     On Count XVI:

a.      Judgment against defendant Whyte Lyon & Co., Inc. in the principal amount of $221,812.00;

b.      Awarding prejudgment and post-judgment interest against Whyte Lyon & Co., Inc.;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

17.     On Count XVII:

a.      Judgment against defendant Peter H. Neuwirth Trust in the principal amount of $57,725.00;

b.      Awarding prejudgment and post-judgment interest against Peter H. Neuwirth Trust;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

18.     On Count XVIII:

a.      Judgment against defendant Marc Jones in the principal amount of $144,312.00;

b.      Awarding prejudgment and post-judgment interest against Marc Jones;

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

19.     On Count XIX:

a.      Judgment against defendant Apex Investment Fund, Ltd. in the principal amount of $18,452.00;

b.      Awarding prejudgment and post-judgment interest against Apex Investment Fund, Ltd.;

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

41

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

20.    On Count XX:

a.      Judgment against defendant Gary Kremen (backup to HJK) in the principal amount of $113,656.00;

b.      Awarding prejudgment and post-judgment interest against Gary Kremen (backup to HJK);

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

21.    On Count XXI:

a.      Judgment against defendant Steve Humphreys (backup to HJK) in the principal amount of $113,656.00;

b.      Awarding prejudgment and post-judgment interest against Steve Humphreys (backup to HJK);

c.      Awarding the Plaintiff reasonable attorneys' fees and its costs; and

d.      For such other and further relief as this Court deems just and proper.

COMPLAINT

PHDATA 3729896_2

Dated: 4-17 , 2012

SCHNADER HARRISON SEGAL & LEWIS LLP

By: _____
    Gregory C. Nuti
    Attorneys for Plaintiff
    United States Small Business
    Administration in Its Capacity as Receiver
    for Rocket Ventures II SBIC, L.P.

Dated: 4-17 , 2012

U.S. SMALL BUSINESS ADMINISTRATION

By: _____
    Arlene M. Embrey
    Office of General Counsel
    Attorneys for Plaintiff,
    United States Small Business
    Administration in its capacity as Receiver
    for Rocket Ventures II SBIC, L.P.

SCHNADER HARRISON SEGAL & LEWIS LLP
601 CALIFORNIA STREET, SUITE 1200
SAN FRANCISCO, CA 94108-2817
(415) 364-6700
FAX: (415) 364-6785

COMPLAINT

PHDATA 3729896_2

# EXHIBIT A

1  GEORGE S. CARDONA
2  Acting United States Attorney
   LEON W. WEIDMAN
3  Assistant United States Attorney
4  Chief, Civil Division
   RUSSELL W. CHITTENDEN (CA Bar No. 112613)
5  Assistant United States Attorney
6    Room 7516, Federal Building
7    300 North Los Angeles Street
     Los Angeles, California 90012
8    Email: russell.chittenden@usdoj.gov
9    Telephone:  (213) 894-2444
     Fax:        (213) 894-7819
10 ARLENE M. EMBREY (FL Bar No. 125539)
11 Trial Attorney
12   U.S. Small Business Administration
     409 3rd Street, S.W., 7th Floor
13   Washington, D.C. 20416
14   Email: arlene.embrey@sba.gov
     Telephone:  (202) 205-6976
15   Fax:        (202) 481-0324
16
17 Attorneys for Plaintiff
   United States of America
18

19         IN THE UNITED STATES DISTRICT COURT
20      FOR THE CENTRAL DISTRICT OF CALIFORNIA
              WESTERN DIVISION
21

22 UNITED STATES OF AMERICA,        )   No. CV10 4316
23                                  )
           Plaintiff,               )   Consent Order
24                                  )
                                    )
25         v.                       )
                                    )
26                                  )
   GKM SBIC, L.P.                   )
27                                  )
                                    )
28         Defendant.               )
                                    )

1

Before this Court is the Complaint by the United States of America, on behalf of the United States Small Business Administration ("SBA"), for the appointment of the SBA as Receiver for GKM SBIC, LP ("GKM"). The Court, being fully advised as to the merits, and based upon the consent of the parties that this order be entered on or after June 1, 2010, believes this relief should be granted.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.   Pursuant to the provisions of 15 U.S.C. § 687c, this Court shall take exclusive jurisdiction of GKM, and all of its assets, wherever located, and the United States Small Business Administration ("SBA"), is hereby appointed receiver ("the Receiver") of GKM to serve without bond until further order of this Court. The Receiver is appointed for the purpose of administering, marshalling and, if necessary, liquidating all of GKM's assets to satisfy the claims of creditors therefrom in the order of priority as determined by this Court.

2.   The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the general partners, managers, officers, and directors of GKM under applicable state and federal law and by the Certificate of Limited Partnership and Partnership Agreement of said partnership, in addition to all powers and authority conferred upon the

Receiver by the provisions of 15 U.S.C. § 687c and 28 U.S.C. § 754. The general partners, managers, directors, officers, employees and agents of GKM are hereby dismissed. Such persons shall have no authority with respect to GKM's operations or assets, except as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operation of GKM and shall pursue and preserve all of its claims.

3. The past and/or present officers, directors, agents, managers, general partners, accountants, attorneys and employees of GKM, as well as all those acting in their place, are hereby ordered and directed to turn over to the Receiver forthwith all books, records, documents, accounts and all other instruments and papers of said partnership and all other assets and property of the partnership, whether real or personal. GKM shall furnish a written statement within five (5) days after the entry of this Order, listing the identity, location and estimated value of all assets of GKM as well as the names, addresses and amounts of claims of all known creditors of GKM. All persons having control, custody or possession of any assets or property of GKM, including its former General Partners are hereby directed to turn such property over to the Receiver.

4. The Receiver shall promptly give notice of its appointment to all known officers, directors, agents, managers, general partners, employees,

limited partners, creditors, debtors and agents of GKM. All persons and entities owing any obligations or debts to GKM shall, until further order of this Court, pay all such obligations in accordance with the terms thereof to the Receiver, and its receipt for such payments shall have the same force and effect as if GKM had received such payments.

5.     The Receiver is hereby authorized to open such Receiver's bank accounts, at banking or other financial institutions, to extend credit on behalf of GKM, to utilize SBA personnel, and to employ such other personnel as necessary to effectuate the operation of the receivership including, but not limited to, attorneys and accountants, and is further authorized to expend receivership funds to compensate such personnel in such amounts and upon such terms as the Receiver shall deem reasonable in light of the usual fees and billing practices and procedures of such personnel. The Receiver is not required to obtain Court approval prior to the disbursement of receivership funds for payments to personnel employed by the Receiver or payments for expenses incidental to administration of the Receivership. In addition, the Receiver is authorized to reimburse the SBA or its employees for travel expenses incurred by SBA personnel in the establishment and administration of the receivership. The Receiver may, without further order of this Court,

transfer, compromise, or otherwise dispose of any claim or asset, other than real estate, which would result in net proceeds to the Receiver.

6. In accordance with the Federal Rules of Civil Procedure and if so requested by the Receiver, GKM's past and/or present officers, directors, agents, managers, general partners, limited partners, employees, and other appropriate persons (including, without limitation, the defendant's portfolio of small business concerns and of banks or other financial institutions doing business with defendant and/or defendant's portfolio of small business concerns) shall answer or provide answers , to all questions put to them by the Receiver regarding the business of GKM, or any other matter relevant to the operation or administration of the GKM receivership or the collection of funds due to GKM. In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons, the production of documents, information, or any other form of discovery concerning the assets, property or business assets of GKM or any other matter relevant to the operation or administration of the Receivership or the collection of funds due to GKM, the Receiver shall provide notice of such to such persons in accordance with the Federal Rules of Civil Procedure.

7. In accordance with 15 U.S.C. 687c, the parties or prospective parties to any and all civil legal proceedings wherever located, including, but

not limited to arbitration proceedings, bankruptcy or foreclosure actions,

default proceedings, or any other proceedings involving GKM or any assets of

GKM, involving GKM or its present or past officers, directors, managers, or

general partners (including the managers or members of such general partner)

or the Receiver, sued for, or in connection with, any action taken by them

while acting in such capacity are hereby enjoined from taking any action,

including discovery, commencing or continuing any legal proceeding of any

nature in connection with any proceeding until further Order of this Court.

8.      In accordance with 15 U.S.C. §687c, all civil legal proceedings

wherever located, including arbitration proceedings, foreclosure activities,

bankruptcy actions, or default proceedings, but excluding the instant

proceeding, involving GKM or any of its assets or any action of any nature

taken by GKM's present or past officers, directors, managers, or general

partners (including the managers or members of such general partner) sued

for, or in connection with, any action taken by them while acting in their

official capacity, are stayed in their entirety, and all Courts having any

jurisdiction thereof are enjoined from taking or permitting any action until

further Order of this Court.

9.      GKM and its past and/or present directors, officers, managers,

general partners, agents, employees and other persons acting in concert or

participation therewith be, and they hereby are, enjoined from either directly or indirectly taking any actions or causing any such action to be taken which would dissipate the assets and property of GKM to the detriment of the Receiver appointed in this cause, including but not limited to destruction of partnership records, or which would violate the Small Business Investment Act of 1958, as amended, (the "SBIA"), 15 U.S.C. Section 661 et seq., or the regulations promulgated thereunder, (the "Regulations"), 13 C.F.R. § 107.1 et seq.

10.     The Receiver is authorized to borrow on behalf of GKM, from the SBA, up to $1,000,000, and is authorized to cause GKM to issue Receiver's Certificates of Indebtedness in the principal amounts of the sums borrowed, which certificates will bear interest at or about 10 percent per annum and will have a maturity date no later than 18 months after the date of issue. Said Receiver's Certificates of Indebtedness shall have priority over all other debts and obligations of GKM, excluding administrative expenses of the Receivership, whether presently existing or hereinafter incurred, including without limitation any claims of partners of GKM.

11.     This Court determines and adjudicates that GKM has violated 13 C.F.R. § 107.1830(b) and 13 C.F.R. § 107.507(a) of the Regulations as alleged in the Complaint filed in this matter. After completing its activities in

7

accordance with this Order, the Receiver may recommend that GKM's license as an SBIC be revoked.

DATED: 7/19/10 _____


_christina a. Snyder_
UNITED STATES DISTRICT JUDGE


Presented by:

GEORGE S. CARDONA
Acting United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
RUSSELL W. CHITTENDEN
Assistant United States Attorney


Arlene M. Embrey, Esq.
Counsel for United States Small Business Administration


Michael R. Wyatt, Esq.
Hogan & Hartson, LLP
Counsel for Defendant

# EXHIBIT B

# GKM SBIC, L.P.

## AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP

Dated as of June 17, 2002

# GKM SBIC, L.P.

## Table of Contents

| | | |
|---|---|---|
| **ARTICLE 1** | **GENERAL PROVISIONS** ........................................................1 | |
| Section 1.01 | Definitions. ...........................................................................1 | |
| Section 1.02 | Name. ...................................................................................9 | |
| Section 1.03 | Principal Office; Registered Office; and Qualification. ...............9 | |
| Section 1.04 | Commencement and Duration. ................................................10 | |
| Section 1.05 | Admission of Partners. ..........................................................10 | |
| Section 1.06 | Representations of Partners. ...................................................11 | |
| Section 1.07 | Notices With Respect to Representations by Private Limited Partners. ..............................................................................12 | |
| Section 1.08 | Liability of Partners. .............................................................13 | |
| **ARTICLE 2** | **PURPOSE AND POWERS** .....................................................14 | |
| Section 2.01 | Purpose and Powers. .............................................................14 | |
| Section 2.02 | Restrictions on Powers. .........................................................14 | |
| Section 2.03 | Unrelated Business Taxable Income. .......................................14 | |
| Section 2.04 | Venture Capital Operating Company. ......................................15 | |
| **ARTICLE 3** | **MANAGEMENT** .................................................................15 | |
| Section 3.01 | Authority of General Partner. .................................................15 | |
| Section 3.02 | Authority of the Private Limited Partners. ...............................16 | |
| Section 3.03 | Authority of the Preferred Limited Partners. ............................16 | |
| Section 3.04 | Acknowledgement of SBA Authority. ......................................16 | |
| Section 3.05 | The Investment Adviser/Manager. ..........................................17 | |
| Section 3.06 | Restrictions on Other Activities of the General Partner and its Affiliates. ...........................................................................17 | |
| Section 3.07 | Management Compensation. ..................................................17 | |
| Section 3.08 | Payment of Management Compensation. ..................................19 | |
| Section 3.09 | Partnership Expenses. ...........................................................19 | |
| Section 3.10 | Valuation of Assets. ..............................................................21 | |
| Section 3.11 | Standard of Care. .................................................................21 | |
| Section 3.12 | Indemnification. ..................................................................21 | |
| **ARTICLE 4** | **SMALL BUSINESS INVESTMENT COMPANY MATTERS** ..................................................................24 | |
| Section 4.01 | SBIC Act. ............................................................................24 | |
| Section 4.02 | Consent or Approval of, and Notice to, SBA. ...........................24 | |
| Section 4.03 | Provisions Required by the SBIC Act for Issuers of Participating Securities. ...........................................................25 | |
| Section 4.04 | Provisions Required by the SBIC Act for Issuers of Debentures. .........................................................................25 | |
| Section 4.05 | Effective Date of Incorporated SBIC Act Provisions. .................26 | |
| Section 4.06 | Admission of Preferred Limited Partners and Increased Commitments. ......................................................................26 | |
| Section 4.07 | Redemption and Withdrawal of Preferred Limited Partners. ...........27 | |
| Section 4.08 | Assignment of Right to Distributions by a Preferred Limited Partner. ...............................................................................28 | |

i

| | | |
|---|---|---|
| Section 4.09 | Priority of Preferred Limited Partnership Interests on Liquidation. | 28 |
| Section 4.10 | SBA as Third Party Beneficiary. | 28 |
| Section 4.11 | Interest of the General Partner After Withdrawal. | 28 |
| **ARTICLE 5** | **PARTNERS' CAPITAL CONTRIBUTIONS** | **28** |
| Section 5.01 | Capital Commitments. | 28 |
| Section 5.02 | Capital Contributions by the Class A Limited Partners. | 29 |
| Section 5.03 | Capital Contributions by the Class B Limited Partners | 29 |
| Section 5.04 | Capital Contributions by Preferred Limited Partners. | 30 |
| Section 5.05 | Capital Contributions by the General Partner. | 30 |
| Section 5.06 | Additional Private Limited Partners and Increased Commitments. | 30 |
| Section 5.07 | Additional, Substitute and Transferee Class A Limited Partners. | 31 |
| Section 5.08 | Conditions to the Commitments of the General Partner and the Private Limited Partners. | 31 |
| Section 5.09 | Termination of the Obligation to Contribute Capital. | 32 |
| Section 5.10 | Notice and Opinion of Counsel. | 32 |
| Section 5.11 | Cure, Termination of Capital Contributions and Withdrawal. | 32 |
| Section 5.12 | Failure to Make Required Capital Contributions. | 33 |
| Section 5.13 | Notice and Consent of SBA with respect to Capital Contribution Defaults. | 33 |
| Section 5.14 | Interest on Overdue Contributions. | 34 |
| Section 5.15 | Termination of a Private Limited Partner's Right to Make Further Capital   Contributions. | 34 |
| Section 5.16 | Forfeiture of a Private Limited Partner's Interest in the Partnership. | 35 |
| Section 5.17 | Withholding and Application of a Private Limited Partner's Distributions. | 35 |
| Section 5.18 | Required Sale of a Private Limited Partner's Interest in the Partnership. | 35 |
| **ARTICLE 6** | **ADJUSTMENT OF CAPITAL ACCOUNTS** | **37** |
| Section 6.01 | Establishment of Capital Accounts. | 37 |
| Section 6.02 | Time of Adjustment of Capital Accounts. | 38 |
| Section 6.03 | Adjustments to Capital Accounts. | 38 |
| Section 6.04 | Tax Matters. | 40 |
| **ARTICLE 7** | **DISTRIBUTIONS** | **41** |
| Section 7.01 | Distributions to Partners. | 41 |
| Section 7.02 | Distributions of Noncash Assets in Kind. | 42 |
| Section 7.03 | Apportionment of Distributions Among the General Partner and Private Limited Partners. | 43 |
| Section 7.04 | Distributions for Payment of Tax. | 43 |
| Section 7.05 | Distributions Violative of the Act Prohibited. | 44 |
| **ARTICLE 8** | **DISSOLUTION, LIQUIDATION, WINDING UP AND WITHDRAWAL** | **44** |
| Section 8.01 | Dissolution. | 44 |

ii

| Section 8.02 | Winding Up. | 45 |
|---|---|---|
| Section 8.03 | Withdrawal of the General Partner. | 46 |
| Section 8.04 | Continuation of the Partnership After the Withdrawal of the General Partner. | 46 |
| Section 8.05 | Withdrawals of Capital. | 46 |
| Section 8.06 | Withdrawal by ERISA Regulated Pension Plans. | 47 |
| Section 8.07 | Withdrawal by Government Plans Complying with State and Local Law. | 47 |
| Section 8.08 | Withdrawal by Government Plans Complying with ERISA. | 47 |
| Section 8.09 | Withdrawal by Tax Exempt Private Limited Partners. | 48 |
| Section 8.10 | Withdrawal by Registered Investment Companies. | 48 |
| Section 8.11 | Distributions on Withdrawal. | 48 |
| **ARTICLE 9** | **ACCOUNTS, REPORTS AND AUDITORS** | **49** |
| Section 9.01 | Books of Account. | 49 |
| Section 9.02 | Audit and Report. | 49 |
| Section 9.03 | Fiscal Year. | 50 |
| **ARTICLE 10** | **MISCELLANEOUS** | **50** |
| Section 10.01 | Assignability. | 50 |
| Section 10.02 | Assignability of Class B Limited Partnership Interests. | 52 |
| Section 10.03 | Binding Agreement. | 52 |
| Section 10.04 | Gender. | 52 |
| Section 10.05 | Notices. | 52 |
| Section 10.06 | Consents and Approvals. | 53 |
| Section 10.07 | Counterparts. | 53 |
| Section 10.08 | Amendments. | 53 |
| Section 10.09 | Power of Attorney. | 55 |
| Section 10.10 | Applicable Law. | 55 |
| Section 10.11 | Severability. | 55 |
| Section 10.12 | Entire Agreement. | 56 |

## EXHIBITS

| Exhibit I | - | Partners and Commitments |
|---|---|---|
| Exhibit I-A | - | Instrument of Admission or Increase in Commitment for a Preferred Limited Partner |
| Exhibit II | - | Valuation Guidelines |
| Exhibit III | - | Definition of Institutional Investor |

WDC - 83555/0001 - 1386423 v8

## GKM SBIC, L.P.

This AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is dated and effective as of June 17, 2002, among GKM SBIC Management, LLC, a Delaware limited liability company (in its capacity as a general partner of the Partnership (the "General Partner")), the Private Limited Partners, and the preferred limited partner, as amended from time to time.

WHEREAS the General Partner and the Private Limited Partner entered into that certain Agreement of Limited Partnership of GKM SBIC, L.P. on February 28, 2002 (the "Original Agreement"), which was evidenced by the execution of the signature page of the Original Agreement by the General Partner and the Private Limited Partner;

WHEREAS the U.S. Small Business Administration (the "SBA") has requested that the General Partner make certain amendments to the Original Agreement to ensure compliance with the Small Business Investment Act of 1958, as amended, and the rules and regulations promulgated thereunder (the "SBIC Act"); and

WHEREAS the General Partner believes it is advisable to make the amendments to the Original Agreement requested by the SBA through an amendment and restatement of the Original Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree to continue the Partnership, upon the terms and conditions set forth herein.

## ARTICLE 1
## GENERAL PROVISIONS

**Section 1.01    Definitions.**

For the purposes of this Agreement, the following terms have the following meanings:

"**Act**" means the Delaware Revised Uniform Limited Partnership Act.

"**Accumulated Prioritized Payments**" has the meaning stated in the SBIC Act.

"**Additional Private Limited Partners**" has the meaning stated in Section 5.06.

"**Adjustments**" has the meaning stated in the SBIC Act.

"**Advisory Committee**" means the advisory committee of the Partnership established pursuant to Section 3.13.

1

"**Affiliate**" has the meaning stated in the SBIC Act.

"**Agreement**" means this agreement of limited partnership, as amended from time to time. References to this Agreement will be deemed to include all provisions incorporated in this Agreement by reference.

"**Assets**" means common and preferred stock (including warrants, rights and other options relating to such stock), notes, bonds, debentures, trust receipts and other obligations, instruments or evidences of indebtedness, and other properties or interests commonly regarded as securities, and in addition, interests in real property, whether improved or unimproved, and interests in personal property of all kinds (tangible or intangible), choses in action, and cash, bank deposits and so-called "money market instruments".

"**Assets Under Management**" means, as of any specified date, the value of all Assets owned by the Partnership (the value to be determined as provided in this Agreement), including contributions requested and due from Partners and uncalled amounts of Commitments that are included in the Partnership's Regulatory Capital, less the amount of any liabilities of the Partnership, determined in accordance with generally accepted accounting principles, consistently applied.

"**Associate**" has the meaning stated in the SBIC Act.

"**Back-Up Limited Partner**" means those individuals and entities so designated on Exhibit I to this Agreement and such other individuals and entities admitted to the Partnership after the date hereof as Back-Up Private Limited Partners pursuant to this Agreement, which individuals and entities are obligated to meet the Capital Contribution obligations of a designated Primary Partner in the event such Primary Partner defaults under its obligation to make a Capital Contribution to the Partnership.

"**Capital Account**" means the account of each Partner that reflects its interest in the Partnership determined in accordance with Section 6.03.

"**Capital Contribution**" means a contribution of capital to the Partnership by a Partner.

"**Certificate of Limited Partnership**" means the certificate of limited partnership with respect to the Partnership filed for record in the office of the Secretary of State of the State of Delaware.

"**Charge**" has the meaning stated in the SBIC Act.

"**Class A Limited Partner**" means the Parent Fund and such other individuals and entities admitted to the Partnership after the date hereof as Class A Limited Partners pursuant to this Agreement.

2

**"Class B Limited Partners"** means those individuals and entities so designated on Exhibit I to this Agreement and such other individuals and entities admitted to the Partnership after the date hereof as Class B Limited Partners pursuant to this Agreement. Initially, Class B Limited Partners shall be partners of the Parent Fund.

**"Closing Capital Account"** means, with respect to any fiscal period, the Opening Capital Account of each Partner for the fiscal period after allocations have been made to the Capital Account in accordance with Section 6.03.

**"Code"** means the Internal Revenue Code of 1986, as amended, and the regulations thereunder and interpretations thereof promulgated by the Internal Revenue Service, as in effect from time to time.

**"Commitments"** means the capital contributions to the Partnership that the Preferred Limited Partners have made and the other Partners have made or are obligated to make to the Partnership. The amounts and terms of the Commitments of the General Partner, the Private Limited Partners, and the Preferred Limited Partners will be as stated in this Agreement.

**"Control Person"** has the meaning stated in the SBIC Act.

**"Debentures"** has the meaning stated in the SBIC Act.

**"Designated Party"** means any of the General Partner, any Investment Adviser/ Manager, and any partner, member, manager, stockholder, director, officer, employee or Affiliate of the General Partner and any Investment Adviser/ Manager.

**"Director Fees"** means the fees and the value (determined by the Advisory Committee at the time of receipt) of any options, warrants or other non-cash compensation paid by a portfolio company to the General Partner or its Affiliates (other than the Partnership or the Parent Fund) for services rendered by the General Partner or any of its members, employees or Affiliates for (a) serving as a director (or similar person) of the portfolio company (but not including any reimbursement of expenses of any such person by the Portfolio Company) or (b) advising, monitoring, consulting, or the provision of similar services to a Portfolio Company (but not including fees paid to GKM by a Portfolio Company for investment banking, consulting or similar services rendered by GKM); provided, however, that Director Fees and Transaction Fees (other than to the extent such fees are described in 13 C.F.R. § 107.860) shall not include a cumulative total of up to $200,000 of such fees or non-cash compensation actually paid to the General Partner or any of its members, employees or Affiliates. Under all circumstances, any investment banking fees charged to portfolio companies of the Partnership by GKM or another Associate may be charged only on funds raised from investors other than the Partnership.

3

"**Distributable Security**" has the meaning stated in the SBIC Act.

"**Earned Prioritized Payments**" has the meaning stated in the SBIC Act.

"**Earmarked Assets**" has the meaning stated in the SBIC Act.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder and interpretations thereof promulgated by the Department of Labor, as in effect from time to time.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the regulations thereunder and interpretations thereof promulgated by the Securities and Exchange Commission, as in effect from time to time.

"**General Partner**" means the general partner or general partners of the Partnership, as set forth in this Agreement.

"**GKM**" means Gerard Klauer Mattison & Co., Inc. or any of its subsidiaries.

"**Indemnifiable Costs**" means all costs, expenses, damages, claims, liabilities, fines and judgments (including the reasonable cost of the defense, and any sums which may be paid with the consent of the Partnership in settlement), incurred in connection with or arising from a claim, action, suit, proceeding or investigation, by or before any court or administrative or legislative body or authority.

"**Initial Closing**" means February 28, 2002, which is the date that the Original Agreement was executed.

"**Investment Advisers Act**" means the Investment Advisers Act of 1940, as amended, and the regulations thereunder and interpretations thereof promulgated by the Securities and Exchange Commission, as in effect from time to time.

"**Investment**" means the securities acquired by the Partnership in any other corporation, partnership, limited liability company, or any or business or concern in which the Partnership becomes an investor in accordance with the provisions of this Agreement, including capital stock, partnership interests, bonds, notes, debentures, warrants, trust receipts, futures and other obligations and instruments or evidences of indebtedness, as well as rights and options to purchase, sell or invest in the foregoing. Except where the context requires otherwise, any reference to an "Investment" shall refer to all securities acquired by the Partnership with respect to a portfolio company in a single or a series of related transactions.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended, and the regulations thereunder and interpretations thereof

4

promulgated by the Securities and Exchange Commission, as in effect from time to time.

**"Investment Adviser/Manager"** has the meaning stated in the SBIC Act.

**"Investment Management Agreement"** means the Investment Management Agreement dated as of the date hereof among the Partnership, the General Partner and _____, the initial Investment Adviser/Manager.

**"Leverage"** has the meaning stated in the SBIC Act.

**"Management Compensation"** means the amounts payable by the Partnership to the General Partner or Investment Adviser/Manager, as provided in Section 3.07.

**"Maximum Tax Liability"** has the meaning stated in the SBIC Act.

**"Net Losses"** means, with respect to any fiscal period, the excess, if any, of:

   (i)  all expenses and losses incurred during the fiscal period by the Partnership from all sources over

   (ii)  the aggregate revenue, income and gains realized during the fiscal period by the Partnership from all sources.

   For purposes of determining Net Losses:

   (A)  items will be taken into account to the extent that (1) they are includable as items of income, credit, loss or deduction for Federal income tax purposes (including items described in Section 705(a)(2)(B) of the Code, or treated as so described in Treasury Regulation § 1.704-1(b)(2)(iv)(i)) or, (2) in the case of items of income, they constitute income that is exempt from Federal income tax; and

   (B)  if any Noncash Asset is distributed in kind, it will be deemed sold at the value established at the most recent valuation of the Noncash Asset under this Agreement (or such other valuation date as is required under the SBIC Act) and any unrealized appreciation or depreciation with respect to the Noncash Asset will be deemed realized and included in the determination of Net Losses.

**"Net Profits"** means, with respect to any fiscal period, the excess, if any, of:

   (i)  the aggregate revenue, income and gains realized during the fiscal period by the Partnership from all sources over

5

    (ii) all expenses and losses incurred during the fiscal period by the Partnership from all sources.

For purposes of determining Net Profits:

(A)    items will be taken into account to the extent that (1) they are includable as items of income, credit, loss or deduction for Federal income tax purposes (including items described in Section 705(a)(2)(B) of the Code, or treated as so described in Treasury Regulation § 1.704-1(b)(2)(iv)(i)) or, (2) in the case of items of income, constitute income that is exempt from Federal income tax; and

(B)    if any Noncash Asset is distributed in kind, it will be deemed sold at the value established at the most recent valuation of the Noncash Asset under this Agreement (or such other valuation date as is required under the SBIC Act) and any unrealized appreciation or depreciation with respect to the Noncash Asset will be deemed realized and included in the determination of Net Profits.

**"Noncash Asset"** means any Asset of the Partnership other than cash.

**"Optionor"** shall have the meaning set forth in Section 5.18.

**"Optionees"** shall have the meaning set forth in Section 5.18.

**"Optioned Partnership Interest"** shall have the meaning set forth in Section 5.18.

**"Option Price"** shall have the meaning set forth in Section 5.18(a).

**"Opening Capital Account"** with respect to any fiscal period, means:

(i)    with respect to any Partner admitted during the fiscal period, the Partners initial capital contribution (or in the case of any Partner admitted as a transferee of all or part of the interest in the Partnership of another Partner, with respect to such transferred interest in the Partnership, that portion of the transferor's initial capital contribution transferred to the transferee); and

(ii)    with respect to any Partner admitted during any prior fiscal period (other than a Partner who has withdrawn as of the last day of the preceding fiscal period), the Partner's Closing Capital Account for the preceding fiscal period (or in the case of any Partner admitted as a transferee of all or part of the interest in the Partnership of another Partner, with respect to such transferred interest in the Partnership, that portion of the transferor's Closing Capital Account transferred to the transferee).

6

"**Organization Expenses**" shall mean all organizational and syndication costs, fees, and expenses incurred by or on behalf of the General Partner in connection with the formation, organization, marketing and licensing of the Partnership and the formation and organization of the General Partner, which include, without limitation, all interest expense, accounting and legal fees, any fees associated with placing interests in the Partnership, all costs incurred in connection with making, registering and selling Partnership investments, including but not limited to, travel, meeting, printing, telephone, office and support staff costs, and the cost of meetings held in connection therewith (including reimbursement of the General Partner and the members, officers and employees of the General Partner for such expenses).

"**Original Agreement**" means that certain Agreement of Limited Partnership of GKM SBIC, L.P. dated February 28, 2002.

"**Outstanding Leverage**" means the total amount of outstanding securities (including, but not limited to, Debentures and Participating Securities) issued by the Partnership that qualify as Leverage and have not been redeemed or repaid as provided in the SBIC Act.

"**Parent Fund**" means GKM Venture Partners, L.P.

"**Parent Fund Advisory Committee**" means the advisory committee of the Parent Fund established pursuant to the Parent Fund Agreement.

"**Parent Fund Agreement**" means the Agreement of Limited Partnership of GKM Venture Partners, L.P. dated as of March 17, 2000 among GKM Venture Partners, L.P. and the partners named therein, as amended.

"**Participating Security**" has the meaning stated in the SBIC Act.

"**Partners**" means the General Partner, the Private Limited Partners and the Preferred Limited Partners, if any.

"**Partnership**" means the limited partnership established by this Agreement.

"**_____ percent (\_\_%) in interest of the Private Limited Partners**" means Private Limited Partners whose capital contributions represent such percentage of the capital contributions of all Private Limited Partners as of the time of determination.

"**Percentage Interest**" means the percentage determined for each Partner (other than any Preferred Limited Partner) by dividing (i) the aggregate Capital Contributions credited to such Partner's Capital Account as provided in Section 6.03 below at the time of any relevant calculation, by (ii) the aggregate Capital Contributions credited to the Capital Accounts of all the Partners (other than any Preferred Limited Partner) at such time. The sum of

the respective Percentage Interests shall at all times equal one hundred percent (100%).

**"Permitted Distributions"** means any distribution made under 13 C.F.R. § 107.1570 which reduces Regulatory Capital and any distribution made under 13 C.F.R. § 107.585 which reduces Regulatory Capital by no more than two percent or which SBA approves for inclusion in the management fee calculation.

**"Primary Partner"** means a Partner in respect of which a designated Back-Up Private Limited Partner is obligated to meet the Capital Contribution obligations in the event such Primary Partner defaults under its obligation to make a Capital Contribution to the Partnership.

**"Preferred Limited Partner"** means SBA, in its capacity as the holder of a Preferred Limited Partnership Interest, or any successor in interest to SBA in its capacity as a Preferred Limited Partner.

**"Preferred Limited Partnership Interest"** means a preferred limited partnership interest in the Partnership which qualifies as a Participating Security.

**"Prioritized Payment"** has the meaning stated in the SBIC Act.

**"Private Capital"** has the meaning stated in the SBIC Act.

**"Private Limited Partners"** means the Class A Limited Partner, the Class B Limited Partners and the Back-Up Limited Partners, but does not include the Preferred Limited Partner.

**"Profit Participation"** has the meaning stated in the SBIC Act.

**"Proportionate Share"** means the percentage set forth on <u>Exhibit I</u> to this Agreement.

**"Qualified Nonprivate Funds"** has the meaning stated in the SBIC Act.

**"Remaining Portion"** shall have the meaning set forth in <u>Section 5.18(b)</u>.

**"Regulatory Capital"** has the meaning stated in the SBIC Act.

**"Retained Earnings Available for Distribution"** has the meaning stated in the SBIC Act.

**"SBA"** means the United States Small Business Administration.

**"SBA Agreements"** has the meaning stated in <u>Section 10.12</u>.

**"SBIC"** means a small business investment company licensed under the SBIC Act.

8

"**SBIC Act**" means the Small Business Investment Act of 1958, as amended, and the rules and regulations thereunder and interpretations thereof promulgated by SBA, as in effect from time to time.

"**SEC**" means the Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the regulations thereunder and interpretations thereof promulgated by the SEC, as in effect from time to time.

"**Special Private Limited Partner**" has the meaning stated in <u>Section 8.03(c)</u>.

"**Transaction Fees**" shall mean any fees received by the General Partner or its Affiliates (other than the Partnership) that are related to services performed or actions taken by the General Partner or any of its members, employees or Affiliates in connection with an Investment, the Partnership's failure to consummate a proposed Investment, or the ongoing operations of a portfolio company (but not including fees paid to GKM by a portfolio company of the Partnership for investment banking, consulting or similar services rendered by GKM). The fees would include breakup fees, transaction fees, advisory fees, consulting fees, management fees, and any fees for investment banking services, subject to the exclusion set forth under the definition of Director Fees set forth above.

**Section 1.02**    <u>Name</u>.

(a)    The name of the Partnership will be "GKM SBIC, L.P."

(b)    Subject to the prior approval of SBA, the General Partner has the power at any time to:

(i)    change the name of the Partnership; and

(ii)    qualify the Partnership to do business under any name when the Partnership's name is unavailable for use, or may not be used, in a particular jurisdiction.

(c)    The General Partner will give prompt notice of any action taken under this Section to each Partner and SBA.

**Section 1.03**    <u>Principal Office; Registered Office; and</u> **Qualification.**

(a)    The principal office of the Partnership will be at 11150 Santa Monica Boulevard, Suite 800, Los Angeles, CA 90025, or such other place as may from time to time be designated by the General Partner, subject to the approval of SBA.

(b)   The registered office of the Partnership in the State of Delaware will be located at [1209 Orange Street, Wilmington, Delaware, 19801]. The name of the registered agent for the Partnership will be [The Corporation Trust Center]. The General Partner may from time to time change the registered agent and registered office of the Partnership.

(c)   The General Partner will qualify the Partnership to do business in each jurisdiction where the activities of the Partnership make such qualification necessary.

(d)   The General Partner will give prompt notice of any action taken under this Section to each Partner and SBA.

**Section 1.04   Commencement and Duration.**

(a)   The Partnership will commence upon the filing for record of the Certificate of Limited Partnership in the office of the Secretary of State of the State of Delaware.

(b)   The Partnership will be dissolved and wound up at the time and in the manner provided for in Article 8.

**Section 1.05   Admission of Partners.**

(a)   No person may be admitted as a General Partner or a Private Limited Partner without subscribing and delivering to the Partnership a counterpart of this Agreement, or other written instrument, which sets forth:

(i)    the name and address of the Partner,

(ii)   the Commitment of the Partner, and

(iii)  the agreement of the Partner to be bound by the terms of this Agreement.

(b)   Without the prior approval of SBA, no person may be admitted as:

(i)    a General Partner, or

(ii)   a Private Limited Partner with an ownership interest of ten percent (10%) or more of the Partnership's capital.

(c)   No one may be admitted as a Preferred Limited Partner without subscribing and delivering to the Partnership an executed Instrument of Admission substantially in the form of Exhibit I-A attached to this Agreement.

(d)   The General Partner will compile, and amend from time to time as necessary, Exhibit I to this Agreement, which will list (i) the name and address of the General and each Private Limited Partner and (ii) the Commitment of the General

10

Partner and each Private Limited Partner to the Partnership, and shall indicate for each Back-Up Private Limited Partner, the Primary Partner with respect to which such Back-Up Private Limited Partner has a back-up Capital Contribution obligation.

(e)    The addition to the Partnership at any time of one or more Partners will not be a cause for dissolution of the Partnership, and all the Partners will continue to be subject to the provisions of this Agreement in all respects.

**Section 1.06    Representations of Partners.**

(a)    This Agreement is made with the General Partner in reliance upon the General Partner's representation to the Partnership, each Preferred Limited Partner and SBA, that:

    (i)    it is duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to do business under the laws of each state where such qualification is required to carry on the business of the Partnership;

    (ii)    it has full power and authority to execute and deliver this Agreement and to act as General Partner under this Agreement;

    (iii)    this Agreement has been authorized by all necessary actions by it, has been duly executed and delivered by it, and is a legal, valid and binding obligation of it, enforceable according to its terms; and

    (iv)    the execution and delivery of this Agreement and the performance of its obligations under this Agreement will not conflict with, or result in any violation of, or default under, any provision of any governing instrument applicable to it, or any agreement or other instrument to which it is a party or by which it or any of its properties are bound, or any provision of law, statute, rule or regulation, or any ruling, writ, order, injunction or decree of any court, administrative agency or governmental body applicable to it.

(b)    This Agreement is made with each Private Limited Partner in reliance upon each Private Limited Partner's representation to the General Partner, the Partnership, each Preferred Limited Partner and SBA, that:

    (i)    it has full power and authority to execute and deliver this Agreement and to act as a Private Limited Partner under this Agreement; this Agreement has been authorized by all necessary actions by it; this Agreement has been duly executed and delivered by it; and this Agreement is a legal, valid and binding obligation of it, enforceable against it according to its terms;

11

(ii)     the execution and delivery of this Agreement and the performance of its obligations under this Agreement do not require the consent of any third party not previously obtained, and will not conflict with, or result in any violation of, or default under, any provision of any governing instrument applicable to it, or any agreement or other instrument to which it is a party or by which it or any of its properties are bound, or any provision of law, statute, rule or regulation, or any ruling, writ, order, injunction or decree of any court, administrative agency or governmental body applicable to it;

(iii)    if the Private Limited Partner is a bank (as the term is used in the SBIC Act, at 15 U.S.C. § 682(b)), the total amount of such Private Limited Partner's investments in SBICs, including such Private Limited Partner's interest in the Partnership, does not exceed five percent (5%) of such Private Limited Partner's capital and surplus;

(iv)    unless otherwise disclosed to the Partnership in writing, the Partner is a citizen or permanent resident of the United States, an entity organized under the laws of the United States or a state within the United States or an entity engaged in a trade or business within the United States; and

(v)    unless otherwise disclosed to the Partnership in writing, the Partner is not subject to Title I of ERISA.

(c)    Each Partner who has disclosed to the Partnership in writing that it is not a person described in <u>Section 1.06(b)(iv)</u>, agrees to provide the Partnership with any information or documentation necessary to permit the Partnership to fulfill any tax withholding or other obligation relating to the Partner, including but not limited to any documentation necessary to establish the Partner's eligibility for benefits under any applicable tax treaty.

(d)    With respect to actions under this Agreement that require the approval of the Private Limited Partners, the Parent Fund shall exercise its rights in a manner that produces the same result that would be produced if (i) the Parent Fund were not a Partner and (ii) each limited partner of the Parent Fund were a Private Limited Partner that had made aggregate Capital Contributions equal to the product of (x) the aggregate Capital Contributions of the Parent Fund and (y) a fraction, the numerator of which equals the aggregate capital contributions made by such limited partner to the Parent Fund and the denominator of which equals the aggregate capital contributions made by all of the partners of the Parent Fund to the Parent Fund.

**Section 1.07**    <u>**Notices With Respect to Representations by Private Limited Partners.**</u>

(a)    If any representation made by a Private Limited Partner in <u>Section 1.06(b)(i)</u>, <u>(ii)</u> or <u>(iii)</u> ceases to be true, then the Private Limited Partner will promptly provide

\\\DC - 83555/0001 - 1386423 v8

the Partnership with a correct separate written representation as provided in each such Section.

(b)     The Partnership will give each Preferred Limited Partner and SBA prompt notice of any corrected representation received from any Private Limited Partner under Section 1.07(a).

**Section 1.08     Liability of Partners.**

(a)     Losses, liabilities and expenses incurred by the Partnership during any fiscal year will be allocated among the Partners in accordance with the procedures for allocating Net Losses as provided in Section 6.03.

(b)     The General Partner has the liability for the liabilities of the Partnership provided for in the Act and the SBIC Act.  The General Partner will not:



(i)     be obligated to restore by way of capital contribution or otherwise any deficits in the respective Capital Accounts of the Private Limited Partners or Preferred Limited Partners should such deficits occur, or

(ii)    have any greater obligation with respect to any Outstanding Leverage than is required by the SBIC Act or by SBA.

(c)     Except as otherwise required under the Act and the SBIC Act, no Private Limited Partner nor any Preferred Limited Partner will be liable for any loss, liability or expense whatsoever of the Partnership.  Notwithstanding the preceding sentence, a Private Limited Partner will remain liable for any portion of such Private Limited Partner's Commitment not paid to the Partnership.

(d)     If a Private Limited Partner is required to return to the Partnership, for the benefit of creditors of the Partnership, amounts previously distributed to the Private Limited Partner, the obligation of the Private Limited Partner to return any such amount to the Partnership will be the obligation of the Private Limited Partner and not the obligation of the General Partner.  No Private Limited Partner will be liable under this Agreement for the obligations under this Agreement of any other Partner.

(e)     Nothing in this Agreement limits any liability of any Partner under any agreement between the Partner and SBA.

13

\\\DC - 83555/0001 - 1386423 v8

**ARTICLE 2**
**PURPOSE AND POWERS**

Section 2.01     <u>Purpose and Powers</u>.

(a)     The Partnership is organized solely for the purpose of operating as a small business investment company under the SBIC Act and conducting the activities described under Title III of the SBIC Act.  The Partnership has the powers and responsibilities, and is subject to the limitations, provided in the SBIC Act.  The operations of the Partnership and the actions taken by the Partnership and the Partners will be conducted and taken in compliance with the SBIC Act.

(b)     Subject to <u>Section 2.01(a)</u>, the Partnership may make, manage, own and supervise investments of every kind and character in conducting its business as a small business investment company.

(c)     Subject to the provisions of the SBIC Act, the Partnership has all powers necessary, suitable or convenient for the accomplishment of the purposes set forth in <u>Section 2.01(a)</u> and <u>Section 2.01(b)</u>, alone or with others, as principal or agent, including, without limitation, the following:

(i)     to locate, analyze and invest in equity and equity-oriented securities, including securities convertible into or exercisable or exchangeable for equity securities;

(ii)     to hold, and to sell, distribute or otherwise dispose of its Investments in accordance with this Agreement over such period as the General Partner determines to be in the best interest of the Partners; and

(iii)     to engage in any lawful act or activity for which limited partnerships may be organized under the Act.

Section 2.02     <u>Restrictions on Powers</u>.

Notwithstanding any provision of <u>Section 2.01(b)</u>, the Partnership will not (i) make investments precluded under 13 C.F.R. § 107.720, including but not limited to foreign investments described therein, (ii) without the prior approval of the SBA, make any investment that exceeds the diversification limitation that is described in 13 C.F.R. § 107.740, (iii) make investments precluded under 13 C.F.R. § 107.530, or (iv) take any action that, if taken by the Parent Fund directly, would violate Section 2.6 of the Parent Fund Agreement.

Section 2.03     <u>Unrelated Business Taxable Income</u>.

The Partnership will use its best efforts to ensure that no Partner (or any limited partner or member of a Partner) exempt from income taxation under Sections 501(a) or 501(c)(3)

of the Code will be deemed to have "unrelated business taxable income" (as that term is defined in Section 512 of the Code) as a result of the activities of the Partnership.

**Section 2.04     Venture Capital Operating Company.**

If directed by the Parent Fund, the Partnership will use its best efforts to ensure that the Parent Fund qualifies as a "venture capital operating company" (within the meaning of Department of Labor Regulation § 2510.3-101(d), 51 Fed. Reg. 41,281 (November 13, 1986) or any amendment or successor regulation). In furtherance thereof and pursuant Department of Labor Opinion No. 95-04A, the Parent Fund shall be provided with management rights to substantially participate in, or substantially influence the conduct of, the management of a sufficient number of the Partnership's portfolio companies in order for the Parent Fund to qualify as a "venture capital operating company." Such rights shall be provided in the Partnership's investment contracts with its portfolio companies, and the Parent Fund will be named as the holder of such rights in such contracts. Such management rights shall flow directly to the Parent Fund and the Parent Fund shall have the right to independently enforce such management rights.

**ARTICLE 3**
**MANAGEMENT**

**Section 3.01     Authority of General Partner.**

(a)     The management and operation of the Partnership and the formulation of investment policy is vested exclusively in the General Partner.

(b)     The act of the General Partner in carrying on the business of the Partnership will bind the Partnership.

(c)     In the case of any General Partner other than a natural person, at any time that the Partnership is licensed as an SBIC, the General Partner will not allow any person to serve as a general partner, director, officer or manager of the General Partner, unless such person has been approved by SBA.

(d)     So long as the General Partner remains the general partner of the Partnership:

(i)     it will comply with the requirements of the SBIC Act, including, without limitation, 13 C.F.R. § 107.160(a) and (b), as in effect from time to time; and

(ii)     in the case of any General Partner other than a natural person, except as set forth in Section 3.01(d)(iii), it will devote all of its activities to the conduct of the business of the Partnership and will not engage actively in any other business, unless its engagement is related to and in furtherance of the affairs of the Partnership.

15

(iii)    The General Partner may, however:

(A)    act as the general partner or Investment Adviser/Manager for one or more other SBICs, and

(B)    receive, hold, manage and sell Assets received by it from the Partnership (or other SBIC for which it acts as general partner or Investment Adviser/Manager), or through the exercise or exchange of Assets received by it from the Partnership (or other SBIC for which it acts as general partner or Investment Adviser/Manager).

**Section 3.02    Authority of the Private Limited Partners.**

The Private Limited Partners will take no part in the control of the business of the Partnership, and the Private Limited Partners will not have any authority to act for or on behalf of the Partnership except as is specifically permitted by this Agreement.

**Section 3.03    Authority of the Preferred Limited Partners.**

The Preferred Limited Partners will take no part in the control of the business of the Partnership, and the Preferred Limited Partners will not have any authority to act for or on behalf of the Partnership except as is specifically permitted by this Agreement.

**Section 3.04    Acknowledgement of SBA Authority.**

(a)    The Partners acknowledge that, in addition to the rights of SBA under this Agreement in SBA's capacity as a Preferred Limited Partner, SBA also has regulatory authority over the Partnership as a licensed small business investment company under the provisions of the SBIC Act. SBA exercises its regulatory authority over the Partnership under the SBIC Act independent of and separate from its rights and actions in its capacity as a Preferred Limited Partner, and actions taken by SBA under its regulatory authority will not be deemed to be actions taken in SBA's capacity as a Preferred Limited Partner of the Partnership.

(b)    The Partners acknowledge that in addition to the rights of SBA under this Agreement in SBA's capacity as a Preferred Limited Partner, SBA may also have additional rights with respect to the Partnership and any Partner or Partners under separate agreements between SBA and the Partnership or such Partner or Partners. The exercise of rights by SBA under any such other agreement will not be deemed to be actions taken by SBA in its capacity as a Preferred Limited Partner of the Partnership unless the other agreement expressly so provides.

16

**Section 3.05    The Investment Adviser/Manager.**

(a)    Subject to the SBIC Act, the General Partner may delegate any part of its authority to an Investment Adviser/Manager.

(b)    Any agreement delegating any part of the authority of the General Partner to an Investment Adviser/Manager will:

    (i)    be in writing, executed by the General Partner, the Partnership and the Investment Adviser/Manager,

    (ii)    specify the authority so delegated, and

    (iii)    expressly require that such delegated authority will be exercised by the Investment Adviser/Manager in conformity with the terms and conditions of such agreement, this Agreement and the SBIC Act.

(c)    Each agreement with an Investment Adviser/Manager made pursuant to this Section 3.05(a) will be binding upon the General Partner and any succeeding General Partner in accordance with its terms.

(d)    Each agreement with an Investment Adviser/Manager, and any material amendment to any such agreement, is subject to the prior approval of SBA.

(e)    **GKM Management, LLC** is the initial Investment Adviser/Manager pursuant to the Investment Management Agreement.

**Section 3.06    Restrictions on Other Activities of the General Partner and its Affiliates.**

Except as provided in the SBIC Act and as otherwise specifically provided in this Agreement, no provision of this Agreement will be construed to preclude any (i) Partner, (ii) Investment Adviser/Manager, or (iii) Affiliate, general partner, member, manager or stockholder of any Partner or Investment Adviser/Manager, from engaging in any activity whatsoever or from receiving compensation therefor or profit from any such activity. Such activities may include, without limitation, (A) receiving compensation from issuers of securities for investment banking services, (B) managing investments, (C) participating in investments, brokerage or consulting arrangements or (D) acting as an adviser to or participant in any corporation, partnership, limited liability company, trust or other business person.

**Section 3.07    Management Compensation.**

(a)    During the five year period commencing on the Initial Closing, Management Compensation with respect to each year during such period commencing on the same day and month as the Initial Closing will be 2.5% of the sum of (i) the Partnership's Regulatory Capital, (ii) any previous Permitted Distributions under

Section 7.03, and (iii) an assumed two tiers of Outstanding Leverage on the amounts described in clauses (i) and (ii).

(b)    During the period commencing on the first day following the fifth anniversary of the Initial Closing, Management Compensation with respect to each year during such period commencing on the same day and month as the Initial Closing will be 2.5% of the Partnership's Combined Capital. In addition, during this period, the Partnership shall pay an additional $125,000 per fiscal year as compensation for management services, unless such Combined Capital equals or exceeds Twenty Million Dollars ($20,000,000).

(c)    The Management Compensation shall not be modified in any respect except (i) upon the approval of 66 2/3% in interest of the Private Limited Partners and (ii) with the prior written approval of SBA.

(d)    If the Partnership fails to pay any Management Compensation provided herein, due to the SBIC Act or otherwise, the unpaid amount shall continue to be due and payable or shall become due and payable at the earliest date on which the payment of such amount or any portion thereof could be made without violation of the SBIC Act. Until paid, the unpaid amount shall accrue interest that shall be compounded on a monthly basis at the highest prime rate reported in The Wall Street Journal, from time to time, during the period of non-payment.

(e)    Transaction Fees and Director Fees will be paid solely to the General Partner or to an Affiliate of the General Partner entitled to them, subject to the following provisions. Management Compensation otherwise payable for any quarterly period will be reduced by (i) 100% of any Transaction Fees, as determined and calculated at the time Management Compensation is due, and (ii) 100% of Director Fees, as determined and calculated at the time Management Compensation is due. Any such amounts under clauses (i) and (ii), to the extent not used in full to reduce any Management Compensation payment, will be carried forward until all of them are applied as reductions of subsequent Management Compensation payments; provided, however, that except with respect to Transaction Fees described in 13 C.F.R. Section 107.860, which shall offset Management Compensation under all circumstances, no such reduction of Management Compensation shall occur if an to the extent the management fee payable by the Parent Fund is reduced as a result of the payment of such remuneration to the Parent Fund by the general partner of the Parent Fund or an affiliate of the general partner of the Parent Fund. The General Partner will use its reasonable efforts to manage the Partnership so that there are no Transaction Fees or Director Fees that cannot eventually be used to reduce management fee payments by either the Partnership or the Parent Fund. If, however, there is any balance of fees not offset by the reduction of Management Compensation before the dissolution of the Partnership, that balance will be paid over to the Partnership by the General Partner and allocated among all Partners in proportion to their respective Percentage Interests.

18

(f)      The Partnership will not pay any Management Compensation with respect to any fiscal year in excess of the amount of Management Compensation approved by SBA.

(g)      Notwithstanding Sections 3.07(a) and 3.07(b), the Partnership will not pay any Management Compensation with respect to any portion of the Commitment of the Parent Fund that was subject to a management fee paid by the Parent Fund.

**Section 3.08    Payment of Management Compensation.**

(a)      The Management Compensation will be paid by the Partnership to the Investment Adviser/Manager.

(b)      Management Compensation will be paid in advance in four quarterly installments on the first business day of each fiscal quarter.  The amount to be paid in each such quarterly installment initially shall be determined in accordance with Section 3.07, based upon (i) the amount of Regulatory Capital the Partnership has as of the first business day of such fiscal quarter and (ii) during the period starting on the fifth anniversary of the Initial Closing, the amounts of Leverage, if any, the Partnership has outstanding as of the first day of such fiscal quarter; provided, however, that such amount shall be subject to adjustment in accordance with Section 3.08(c).  With respect to partial quarters (such as the final quarter of the Partnership), Management Compensation shall be pro rated based on the number of days in such quarters.

(c)      Within thirty (30) days after (i) the end of each quarter of each year commencing on the same day and month as the Initial Closing, (ii) the date of the Partnership's dissolution, and (iii) the date a person ceases to be an Investment Adviser/Manager, appropriate adjustment (by way of payment or refund) will be made so that Management Compensation paid with respect to such quarter then ended or the period from the end of the last quarter to the date set forth in clause (ii) or (iii) will be equal to Management Compensation that would have resulted had it been calculated on a daily basis under Section 3.07(a) or Section 3.07(b) for such period.

**Section 3.09    Partnership Expenses.**

(a)      The Investment Adviser/Manager will pay:

    (i)      the compensation of all professional and other employees of the Partnership, the General Partner or an Investment Adviser/Manager who provide services to the Partnership;

    (ii)     except as provided in Section 3.09(b), the cost of providing support and general services to the Partnership, including, without limitation:

        (A)    office expenses,

      (B)     travel,

      (C)     business development,

      (D)     office and equipment rental,

      (E)     bookkeeping, and

      (F)     the development, investigation and monitoring of investments; and

    (iii)    all other expenses of the Partnership not authorized to be paid by the Partnership under Section 3.09(b).

(b)    The Partnership will pay the following Partnership expenses:

    (i)    all interest and expenses payable by the Partnership on any indebtedness incurred by the Partnership;

    (ii)    all amounts payable to SBA under the SBIC Act, and all amounts payable in connection with any Leverage commitment and any Outstanding Leverage;

    (iii)    taxes payable by the Partnership to Federal, state, local and other governmental agencies;

    (iv)    Management Compensation;

    (v)    expenses incurred in the actual or proposed acquisition or disposition of Assets, including without limitation, accounting fees, brokerage fees, legal fees, transfer taxes and costs related to the registration or qualification for sale of Assets;

    (vi)    legal, insurance (including any insurance as contemplated in Section 3.12(m)), accounting and auditing expenses;

    (vii)    all expenses incurred by the Partnership in connection with commitments for or issuance of Leverage;

    (viii)    fees or dues in connection with the membership of the Partnership in any trade association for small business investment companies or related enterprises; and

    (ix)    Organization Expenses up to but not exceeding $300,000.

(c)    All Partnership expenses paid by the Partnership will be made against appropriate supporting documentation.   The payment by the Partnership of Partnership expenses will be due and payable as billed.

\\\DC - 83555/0001 - 1386423 v8

**Section 3.10    Valuation of Assets.**

    (a)    The Partnership will adopt written guidelines for determining the value of its Assets. Assets held by the Partnership will be valued by the General Partner in a manner consistent with the Partnership's written guidelines and the SBIC Act. The Valuation Guidelines attached to this Agreement as <u>Exhibit II</u> are the Partnership's written guidelines for valuation.

    (b)    To the extent that the SBIC Act requires any Asset held by the Partnership to be valued other than as provided in this Agreement, the General Partner will value the Asset in such manner as it determines to be consistent with the SBIC Act.

    (c)    Assets held by the Partnership will be valued at least annually (or more often, as SBA may require), and will be valued at least semi-annually (or more often, as SBA may require) at any time that the Partnership has Outstanding Leverage.

**Section 3.11    Standard of Care.**

    (a)    No Designated Party will be liable to the Partnership or any Partner for any action taken or omitted to be taken by it or any other Partner or other person in good faith and in a manner it reasonably believed to be in or not opposed to the best interests of the Partnership, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.

    (b)    Neither any Private Limited Partner, nor any member of any Partnership committee or board who is not an Affiliate of the General Partner, will be liable to the Partnership or any Partner as the result of any decision made in good faith by the Private Limited Partner or member, in its capacity as such.

    (c)    Any Designated Party, any Private Limited Partner and any member of a Partnership committee or board, may consult with reputable legal counsel selected by it and will be fully protected, and will incur no liability to the Partnership or any Partner, in acting or refraining to act in good faith in reliance upon the opinion or advice of such counsel.

    (d)    This Section does not constitute a modification, limitation or waiver of Section 314(b) of the SBIC Act, or a waiver by SBA of any of its rights under Section 314(b).

    (e)    In addition to the standards of care stated in this Section, this Agreement may also provide for additional (but not alternative) standards of care that must also be met.

**Section 3.12    Indemnification.**

    (a)    The Partnership will indemnify and hold harmless, but only to the extent of Assets Under Management (less any Outstanding Leverage not included as a liability in the computation of Assets Under Management), any Designated Party, from any

and all Indemnifiable Costs which may be incurred by or asserted against such person or entity, by reason of any action taken or omitted to be taken on behalf of the Partnership and in furtherance of its interests.

(b)     The Partnership will indemnify and hold harmless, but only to the extent of Assets Under Management (less any Outstanding Leverage not included as a liability in the computation of Assets Under Management), the Private Limited Partners, and members of any Partnership committee or board who are not Affiliates of the General Partner or any Investment Adviser/Manager from any and all Indemnifiable Costs which may be incurred by or asserted against such person or entity, by any third party on account of any matter or transaction of the Partnership, which matter or transaction occurred during the time that such person has been a Private Limited Partner or member of any Partnership committee or board.

(c)     The Partnership has power, in the discretion of the General Partner, to agree to indemnify on the same terms and conditions applicable to persons indemnified under Section 3.12(b), any person who is or was serving, under a prior written request from the Partnership, as a consultant to, agent for or representative of the Partnership as a director, manager, officer, employee, agent of or consultant to another corporation, partnership, limited liability company, joint venture, trust or other enterprise, against any liability asserted against such person and incurred by the person in any such capacity, or arising out of the person's status as such.

(d)     No person may be entitled to claim any indemnity or reimbursement under Section 3.12(a), (b) or (c) in respect of any Indemnifiable Cost that may be incurred by such person which results from the failure of such person to act in accordance with the provisions of this Agreement and the applicable standard of care stated in Section 3.11. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, will not, of itself, preclude a determination that such person acted in accordance with the applicable standard of care stated in Section 3.11.

(e)     To the extent that a person claiming indemnification under Section 3.12(a), (b) or (c) has been successful on the merits in defense of any action, suit or proceeding referred to in Section 3.12(a), (b) or (c) or in defense of any claim, issue or matter in any such action, suit or proceeding, such person must be indemnified with respect to such matter as provided in such Section. Except as provided in the foregoing sentence and as provided in Section 3.12(h) with respect to advance payments, any indemnification under this Section 3.12 will be paid only upon determination that the person to be indemnified has met the applicable standard of conduct stated in Section 3.11(a) or Section 3.11(b), as applicable.

(f)     A determination that a person to be indemnified under this Section has met the applicable standard stated in Section 3.11(a) or Section 3.11(b) may be made by (i) the General Partner, with respect to the indemnification of any person other than a person claiming indemnification under Section 3.12(a), (ii) a committee of

the Partnership whose members are not affiliated with the General Partner or any Investment Adviser/Manager with respect to indemnification of any person indemnified under Section 3.12(a) or (iii) at the election of the General Partner, independent legal counsel selected by the General Partner, with respect to the indemnification of any person indemnified under this Section, in a written opinion.

(g)     In making any determination with respect to indemnification under subsection (f) above, the General Partner, a committee of the Partnership whose members are not affiliated with the General Partner or any Investment Adviser/Manager or independent legal counsel, as the case may be, is authorized to make the determination on the basis of its evaluation of the records of the General Partner, the Partnership or any Investment Adviser/Manager to the Partnership and of the statements of the party seeking indemnification with respect to the matter in question and is not required to perform any independent investigation in connection with any determination. Any party making any such determination is authorized, however, in its sole discretion, to take such other actions (including engaging counsel) as it deems advisable in making the determination.

(h)     Expenses incurred by any person in respect of any Indemnifiable Cost may be paid by the Partnership before the final disposition of any such claim or action upon receipt of an undertaking by or on behalf of such person to repay such amount unless it is ultimately determined as provided in Section 3.12(e) or (f) that the person is entitled to be indemnified by the Partnership as authorized in this Section 3.12.

(i)     The rights provided by this Section 3.12 will inure to the benefit of the heirs, executors, administrators, successors, and assigns of each person eligible for indemnification under this Agreement.

(j)     The rights to indemnification provided in this Section 3.12 are the exclusive rights of all Partners to indemnification by the Partnership. No Partner may have any other rights to indemnification from the Partnership or enter into, or make any claim under, any other agreement with the Partnership (whether direct or indirect) providing for indemnification.

(k)     The Partnership may not enter into any agreement with any person (including, without limitation, any Investment Advisor/Manager, Partner or any person that is an employee, officer, director, partner or shareholder, or an Affiliate, Associate or Control Person of any Partner) providing for indemnification of any such person (i) except as provided for under this Section 3.12, and (ii) unless such agreement provides for a determination with respect to the indemnification as provided under Section 3.12(f).

(l)     The provisions of this Section 3.12 do not apply to indemnification of any person that is not at the expense (whether in whole or in part) of the Partnership.

23

(m)     The Partnership may purchase and maintain insurance on its own behalf, or on behalf of any person or entity, with respect to liabilities of the types described in this <u>Section 3.12</u>.  The Partnership may purchase such insurance regardless of whether the person is acting in a capacity described in this <u>Section 3.12</u> or whether the Partnership would have the power to indemnify the person against such liability under the provisions of this Section.

**Section 3.13    <u>Advisory Committee</u>.**

The General Partner shall establish an advisory committee (the "**Advisory Committee**"). The Advisory Committee shall consist of persons appointed by the managing member of the General Partner, at least two-thirds of which shall be limited partners of the Parent Fund or their representatives. The Advisory Committee shall (a) review and approve or disapprove any transactions involving potential conflicts of interest of the General Partner or its affiliates, or any transactions between any of them and the Partnership, which decision will be binding on the subject person and the Partnership; (b) advise the General Partner on other matters as it reasonably requests and as agreed to by the Advisory Committee; (c) review the General Partner's asset valuations on a regular basis, and in any event prior to the time any distribution is made based on such valuations; and (d) provide such advice and counsel as is requested by the General Partner in connection with the Partnership's strategy of investments and other general Partnership matters. However, the General Partner will retain ultimate responsibility for (1) the determination of the valuation of Investments, the determination of which shall be made by the General Partner pursuant to the Valuation Guidelines set forth on Exhibit II hereto, and (2) for making all investment decisions.  The Partnership will reimburse each member of the Advisory Committee for his or her reasonable out-of-pocket expenses.

# ARTICLE 4
## SMALL BUSINESS INVESTMENT COMPANY MATTERS

**Section 4.01    <u>SBIC Act</u>.**

The provisions of this Agreement must be interpreted to the fullest extent possible in a manner consistent with the SBIC Act.  If any provision of this Agreement conflicts with any provision of the SBIC Act (including, without limitation, any conflict with respect to the rights of SBA or the respective Partners under this Agreement), the provisions of the SBIC Act will control.

**Section 4.02    <u>Consent or Approval of, and Notice to, SBA</u>.**

(a)     The requirements of the prior consent or approval of, and notice to, SBA in this Agreement will be in effect at any time that the Partnership is licensed as an SBIC, has Outstanding Leverage or owns Earmarked Assets.  These requirements

will not be in effect if the Partnership is not licensed as an SBIC, does not have any Outstanding Leverage, and does not own any Earmarked Assets.

(b) Except as provided in the SBIC Act, a consent or approval required to be given by SBA under this Agreement will be deemed given and effective for purposes of this Agreement only if the consent or approval is (i) given by SBA in writing and (ii) delivered by SBA to the party requesting the consent or approval in the manner provided for notices to such party under Section 10.05.

**Section 4.03    Provisions Required by the SBIC Act for Issuers of Participating Securities.**

(a) The provisions of 13 C.F.R. § 107.1820 are incorporated by reference in this Agreement as if fully stated in this Agreement.

(b) The Partnership and the Partners consent to the exercise by SBA of all of the rights of SBA under 13 C.F.R. § 107.1820, and agree to take all actions that SBA may require in accordance with 13 C.F.R. § 107.1820.

(c) This Section 4.03 will be in effect at any time that the Partnership has outstanding Participating Securities or owns Earmarked Assets, and will not be in effect at any time that the Partnership neither has outstanding Participating Securities nor owns Earmarked Assets.

(d) Nothing in this Section may be construed to limit the ability or authority of SBA to exercise its regulatory authority over the Partnership as a licensed small business investment company under the SBIC Act.

**Section 4.04    Provisions Required by the SBIC Act for Issuers of Debentures.**

(a) The provisions of 13 C.F.R. § 107.1810(i) are incorporated by reference in this Agreement as if fully stated in this Agreement.

(b) The Partnership and the Partners consent to the exercise by SBA of all of the rights of SBA under 13 C.F.R. § 107.1810(i), and agree to take all actions that SBA may require in accordance with 13 C.F.R. § 107.1810(i).

(c) This Section will be in effect at any time that the Partnership has outstanding Debentures, and will not be in effect at any time that the Partnership does not have outstanding Debentures.

(d) Nothing in this Section may be construed to limit the ability or authority of SBA to exercise its regulatory authority over the Partnership as a licensed small business investment company under the SBIC Act.

\\\DC - 83555/0001 - 1386423 v8

**Section 4.05    Effective Date of Incorporated SBIC Act Provisions.**

(a)    Any section of this Agreement which relates to Participating Securities or Debentures issued by the Partnership and incorporates or refers to the SBIC Act or any provision of the SBIC Act (including, without limitation, 13 C.F.R. §§ 107.1810(i), 107.1820, and 107.1830 - 107.1850)) will, with respect to each Participating Security or Debenture, be deemed to refer to the SBIC Act or such SBIC Act provision as in effect on the date on which the capital contribution with respect to the Participating Security was made to the Partnership or the Debenture was purchased from the Partnership, as the case may be.

(b)    Section 4.05(a) will not be construed to apply to:

(i)    the provisions of the SBIC Act which relate to the regulatory authority of SBA under the SBIC Act over the Partnership as a licensed small business investment company; or

(ii)    the rights of SBA under any other agreement between the Partnership and SBA.

(c)    The parties acknowledge that references in this Agreement to the provisions of the SBIC Act relating to SBA's regulatory authority refer to the provisions as in effect from time to time.

**Section 4.06    Admission of Preferred Limited Partners and Increased Commitments.**

The Partnership may, from time to time after the date of this Agreement, admit one or more Preferred Limited Partners under the following terms and conditions:

(a)    Each Preferred Limited Partner must execute and deliver to the Partnership an instrument substantially in the form attached to this Agreement as Exhibit I-A, or other form satisfactory to the Partnership and the Preferred Limited Partner, evidencing the Preferred Limited Partner's agreement to be bound by and comply with the terms and provisions of this Agreement as if the Preferred Limited Partner were an original signatory to this Agreement, and setting forth the Preferred Limited Partner's name and Commitment.

(b)    Each Preferred Limited Partner will be admitted to the Partnership as of the date that the first such instrument is executed by the Preferred Limited Partner and the General Partner. Each Preferred Limited Partner must pay, on the date of its admission to the Partnership, a capital contribution equal to 100% of the amount of its Commitment as of such date.

(c)    At the time that any Preferred Limited Partner increases its Commitment, it must execute an instrument as provided in Section 4.06(a) setting forth the amount of such increase in its Commitment. Each Preferred Limited Partner must pay, on

26

the date it increases its Commitment, a capital contribution equal to 100% of the amount of such increase in its Commitment.

(d)     The amount of any user, commitment or other fees deducted by SBA from the proceeds of any Preferred Limited Partnership interest issued by the Partnership will be deemed a capital contribution to the Partnership by such Preferred Limited Partner.

**Section 4.07    Redemption and Withdrawal of Preferred Limited Partners.**

(a)     The redemption of the Preferred Limited Partnership Interest under the SBIC Act will not cause the withdrawal of the Preferred Limited Partner from the Partnership, and any Preferred Limited Partner whose Preferred Limited Partnership Interest is redeemed under the SBIC Act will remain a Preferred Limited Partner of the Partnership notwithstanding the redemption, until such time as the Preferred Limited Partner is deemed to have withdrawn under Section 4.07(d).

(b)     If before the redemption date of a Preferred Limited Partnership Interest under the SBIC Act the Preferred Limited Partner has not received on a cumulative basis the amount provided under the SBIC Act with respect to such Preferred Limited Partnership Interest, then on the redemption date the Partnership will distribute to the Preferred Limited Partner such amount as is required so that as of the redemption date the Preferred Limited Partner has received on a cumulative basis the amount provided under the SBIC Act with respect to the Preferred Limited Partnership Interest.

(c)     If at the time any Preferred Limited Partner's Preferred Limited Partnership Interest has been redeemed under the SBIC Act the Partnership has not (i) paid all Earned Prioritized Payments, earned Adjustments and earned Charges in full, and (ii) sold or otherwise disposed of all assets which are Earmarked Assets, then the Partnership's obligation to pay Earned Prioritized Payments, earned Adjustments and earned Charges will continue and payment will be made as provided in the SBIC Act. The Partnership's obligation to pay Profit Participation with respect to Earmarked Assets will continue until such time as all Earmarked Assets are disposed of. If on disposition of all Earmarked Assets there remain any Accumulated Prioritized Payments, unearned Adjustments and unearned Charges, the obligation to make such payments will be extinguished.

(d)     A Preferred Limited Partner will be deemed to have withdrawn from the Partnership at such time as the Preferred Limited Partnership Interest of the Preferred Limited Partner has been redeemed under the SBIC Act, the Partnership no longer owns any assets which are Earmarked Assets, and all amounts due from the Partnership to the Preferred Limited Partner with respect to its Preferred Limited Partnership Interest (including, without limitation, all allocated Profit Participation) have been paid to the Preferred Limited Partner or the obligation to

27

pay such amounts has been extinguished as provided in Section 4.07(c) or the SBIC Act.

**Section 4.08**    **Assignment of Right to Distributions by a Preferred Limited Partner.**

A Preferred Limited Partner may assign to a designee all or part of its right to receive any distribution or payment from the Partnership with respect to its Preferred Limited Partnership Interest. Upon receipt of written notice from the Preferred Limited Partner as to such an assignment, the Partnership will pay any such assigned distribution or payment directly to the designee. Any assignment made solely under this Section 4.08 will not be deemed an assignment of a partnership interest or the substitution of a designee as a Partner, and will not be deemed to give the designee any rights or interest in the Partnership as a Partner in the Partnership.

**Section 4.09**    **Priority of Preferred Limited Partnership Interests on Liquidation.**

If the Partnership is liquidated under the SBIC Act, the Preferred Limited Partnership Interests will be senior in priority for all purposes to all other partnership interests (or other equity interests) in the Partnership to the extent of the amount determined, with respect to each Preferred Limited Partnership Interest, as provided in the SBIC Act.

**Section 4.10**    **SBA as Third Party Beneficiary.**

SBA will be deemed an express third party beneficiary of the provisions of this Agreement to the extent of the rights of the Preferred Limited Partners and SBA under this Agreement and under the Act SBA will be entitled to enforce the provisions (including, without limitation, the obligations of each Partner to make capital contributions to the Partnership) for the benefit of the Preferred Limited Partners and for its benefit, as if SBA were a party to this Agreement.

**Section 4.11**    **Interest of the General Partner After Withdrawal.**

If the General Partner withdraws as a general partner of the Partnership by notice from SBA as provided in the SBIC Act or otherwise, then the entire interest of the General Partner in the Partnership will be converted into an interest as a Special Private Limited Partner on the terms provided in Section 8.03(c).

### ARTICLE 5
### PARTNERS' CAPITAL CONTRIBUTIONS

**Section 5.01**    **Capital Commitments.**

(a)    The Private Limited Partners and the General Partner commit to make Capital Contributions to the Partnership in the amounts set forth by their respective names

on Exhibit I to this Agreement (and its counterparts) executed by each such Partner; provided, however, that the Commitment of a Back-Up Private Limited Partner shall be reduced as and to the extent that the Primary Partner, in respect of which the Back-Up Limited Partner has made a Commitment, funds its own Commitment.

(b) Notwithstanding Section 5.01(a), a Back-Up Limited Partner shall be required to make Capital Contributions to the Partnership only to the extent that the Primary Partner, with respect to whom the Back-Up Limited Partner has been admitted to the Partnership, fails to timely make a Capital Contribution.

(c) The Commitment of a Preferred Limited Partner includes only the amount the Preferred Limited Partner has actually contributed to the Partnership, and does not include any amount under any agreement by the Preferred Limited Partner or SBA to provide Leverage to the Partnership that has not been contributed to the Partnership. The amount of the actual contribution by a Preferred Limited Partner to the Partnership will be set forth on Exhibit I-A attached to this Agreement.

**Section 5.02    Capital Contributions by the Class A Limited Partners.**

The Class A Limited Partners will contribute to the capital of the Partnership in cash the aggregate amount that is set forth opposite their respective names on Exhibit I payable in such installments, as specified by the General Partner in its sole discretion, from time to time, upon not less than ten (10) business days' prior notice; provided that the time requirement for such notice may be waived by a Class A Limited Partner.

**Section 5.03    Capital Contributions by the Class B Limited Partners**

If at any time (and only at such time) the Parent Fund ~~GKM Venture Partners, L.P.~~ fails to make a Capital Contribution as required by this Agreement, then the Class B Limited Partners shall contribute to the capital of the Partnership in cash an amount equal to the Parent Fund Capital Contribution then in default, with each such Class B Limited Partner being required to contribute its Proportionate Share of the Capital Contribution then in default; provided, however, that the obligation of each Class B Limited Partner to contribute to the capital of the Partnership shall be several, and not joint, and in no event shall any Class B Limited Partner be required to contribute to the Partnership an amount greater than the then unpaid amount that such Class B Limited Partner has agreed to contribute to the capital of the Parent Fund. The amount of each such Capital Contribution shall be made to the Partnership upon ten (10) business days advance written notice by the General Partner with respect to each contribution. Simultaneously with a contribution to the Partnership of any capital by a Class B Limited Partner, such Class B Limited Partner shall transfer to the Parent Fund the interest in the Partnership so acquired with a corresponding credit to the Parent Fund's Capital Account and reduction in the Parent Fund's unpaid Commitment to the Partnership, and the Parent Fund shall in turn credit such Class B Limited Partner with an additional capital contribution to the Parent Fund pursuant to the Parent Fund Agreement (which shall serve to correspondingly reduce the amount of such Class B Limited Partner's commitment to the Parent Fund). No Capital

29

Contribution by a Class B Limited Partner pursuant to this Agreement shall give it any right to receive any distributions or allocations pursuant to this Agreement or give rise to a Capital Account for such Class B Limited Partner.

**Section 5.04    Capital Contributions by Preferred Limited Partners.**

Each Preferred Limited Partner will contribute the entire amount of its initial Commitment to the Partnership on the date of its admission to the Partnership as a Preferred Limited Partner. On the date that any Preferred Limited Partner increases its Commitment, it will pay a capital contribution equal to 100% of the amount of the increase in its Commitment. Any capital contribution by a Preferred Limited Partner with respect to its initial Commitment or increase in its Commitment will be deemed to include any portion of any such Commitment contributed as provided in Section 4.06(d).

**Section 5.05    Capital Contributions by the General Partner.**

(a)    All Capital Contributions to the Partnership by the General Partner must be in cash, except as provided in this Agreement and approved by SBA.

(b)    The General Partner must pay its Commitment in installments at the same times as the Private Limited Partners. The ratio of the Capital Contributions made by the General Partner to the aggregate Capital Contributions made by the Private Limited Partners shall be equal to the ratio of the Commitment of the General Partner to the Commitment of the Class A Limited Partners.

(c)    If the Commitment of the General Partner is increased as a result of an increase in the Commitment of the Private Limited Partners or the admission of any Additional Private Limited Partner, the amount of the increased Commitment will be payable by the General Partner in installments, the first of which will be due upon the effectiveness of the increased Commitment and each subsequent installment will be due at the same times and in the same percentage amounts as the Private Limited Partners.

**Section 5.06    Additional Private Limited Partners and Increased Commitments.**

From time to time after the date of this Agreement, the General Partner, in its sole discretion, may admit one or more new Private Limited Partners (the "**Additional Private Limited Partners**") or permit any Private Limited Partner to increase its Commitment under the following terms and conditions:

(a)    Each Additional Private Limited Partner (and Private Limited Partner increasing its Commitment) must execute and deliver to the Partnership a counterpart of this Agreement, or other written instrument, which sets forth (i) the name and address of the Partner, (ii) the Commitment of the Partner and (iii) in the case of an Additional Private Limited Partner, the agreement of the Partner to be bound by the terms of this Agreement. Exhibit I attached to this Agreement will be amended to reflect such Additional Private Limited Partner's name, address and

Commitment (or the increase in the Private Limited Partner's Commitment, as the case may be).

(b)    [Notwithstanding the other provisions of this Section 5.06, except in connection with a transfer of an interest in the Partnership, the General Partner will not admit any Additional Private Limited Partners or allow for the increase of a Private Limited Partner's Commitment after the period of time specified in Section 5.6 of the Parent Fund Agreement has expired; provided, however, that this restriction shall not apply to the admission or the increase in Commitment of a Back-Up Private Limited Partner.]

**Section 5.07    Additional, Substitute and Transferee Class A Limited Partners.**

No person or entity shall be admitted as a substituted Class A Limited Partner with respect to the interest held by the Parent Fund nor shall the Parent Fund transfer any interest in the Partnership without the prior written approval of SBA and, further, unless the limited partners or equity owners of the substituted Class A Limited Partner or of the transferee Class A Limited Partner simultaneously become Class B Limited Partners.

**Section 5.08    Conditions to the Commitments of the General Partner and the Private Limited Partners.**

(a)    Notwithstanding any provision in this Agreement to the contrary, on the earlier of (i) the completion of the liquidation of the Partnership or (ii) one year from the commencement of the liquidation, the General Partner and the Private Limited Partners will be obligated to contribute any amount of their respective Commitments, not previously contributed to the Partnership, if and to the extent that the other Assets of the Partnership have not been sufficient to permit at that time the redemption of all Outstanding Leverage, the payment of all amounts due with respect to the Outstanding Leverage as provided in the SBIC Act, and the payment of all other amounts owed by the Partnership to SBA.

(b)    Notwithstanding any provision in this Agreement to the contrary, if the Partnership is subject to restricted operations (as that term is used in the SBIC Act) and before the liquidation of the Partnership SBA requires the General Partner and the Private Limited Partners to contribute any amount of their respective Commitments not previously contributed to the Partnership, the obligation to make such contributions will not be subject to any conditions stated in this Agreement other than limitations on the amount of capital which a Partner is obligated to contribute (i) within any specified time period or (ii) before any specified date.

(c)    The provisions of this Section do not apply to the Commitment of any Private Limited Partner whose obligation to make capital contributions has been terminated or who has withdrawn from the Partnership, with the consent of SBA, under a provision of this Article 5 or Article 8 or any agreement, release, settlement or action under any provision of this Agreement. No Private Limited

31

Partner or General Partner has any right to delay, reduce or offset any obligation to contribute capital to the Partnership called under this Section by reason of any counterclaim or right to offset by the Partner or the Partnership against SBA or any Preferred Limited Partner.

**Section 5.09**    **Termination of the Obligation to Contribute Capital.**

(a)    Any Private Limited Partner may elect to terminate its obligation in whole or in part to make a capital contribution required under this Agreement, or upon demand by the General Partner, will no longer be entitled to make such capital contribution, if the Private Limited Partner or the General Partner obtains an opinion of counsel as provided under Section 5.10 to the effect that making such contribution would require the Private Limited Partner to withdraw from the Partnership under Section 8.06 through Section 8.10.

(b)    Upon receipt by the General Partner of a notice and opinion as provided under Section 5.10, unless cured within the period provided under Section 5.11, the Commitment of the Private Limited Partner delivering the opinion will be deemed to be reduced by the amount of such unfunded capital contribution and this Agreement will be deemed amended to reflect a corresponding reduction of aggregate Commitments to the Partnership.

**Section 5.10**    **Notice and Opinion of Counsel.**

(a)    A copy of any opinion of counsel issued as described in Section 5.09 or Section 8.06 through Section 8.10 must be sent by the General Partner to SBA, together with (i) the written notice of the election of the Private Limited Partner or (ii) the written demand of the General Partner, to which the opinion relates.

(b)    An opinion rendered to the Partnership as provided in Section 5.09 or Section 8.06 through Section 8.10 will be deemed sufficient for the purposes of those Sections only if the General Partner and SBA each approve (i) the counsel rendering the opinion, and (ii) the form and substance of the opinion.

**Section 5.11**    **Cure, Termination of Capital Contributions and Withdrawal.**

(a)    Unless within ninety (90) days after the giving of written notice and opinion of counsel, as provided in Section 5.10, the Private Limited Partner or the Partnership eliminates the necessity for termination of the obligation of the Private Limited Partner to make further capital contributions or for the withdrawal of the Private Limited Partner from the Partnership in whole or in part to the reasonable satisfaction of the Private Limited Partner and the General Partner, the Private Limited Partner will withdraw from the Partnership in whole or in part to the extent required, effective as of the end of the ninety (90) day period.

32

(b)    Subject to the provisions of <u>Section 5.13</u>, in its discretion the General Partner may waive all or any part of the ninety (90) day cure period and cause such termination of capital contributions or withdrawal to be effective at an earlier date as stated in the waiver.

(c)    Any distributions made to a Private Limited Partner with respect to such Partner's withdrawal under this Section will be subject to and made as provided in <u>Section 8.11</u>.

**Section 5.12     Failure to Make Required Capital Contributions.**

The Partnership is entitled to enforce the obligations of each Partner to make the contributions to capital specified in this Agreement.  The Partnership has all rights and remedies available at law or equity if any such contribution is not so made.

**Section 5.13     Notice and Consent of SBA with respect to Capital Contribution Defaults.**

(a)    The Partnership must give SBA prompt written notice of any failure by a Private Limited Partner to make any capital contribution to the Partnership required under this Agreement when due, which failure continues beyond any applicable grace period specified in this Agreement.

(b)    Unless SBA has given its prior consent or the provisions of subsection (c) of this Section have become applicable, the Partnership will not (i) take any action (including entering into any agreement (whether oral or written), release or settlement with any Partner) which defers, reduces, or terminates the obligations of the Partner to make contributions to the capital of the Partnership, or (ii) commence any legal proceeding or arbitration, which seeks any such deferral, reduction or termination of such obligation.   Without the consent of SBA (including SBA's deemed consent under subsection (c) of this Section) no such agreement, release, settlement or action taken will be effective with respect to the Partnership or any Partner.

(c)    If the Partnership has given SBA thirty (30) days prior written notice of any proposed legal proceeding, arbitration or other action described under subsection (b) of this Section with respect to any default by a Private Limited Partner in making any capital contribution to the Partnership, and the Partnership has not received written notice from SBA that it objects to the proposed action within the thirty (30) day period, then SBA will be deemed to have consented to the proposed Partnership action.

(d)    Any notice given by the Partnership to SBA under this Section must:

(i)    be given by separate copies directed to each of the Investment Division and the Office of the General Counsel of SBA;

33

(ii)    explicitly state in its caption or first sentence that the notice is being given with respect to a specified default by a Private Limited Partner in making a capital contribution to the Partnership and a proposed legal proceeding, arbitration, agreement, release, settlement or other action with respect to that default; and

(iii)   state the nature of the default, the identity of the defaulting Private Limited Partner, and the nature and terms of the proposed legal proceeding, arbitration, agreement, release, settlement or other action with respect to that default.

## Section 5.14    Interest on Overdue Contributions.

In the event that any Private Limited Partner fails to make a contribution required under this Agreement within ten (10) days after the date such contribution is due, then the General Partner may, in its sole discretion, elect to charge such Private Limited Partner interest at an annual rate equal to the then current prime rate published in The Wall Street Journal dated the business day preceding the tenth day after such contribution is due, plus two percent (2%) per annum on the amount due from the date such amount became due until the earlier of (i) the date on which such payment is received by the Partnership from such Private Limited Partner or (ii) the date of any notice given to such Private Limited Partner by the General Partner pursuant to Section 5.15 or Section 5.16, or (iii) the date on which such payment is received by the Partnership under Section 5.17 or Section 5.18. Any distributions to which such Private Limited Partner is entitled shall be reduced by the amount of such interest, and such interest shall be deemed to be income to the Partnership.

## Section 5.15    Termination of a Private Limited Partner's Right to Make Further Capital Contributions.

In the event that any Private Limited Partner (other than the Parent Fund) fails to make a contribution required under this Agreement within ten (10) days after the date such contribution is due, the General Partner may, in its sole discretion (but only with the consent of SBA given as provided in Section 5.13), elect to declare, by notice to such Private Limited Partner, that:

(a)    Such Private Limited Partner's Commitment shall be deemed to be reduced to the amount of any contributions of capital timely made pursuant to this Agreement; and

(b)    Upon such notice (i) such Private Limited Partner shall have no right to make any capital contribution thereafter (including the contribution as to which the default occurred and any contribution otherwise required to be made thereafter pursuant to the terms of this Agreement) and (ii) to this Agreement shall be deemed amended to reflect such reduced Commitment.

34

**Section 5.16    Forfeiture of a Private Limited Partner's Interest in the Partnership.**

In the event that any Private Limited Partner (other than the Parent Fund) fails to make a contribution required under this Agreement, within ten (10) days after notice by the General Partner to such Private Limited Partner that it has failed to make its contribution on the date such contribution was due, the General Partner may in its sole discretion (but only with the consent of SBA given as provided in Section 5.13) declare, by notice of forfeiture to such Private Limited Partner, that [one hundred percent (100%)] of the interest of such Private Limited Partner in the Partnership (including amounts in its Capital Account as well as any interest in future profits, losses or distributions of the Partnership) is forfeited, effective as of the date of such Private Limited Partner's failure to make such required contribution, in which event, as of the date of such notice of forfeiture (i) the Private Limited Partner shall cease to be a Partner with respect to such forfeited interest; provided, however, that such forfeited Private Limited Partner shall cease to have any liability for the payment of the forfeited percentage of any capital contributions due at such time or in the future and (ii) the forfeited percentage of such Private Limited Partner's Capital Account shall be held by the Partnership and reallocated among the Capital Accounts of the Partners, pro rata in proportion to their respective Percentage Interests (other than such forfeited Private Limited Partner) to be apportioned among such Private Limited Partners in accordance with their respective aggregate capital contributions.

**Section 5.17    Withholding and Application of a Private Limited Partner's Distributions.**

No part of any distribution shall be paid to any Private Limited Partner (other than the Parent Fund) from which there is then due and owing to the Partnership, at the time of such distribution, any amount required to be paid to the Partnership. At the election of the General Partner, which it may make in its sole discretion, the Partnership may either (i) apply all or part of any such withheld distribution in satisfaction of the amount then due to the Partnership from such Private Limited Partner or (ii) withhold such distribution until all amounts then due are paid to the Partnership by such Private Limited Partner. Upon payment of all amounts due to the Partnership (by application of withheld distributions or otherwise), the General Partner shall distribute any unapplied balance of any such withheld distribution to such Private Limited Partner. No interest shall be payable on the amount of any distribution withheld by the Partnership pursuant to this Section.

**Section 5.18    Required Sale of a Private Limited Partner's Interest in the Partnership.**

In the event that any Private Limited Partner (other than the Parent Fund) fails to make a contribution required under this Agreement within ten (10) days after notice by the General Partner to such Private Limited Partner that it has failed to make its contribution on the date such contribution is due, unless the General Partner has acted pursuant to Section 5.15 or Section 5.16, the General Partner may, in its sole discretion, (and with the consent of SBA given as provided in Section 5.13) elect to declare such Private Limited Partner in default. If the General Partner so elects to declare such Private Limited Partner in default (such Private Limited Partner being hereinafter referred to as the **"Optionor"**), then the other Private Limited Partners of the Partnership which are not in default (the

"Optionees") and the General Partner shall have the right and option to acquire one hundred percent (100%) of the Partnership interest, which shall include one hundred percent (100%) of the Capital Account (the **"Optioned Partnership Interest"**) of the Optionor on the following terms:

(a)     The General Partner shall give the Partners notice promptly after declaration of any such default. Such notice shall advise each Optionee of the portion of the Optioned Partnership Interest available to it and the price therefor. The portion available to each Optionee shall be that portion of the Optioned Partnership Interest that bears the same ratio to the Optioned Partnership Interest as each Optionee's capital contributions to the Partnership bears to the aggregate capital contributions to the Partnership, exclusive of the capital contributions to the Partnership of the Optionor. The aggregate price for the Optioned Partnership Interest shall be the assumption of the unpaid Commitment obligation (both that portion then due and amounts due in the future) of the Optionor (the **"Option Price"**). The Option Price for each Optionee shall be prorated according to the portion of the Optioned Partnership Interest purchased by each such Optionee so that the percentage of the unpaid Commitment assumed by each Optionee is the same as the percentage of the Optioned Partnership Interest purchased by such Optionee. The option granted hereunder shall be exercisable by each Optionee in whole only at any time within ten (10) days of the date of the notice from the General Partner by the delivery to the General Partner of (i) a notice of exercise of option, and (ii) the capital contribution due in accordance with Section 5.18(e)(i) below. The General Partner shall forward the above notices of exercise of option received to the Optionor.

(b)     Should any Optionee not exercise its option within the period provided in Section 5.18(a), the General Partner, within ten (10) days of the end of such period, shall notify the other Optionees who have previously exercised their options in full, which Optionees shall have the right and option ratably among them to acquire the portion of the Optioned Partnership Interest not so acquired (the **"Remaining Portion"**) within ten (10) days of the date of the notice specified in this subsection on the same terms as provided in Section 5.18(a).

(c)     The amount of the Remaining Portion not acquired by the Optionees pursuant to Section 5.18(b) may be acquired by the General Partner within ten (10) days of the expiration of the period specified in Section 5.18(b) on the same terms as set forth in Section 5.18(a).

(d)     The amount of the Remaining Portion not acquired by the Optionees and the General Partner pursuant to Section 5.18(c) may, if the General Partner deems it in the best interest of the Partnership, be sold to any other corporations, partnerships, individuals or other entities on terms not more favorable to such purchaser than the Optionees' option (and the General Partner may admit any such third party purchaser as a Private Limited Partner, subject to the approval of SBA, if required under the SBIC Act). Any consideration received by the Partnership for such amount of the Optionor's interest in the Partnership in excess

36

of the Option Price therefor shall be retained by the Partnership and allocated among the Partners' Capital Accounts in proportion to the respective Partners' capital contributions.

(e)     Upon exercise of any option hereunder, such Optionee (or the General Partner, if it has exercised its rights pursuant to Section 5.18(c)) shall be deemed to have assumed that portion of the Optionor's unpaid Commitment representing the Option Price of the purchased portion of the Optioned Partnership Interest and shall be obligated (i) to contribute to the Partnership the portion of the capital contribution then due from the Optionor equal to the percentage of the Optioned Partnership Interest purchased by such Optionee and (ii) to pay the same percentage of any further contributions which would have otherwise been due from such Optionor.

(f)     Upon the purchase by the General Partner of any portion of the Optioned Partnership Interest in the Partnership pursuant to Section 5.18(c), the General Partner shall also become a Private Limited Partner to the extent of such interest.

(g)     Upon the purchase of any portion of any Optioned Partnership Interest by an Optionee, the General Partner or other person pursuant to this Section, the Optionor shall have no further rights or obligations under this Agreement with respect to such portion.

(h)     Upon the purchase of any portion of the Optioned Partnership Interest, for purposes of computing such purchaser's aggregate capital contributions, such purchaser shall be deemed to have aggregate capital contributions (or the aggregate capital contributions of any Optionee, shall be increased by an amount) equal to the percentage of the defaulting Private Limited Partner's aggregate capital contribution which the purchased portion of the Optioned Partnership Interest represents of the defaulting Private Limited Partner's entire Partnership interest, and the aggregate capital contributions of such defaulting Private Limited Partner shall be reduced by a corresponding amount.

# ARTICLE 6
## ADJUSTMENT OF CAPITAL ACCOUNTS

**Section 6.01     Establishment of Capital Accounts.**

There will be established on the books of the Partnership an Opening Capital Account for each Partner in accordance with the definitions and methods of allocation prescribed in this Agreement. The Partnership shall not establish a Capital Account for any Back-Up Private Limited Partner until the Back-Up Private Limited Partner makes a Capital Contribution to the Partnership; provided, however, that if a Back-Up Private Limited Partner makes a Capital Contribution with respect to a Class B Limited Partner, the final sentence of Section 5.03 of this Agreement shall control.

37

**Section 6.02**   <u>Time of Adjustment of Capital Accounts</u>.

Allocations will be made to the Opening Capital Account of each Partner in accordance with <u>Section 6.03</u>, as of the following dates:

(i)    the close of each fiscal year of the Partnership;

(ii)    the day before the date of the admission of an Additional Private Limited Partner, increase in any Private Limited Partner's Commitment, admission of any Preferred Limited Partner or increase in the Commitment of any Preferred Limited Partner;

(iii)    the day before the dissolution of the Partnership;

(iv)    the date of a distribution; and

(v)    such other dates as this Agreement may provide.

**Section 6.03**   <u>Adjustments to Capital Accounts</u>.

(a)    As of the times stated in <u>Section 6.02</u>, allocations will be made to the Opening Capital Accounts of the Partners to arrive at each Partner's Closing Capital Account for the period in the following order and amounts:

(i)    The amount of any capital contributions paid by each Partner during such period will be credited to the Partner's Opening Capital Account (other than capital contributions referred to in clause (i) of the definition of Opening Capital Account in <u>Article 1</u>); <u>provided</u>, <u>however</u>, that any such capital contribution will be credited to the Partner's Opening Capital Account on the later of the date the capital contribution was due or the date on which the capital contribution was actually received by the Partnership;

(ii)    The amount of any distributions made to each Partner during the period will be debited against the Partner's Opening Capital Account;

(iii)    Net Profits will be credited and Net Losses will be debited to the Opening Capital Accounts of the Preferred Limited Partners in such amount and in such manner as is required to allocate to the Preferred Limited Partners the amount of the Earned Prioritized Payments and earned Adjustments and earned Charges to which the Preferred Limited Partners are then entitled (determined as provided in the SBIC Act), to be apportioned among them as required under the SBIC Act;

(iv)    The balance of any Net Profits will be credited, and the balance of any Net Losses will be debited, to the Opening Capital Accounts of the Partners as follows:

38

(A)    to the Preferred Limited Partners in such amount as is required to allocate to the Preferred Limited Partners the amount of the Profit Participation to which the Preferred Limited Partners are then entitled (determined as provided in the SBIC Act), to be apportioned among them as required under the SBIC Act; and

(B)    the balance to the General Partner and the Private Limited Partners to be apportioned among the General Partner and the Private Limited Partners, pro rata in proportion to their respective Percentage Interests.

(b)    Notwithstanding the provisions of Section 6.03(a)(iv):

(i)    at such time as the Capital Account of the General Partner or any Private Limited Partner is reduced to an amount equal to the aggregate capital contributions of such Partner (less all distributions to such Partner), the balance of all Net Losses will be allocated:

(A)    first, to the remaining Capital Accounts of the General Partner and Private Limited Partners which have not been reduced to zero (to be apportioned among them in accordance with their respective positive Capital Accounts);

(B)    second, after the Capital Accounts of the General Partner and all Private Limited Partners have been reduced to zero, then to the remaining Capital Accounts of the Preferred Limited Partners which have not been reduced to zero (to be apportioned among them according to their respective Capital Accounts); and

(C)    third, after the Capital Accounts of all Private Limited Partners and Preferred Limited Partners have been reduced to zero, then the balance to the General Partner.

(ii)    If Net Losses are allocated in accordance with the foregoing clause (i), any Net Profits that are required to be allocated after such special allocation of Net Losses as provided in the foregoing clause will be allocated:

(A)    first, to the General Partner until the effect of the special allocation of Net Losses under clause (i)(C) is reversed and eliminated;

(B)    second, to all of the Preferred Limited Partners to whom the allocation of such Net Losses has been made under clause (i)(B) until the effect of such special allocation of Net Losses has been reversed and eliminated; and

(C)    third, to the General Partner and Private Limited Partners to whom the allocation of such Net Losses has been made under clause

39

(i)(A) until the effect of such special allocation of Net Losses has been reversed and eliminated.

(c)     To the extent not otherwise accomplished by the provisions of Section 6.03(a) and Section 6.03(b), the Opening Capital Accounts of the Partners will be adjusted to effect any allocation of any item of income, gain, loss, deduction or credit to a Partner required by the Code.

**Section 6.04    Tax Matters.**

(a)     If at the end of a fiscal year of the Partnership, a Private Limited Partner or any Preferred Limited Partner unexpectedly receives an adjustment, allocation, or distribution described in clauses (4), (5) and (6) of Treasury Regulation § 1.704 -l(b)(2)(ii) and that adjustment, allocation, or distribution reduces that Private Limited Partner's or Preferred Limited Partner's Opening Capital Account below zero (0), then the Private Limited Partner or Preferred Limited Partner will be allocated all items of income and gain of the Partnership for that year and for all subsequent fiscal years until the deficit balance has been eliminated as provided in Treasury Regulation § 1.704 -l(b)(2)(ii)(d), as quickly as possible. If any such unexpected adjustment, allocation or distribution creates a deficit balance in the Opening Capital Accounts of more than one Private Limited Partner or Preferred Limited Partner in any fiscal year, all items of income and gain of the Partnership for the fiscal year and all subsequent fiscal years will be allocated among all such Private Limited Partners and Preferred Limited Partners in proportion to their respective deficit balances until such balances have been eliminated. If any allocation is made pursuant to this paragraph, subsequent allocations shall be made (in a manner consistent with this paragraph) to offset the effects of such prior allocation. This provision is intended to qualify as a "qualified income offset" within the meaning of Treasury Regulation § 1.704-1(b)(2)(ii)(d).

(b)     For Federal, state and local income tax purposes, each item of Partnership income, credit, gain or loss will be allocated among the Partners as provided in Section 6.03.

(c)     The General Partner has the power, limited as provided in the following sentence, to make such allocations and to take such actions necessary under the Code or other applicable law to effect and to maintain the substantial economic effect of allocations made to the Partners under Section 704(b) of the Code. The preceding sentence does not give the General Partner any power to make any allocation or take any other action that affects the rights or preferences of, or allocations or distributions to, any Preferred Limited Partner. All allocations made and other actions taken by the General Partner under this paragraph will be consistent to the maximum extent possible with the provisions of this Agreement.

(d)     The General Partner is the "tax matters partner," as the term is used in the Code.

40

(e)    The General Partner is expressly authorized to (i) elect that the Partnership be classified as a partnership for federal tax purposes, and (i) to make any election or other action on behalf of the Partnership permitted under the Code with respect to the election of that tax classification.

(f)    The General Partner must keep the Partners informed of all administrative and judicial proceedings with respect to Partnership tax returns or the adjustment of Partnership items.  Any Partner who enters into a settlement agreement with respect to Partnership items must promptly give the General Partner notice of the settlement agreement and terms that relate to Partnership items.

(g)    In the event of any admission of any Additional Private Limited Partner or Preferred Limited Partner or transfer by any Private Limited Partner of its Partnership interest, the General Partner will allocate items of income, credit, gain or loss in accordance with the Code and may make such elections under the Code as the General Partner determines to be necessary or appropriate.

(h)    Anything contained in this Agreement to the contrary notwithstanding, if the Partnership is deemed liquidated within the meaning of Treasury Regulation § 1.704-1(b)(2)(ii)(g) but has not dissolved under Section 8.01(a), then the assets of the Partnership will, after provision for payment to creditors, be deemed distributed to the Partners in accordance with Treasury Regulation §1.704-1(b)(2)(ii)(b)(2) and immediately recontributed to the Partnership and the General Partner must make the contributions contemplated by Section 5.04(d).

## ARTICLE 7
## DISTRIBUTIONS

**Section 7.01**   **Distributions to Partners.**

(a)    The Partnership must make distributions of cash and/or property, if any, at such times as the SBIC Act requires and may make distributions of cash and/or property at such other times as the SBIC Act permits and as are determined under this Agreement.

(b)    All distributions must be made in the following order and amounts:

(i)    to the Preferred Limited Partners in an amount up to any unpaid Earned Prioritized Payments, earned Adjustments and earned Charges to which any Preferred Limited Partners are entitled (as determined under the SBIC Act), to be apportioned among them as required by the SBIC Act;

(ii)    if all amounts required to be distributed under clause (i) have been distributed, then at the election of the General Partner, to the Partners (whether or not each Partner is a taxpayer or is a tax exempt entity) in an

41

amount up to the Maximum Tax Liability of the Partners, to be apportioned between the Preferred Limited Partners on the one hand and the General Partner and the Private Limited Partners on the other hand, as required by the SBIC Act;

(iii)    if all amounts required to be distributed under clause (i) and clause (ii) (if the General Partner has elected to make a distribution under clause (ii)) have been distributed, then to the Partners in an amount up to the amount of the Retained Earnings Available for Distribution of the Partnership, to be apportioned among them in the following ratios:

(A)    if as of the date of the distribution there is Outstanding Leverage, then in the ratios stated in the SBIC Act; and

(B)    if as of the date of the distribution there is no Outstanding Leverage, then any amount to be distributed under this clause (iii) will be apportioned to the Preferred Limited Partners up to the amount of any Profit Participation payable to the Preferred Limited Partners following the redemption of their Preferred Limited Partnership Interests under the SBIC Act, if any, and the balance will be apportioned to the General Partner and the Private Limited Partners;

(iv)    if all amounts required to be distributed under clauses (i) (ii) (if the General Partner has elected to make a distribution under clause (ii)), and (iii) have been distributed, then any additional amount will be distributed and apportioned among the Partners in the following ratios:

(A)    if as of the date of the distribution there is Outstanding Leverage then in the ratios stated in the SBIC Act; and

(B)    if as of the date of the distribution there is no Outstanding Leverage, then any amount to be distributed under this clause (iv) will be distributed one hundred percent (100%) to the General Partner and the Private Limited Partners.

**Section 7.02**    **Distributions of Noncash Assets in Kind.**

(a)    Subject to the provisions of the SBIC Act (including, without limitation, 13 C.F.R. § 107.1580), the prior approval of SBA and the provisions of this Section, the Partnership at any time may distribute Noncash Assets in kind.

(b)    Except as provided in the next sentence, any distribution of Noncash Assets will be made pro rata between the Preferred Limited Partners on the one hand and the General Partner and Private Limited Partners on the other hand (based upon the respective amounts which each of the two groups would be entitled to receive if the distribution were made in cash) with respect to the distribution of each

42

Noncash Asset. With the prior approval of SBA, the Partnership may distribute cash to the Preferred Limited Partners in lieu of all or part of any Noncash Assets that they would otherwise receive in such distribution.

(c)     Distributions of Noncash Assets in kind before the redemption of all Preferred Limited Partnership Interests will only be made if the Noncash Assets are Distributable Securities. Distributions in kind of Noncash Assets which are Earmarked Assets after the redemption of all Preferred Limited Partnership Interests will be made only (i) if the Noncash Assets are Distributable Securities or (ii) if the Noncash Assets are not Distributable Securities, then with the prior approval of SBA (which must include the approval of the valuation of the Noncash Assets).

(d)     At any time that any amount due to a Preferred Limited Partner whose Preferred Limited Partnership Interest has been redeemed for purposes of the SBIC Act has not been paid in full, the Partnership will not make any distribution of Noncash Assets in kind unless the Partnership distributes to the Preferred Limited Partner such amount, up to the amount of the unrealized appreciation on the Noncash Assets to be distributed, as may be necessary to pay in full the amounts due to the Preferred Limited Partner under Section 4.07(c).

(e)     Subject to the SBIC Act, Noncash Assets distributed in kind under this Section 7.02 will be subject to such conditions and restrictions as are legally required, including, without limitation, such conditions and restrictions required to assure compliance by the Partners and/or the Partnership with the aggregation rules and volume limitations under Rule 144 promulgated under the Securities Act.

**Section 7.03    Apportionment of Distributions Among the General Partner and Private Limited Partners.**

All amounts to be distributed to the General Partner and the Private Limited Partners will be apportioned among the General Partner and the Private Limited Partners, pro rata, in proportion to their respective Percentage Interests.

**Section 7.04    Distributions for Payment of Tax.**

(a)     Notwithstanding anything contained in this Agreement to the contrary, at any time when the Partnership does not have any Outstanding Leverage, own any Earmarked Assets and all payments due with respect to any previously issued Outstanding Leverage have been made, (i) the General Partner and the Private Limited Partners will be entitled to receive cash distributions from the Partnership (after taking into account any other distributions received by the General Partner and the Private Limited Partners in that fiscal year) in amounts sufficient to enable the General Partner and the Private Limited Partners (and the partners or members of the General Partner and the Private Limited Partners, if any) to discharge any Federal, state and local tax liability excluding penalties arising as a

43

result of the General Partner's and the Private Limited Partners' interest in the Partnership. Such distributions will be debited to the General Partner's and the Private Limited Partners' Capital Accounts, as provided in Section 6.03(a)(ii).

(b)    Subject to the SBIC Act, the Partnership will at all times be entitled to make tax withholding payments with respect to any Private Limited Partner in amounts required to discharge any legal obligation of the Partnership to make payments to any governmental authority with respect to any Federal, state or local tax liability of the Partner arising as a result of the Partner's interest in the Partnership. Each such payment will be debited to such Partner's Capital Account, as provided in Section 6.03(a)(ii).

**Section 7.05    Distributions Violative of the Act Prohibited.**

Notwithstanding anything contained in this Agreement to the contrary, no distribution may be made by the Partnership if and to the extent that such distribution would violate Section 17-607 of the Act.

## ARTICLE 8
## DISSOLUTION, LIQUIDATION, WINDING UP AND WITHDRAWAL

**Section 8.01    Dissolution.**

(a)    The Partnership will be dissolved upon the first to occur of the following:

   (i)    subject to Section 8.04 of this Agreement, an event of withdrawal (as defined in Section 17-101(3) and 17-402 of the Act) of the General Partner;

   (ii)    the later of:

      (A)    ten (10) years from the date of formation of the Partnership; or

      (B)    two years after all Preferred Limited Partners have withdrawn from the Partnership and all Outstanding Leverage has matured; or

   (iii)    the determination of the Partners to dissolve and terminate the Partnership as provided in Section 8.01(c).

(b)    The Partnership will not dissolve upon the withdrawal, dissolution, bankruptcy, death or adjudication of incompetence or insanity of any Private Limited Partner or Preferred Limited Partner.

(c)    The General Partner may elect to dissolve the Partnership by giving notice to each Partner and SBA of the election. Any notice of an election to dissolve the Partnership may only be given:

44

(i)     on or after the tenth (10th) anniversary of the Initial Closing;

(ii)    if all Outstanding Leverage has been repaid or redeemed; and

(iii)   if all amounts due the Preferred Limited Partners, SBA, its agent or trustee have been paid.

Any election to dissolve the Partnership given under this Section 8.01(c) will not be effective until the later of: (A) thirty (30) days from the date the notice is given to all parties or (B) the effective date of dissolution stated in the notice.

(d)    The General Partner may elect to extend the date set forth in Section 8.01(a)(ii)(A) and Section 8.01(c)(i) at any time within ninety (90) days prior to such date. Such date can be extended by any such election for up to three (3) additional successive periods of one (3) year each.

## Section 8.02   Winding Up.

(a)    Subject to the SBIC Act and Section 8.03, when the Partnership is dissolved, the property and business of the Partnership will be liquidated by the General Partner or if there is no General Partner or the General Partner is unable to act, a person designated by the holders of [fifty-one percent (51%)] in interest of the Private Limited Partners.

(b)    Within a reasonable period (and subject to the requirements of Treasury Regulation §§ 1.704-l(b)(ii)(g) and 1.704-l(b)(2)(ii)(b)(2)) after the effective date of dissolution of the Partnership, the affairs of the Partnership will be wound up and the Partnership's assets will be distributed as follows:

(i)    First, to the payment of the debts and liabilities of the Partnership and the expenses of liquidation;

(ii)    Second, to the setting up of any reserves that the General Partner may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or of the Partners arising out of or in connection with the Partnership;

(iii)   Third, to the distribution to each of the Partners of the amounts in their respective Capital Accounts or, if the amount available is less than the aggregate amount of such Capital Accounts, then pro rata to the Partners in proportion to the amounts in their respective Capital Accounts; and

(iv)   Any balance remaining shall be distributed among the Partners, pro rata in proportion their respective Percentage Interests.

45

**Section 8.03**   **Withdrawal of the General Partner.**

(a)   Except as provided in Section 4.03 and Section 4.04, the General Partner may not withdraw as the general partner of the Partnership without the approval of fifty-one percent (51%) in interest of the Private Limited Partners.

(b)   To the extent required by the SBIC Act, no transfer of the interest of the General Partner, or any portion of such interest, will be effective without the consent of SBA.

(c)   Subject to the limitations set forth in Section 8.03(b), Section 10.01(b), Section 10.01(d), and Section 10.01(f), any person who acquires the interest of the General Partner, or any portion of such interest, in the Partnership, will not be a General Partner but will become a special private limited partner (a **"Special Private Limited Partner"**) upon his written acceptance and adoption of all the terms and provisions of this Agreement.  Such person will acquire no more than the interest of the General Partner in the Partnership as it existed on the date of the transfer, but will not be entitled to any priority given to the Private Limited Partners, their successors and assigns, in respect of the interest.  No such person will have any right to participate in the management of the affairs of the Partnership or to vote with the Private Limited Partners, and the interest acquired by such person will be disregarded in determining whether any action has been taken by any percentage of the limited partnership interests.

(d)   Upon an event of withdrawal of the General Partner without continuation of the Partnership as provided in Section 8.04, the affairs of the Partnership will be wound up in accordance with the provisions of Section 8.02.

**Section 8.04**   **Continuation of the Partnership After the Withdrawal of the General Partner.**

Upon the occurrence of an event of withdrawal (as defined in the Act) of the General Partner, the Partnership will not be dissolved, if, within ninety (90) days after the event of withdrawal, fifty-one percent (51%) in interest of the Private Limited Partners agree in writing to continue the business of the Partnership and to the appointment of one or more additional general partners (subject to the approval of SBA), effective as of the date of withdrawal of the General Partner.

**Section 8.05**   **Withdrawals of Capital.**

Except as specifically provided in this Agreement, withdrawals by a Partner of any amount of its Capital Account are not permitted.

46

**Section 8.06    Withdrawal by ERISA Regulated Pension Plans.**

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is (x) an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, or (y) any other Person, any of the assets of which constitute "plan assets" of an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable the Private Limited Partner to avoid a violation of, or breach of the fiduciary duties of any person under ERISA (other than a breach of the fiduciary duties of any such person based upon the investment strategy or performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership (as opposed to the Private Limited Partner's partnership interest) constitute assets of the Private Limited Partner for purposes of ERISA and are subject to the provisions of ERISA to substantially the same extent as if owned directly by the Private Limited Partner.

**Section 8.07    Withdrawal by Government Plans Complying with State and Local Law.**

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that as a result of state statutes, regulations, case law, administrative interpretations or similar authority applicable to the "government plan", the withdrawal of such Private Limited Partner from the Partnership to such extent is required to enable the Private Limited Partner or the Partnership to avoid a violation (other than a violation based upon the investment performance of the Partnership) of the applicable state law.

**Section 8.08    Withdrawal by Government Plans Complying with ERISA.**

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, if the "government plan" obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the "government plan" from the Partnership to such extent would be required if it were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, to enable the "government plan" to avoid a violation of, or breach of the fiduciary duties of any person under ERISA (other than a breach of the fiduciary duties of any such person based upon the investment strategy or performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership would constitute assets of the "government plan" for the purposes of ERISA, if the "government plan" were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA

and would be subject to the provisions of ERISA to substantially the same extent as if owned directly by the "government plan."

**Section 8.09**    **Withdrawal by Tax Exempt Private Limited Partners.**

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is exempt from taxation under Section 501(a) or 501(c)(3) of the Code may elect to withdraw from the Partnership in whole or in part, if the Private Limited Partner obtains an opinion of counsel to the effect that as a result of applicable statutes, regulations, case law, administrative interpretations or similar authority, the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable the tax exempt Private Limited Partner to avoid loss of its tax exempt status under Section 501(a) or 501(c)(3) of the Code.

**Section 8.10**    **Withdrawal by Registered Investment Companies.**

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is an "investment company" subject to registration under the Investment Company Act, may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of the Investment Company Act, the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable such Private Limited Partner or the Partnership to avoid a violation of applicable provisions of the Investment Company Act or the requirement that the Partnership register as an investment company under the Investment Company Act.

**Section 8.11**    **Distributions on Withdrawal.**

(a)    Subject to the provisions of <u>Section 8.11(b)</u>, upon withdrawal under any provision of this Agreement, a Private Limited Partner will have the rights to distributions provided in the Act with respect to distributions to be made to limited partners upon withdrawal from a limited partnership.

(b)    The Partnership will not make any distribution to any Partner in connection with its withdrawal under any provision of this Agreement or the Act, unless the distribution is permitted by the SBIC Act and SBA has given its consent to such distribution before the distribution is made.

(c)    Except in the case of distributions made as permitted under subsection (b), the right of the General Partner or any Private Limited Partner to receive any distribution from the Partnership as a result of such Partner's withdrawal, including any right any such Partner may have as a creditor of the Partnership with respect to the amount of any such distribution, is subordinate to any amount due to a Preferred Limited Partner or SBA by the Partnership.

# ARTICLE 9
## ACCOUNTS, REPORTS AND AUDITORS

**Section 9.01**   **Books of Account.**

    (a)    The Partnership must maintain books and records in accordance with the provisions of the SBIC Act regarding financial accounts and reporting and, except as otherwise provided in this Agreement, generally accepted accounting principles.

    (b)    The books and records of the Partnership must be kept at the principal place of business of the Partnership. Each Partner will have access, upon reasonable notice and during regular business hours, to all books and records of the Partnership for all proper purposes as a Partner of the Partnership. Each Partner will have the right to receive copies of such books and records, subject to payment of the reasonable costs of such copies.

    (c)    The Partnership will not be required to disclose, however, any confidential or proprietary information received by the Partnership in connection with its investment operations, except for any disclosure to SBA required by the SBIC Act.

**Section 9.02**   **Audit and Report.**

    (a)    The financial statements of the Partnership must be audited and certified as of the end of each fiscal year by a firm of independent certified public accountants selected by the Partnership.

    (b)    Within three (3) months of the end of each fiscal year, the Partnership must prepare and mail to each Partner a report prepared in accordance with the provisions of the SBIC Act regarding financial reporting, setting forth as at the end of the fiscal year:

        (i)    a balance sheet of the Partnership;

        (ii)    a statement of operations for the year;

        (iii)    a statement of cash flows;

        (iv)    a statement of changes in partners' capital, and such Partner's Closing Capital Account;

        (v)    a statement of the Assets, valued as provided under this Agreement;

(vi) the amount of such Partner's share in the Partnership's taxable income or loss for the year, in sufficient detail to enable it to prepare its Federal, state and other tax returns;

(vii) any other information the General Partner, after consultation with any Private Limited Partner requesting the same, deems necessary or appropriate;

(viii) upon request by any Partner, such other information as is needed by such Partner in order to enable it to file any of its tax returns; and

(ix) such other information as any Partner may reasonably request for the purpose of enabling it to comply with any reporting or filing requirements imposed by any statute, rule, regulation or otherwise by any governmental agency or authority.

The items set forth in clauses (i), (ii), (iii), (iv), (v) and (vi) of this Section 9.02(b) will be certified by the firm of independent certified public accountants selected by the Partnership

(c) Within forty-five (45) days of the end of each of the first three fiscal quarters, the Partnership will prepare and mail to each Partner a report of the General Partner prepared in accordance with the provisions of the SBIC Act regarding financial reporting setting forth the information described in Section 9.02(b) (i) – (iv) identifying the securities held by the Partnership and stating the amount of each security held and the cost and value thereof as determined under Section 3.10.

**Section 9.03** **Fiscal Year.**

The fiscal year of the Partnership will be a twelve-month year (except for the first and last partial years, if any) ending on December 31.

**ARTICLE 10**
**MISCELLANEOUS**

**Section 10.01** **Assignability.**

(a) No Private Limited Partner may assign, pledge or otherwise grant a security interest in its or his interest in the Partnership or in this Agreement, except with the prior written consent of the General Partner (which consent may be withheld in the absolute discretion of the General Partner).

(b) No General Partner or Private Limited Partner may transfer any interest of ten percent (10%) or more in the capital of the Partnership without the prior approval of SBA.

50

(c)     The General Partner may not assign, pledge or otherwise grant a security interest in its interest in the Partnership or in this Agreement, except with the prior consent of SBA and the prior approval of fifty percent (50%) in interest of the Private Limited Partners.

(d)     No transfer of any interest in the Partnership will be allowed if such transfer or the actions to be taken in connection with that transfer would:

  (i)     result in any violation of the SBIC Act;

  (ii)    result in a violation of any law, rule or regulation by the Partnership;

  (iii)   cause the termination or dissolution of the Partnership;

  (iv)    cause the Partnership to be classified other than as a partnership for Federal income tax purposes;

  (v)     result in the transfer of a limited partnership interest with a cost of less than $20,000 or cause the Partnership to be classified as a "publicly traded partnership" within the meaning of Section 469(k)(2) of the Code or for the purposes of Section 512(c)(2) of the Code;

  (vi)    result in a violation of the Securities Act;

  (vii)   require the Partnership to register as an investment company under the Investment Company Act;

  (viii)  require the Partnership, the General Partner or the Investment Adviser/Manager to register as an investment adviser under the Investment Advisers Act; or

  (ix)    result in a termination of the Partnership for Federal or state income tax purposes.

(e)     If a natural person Private Limited Partner dies or become incapacitated, his or her legal representative will, upon execution of a counterpart of this Agreement, be substituted as a Private Limited Partner, subject to all the terms and conditions of this Agreement.

(f)     Any transferee of any interest in the Partnership by a transfer in compliance with this Section will become a substituted Partner under this Agreement upon delivery and execution of a counterpart of this Agreement, will have the same rights and responsibilities under this Agreement as its assignor and will succeed to the Capital Account and balances thereof.

\\\DC - 83555/0001 - 1386423 v8

**Section 10.02** **Assignability of Class B Limited Partnership Interests.**

In addition to the limitations on assignment imposed by Section 10.01 or any other Section of this Agreement, no Class B Limited Partner may transfer, sell, pledge, assign or otherwise dispose of its interest in the Partnership as a Class B Limited Partner or in this Agreement unless such Class B Limited Partner simultaneously transfers its interest in the Parent Fund to the transferee of such interest.

**Section 10.03** **Binding Agreement.**

Subject to the provisions of Section 10.01, this Agreement is binding upon, and inures to the benefit of, the heir, successor, assign, executor, administrator, committee, guardian, conservator or trustee of any Partner.

**Section 10.04** **Gender.**

As used in this Agreement, masculine, feminine and neuter pronouns include the masculine, feminine and neuter; and the singular includes the plural.

**Section 10.05** **Notices.**

(a)    All notices under this Agreement must be in writing and may be given by personal delivery, telex, telegram, private courier service or registered or certified mail.

(b)    A notice is deemed to have been given:

   (i)    by personal delivery, telex, telegram, or private courier service, as of the day of delivery of the notice to the addressee; and

   (ii)    by mail, as of the fifth (5th) day after the notice is mailed.

(c)    Notices must be sent to:

   (i)    the Partnership, at the address of the General Partner in the Certificate of Limited Partnership, or such other address or addresses as to which the Partners have been given notice;

   (ii)    the Private Limited Partners, at the addresses in Exhibit I attached to this Agreement (as Exhibit I may be amended from time to time) or such other addresses as to which the Partnership has been given notice;

   (iii)    the Preferred Limited Partner, at the address of the Investment Division of SBA or such other addresses as to which the Partnership has been given notice; and

52

(iv)    SBA, at the address of the Investment Division of SBA and, if so required under any Section of this Agreement, in duplicate at the address of the Office of the General Counsel of SBA.

### Section 10.06  Consents and Approvals.

A consent or approval required to be given by any party under this Agreement will be deemed given and effective for purposes of this Agreement only if the consent or approval is:

(i)     given by such party in writing, and

(ii)    delivered by such party to the party requesting the consent or approval in the manner provided for notices to such party under Section 10.05.

### Section 10.07  Counterparts.

This Agreement and any amendment to this Agreement may be executed in more than one counterpart with the same effect as if the parties executed one counterpart as of the day and year first above written on this Agreement or any such amendment.  To be effective, each separate counterpart must be executed by the General Partner.

### Section 10.08  Amendments.

(a)    This Agreement may not be amended except by an instrument in writing executed by the holders of sixty-six and two-thirds percent (66 2/3%) in interest of the Private Limited Partners who have not withdrawn as of the effective date of that amendment and the General Partner, and approved by SBA.

(b)    In addition to the requirements in Section 10.07 and Section 10.08(a), any amendment that:

(i)     increases the amount of a Private Limited Partner's Commitment requires that Partner's consent;

(ii)    may cause a Private Limited Partner or Preferred Limited Partner to become liable as a general partner of the Partnership requires the written consent of all Partners;

(iii)   amends this Section requires the consent of all Partners; or

(iv)    dilutes the relative interest of any Private Limited Partner in the profits or capital of the Partnership or in allocations or distributions attributable to the ownership of such interest requires that Partner's consent;

(c)    Each Private Limited Partner consents to:

53

(i)    the admission of Additional Private Limited Partners and the increase in any Private Limited Partner's Commitment in accordance with Section 5.06;

(ii)    the admission of any Preferred Limited Partner and the increase in any Preferred Limited Partner's Commitment in accordance with Section 4.05(b);

(iii)    the transfer of a Partner's interest in accordance with Section 10.01 and the admission of a substituted Partner under such transfer;

(iv)    any amendment of this Agreement or the Certificate of Limited Partnership necessary to effect such transfer or admission;

(v)    any amendment of this Agreement or the Certificate of Limited Partnership to comply with or conform to any amendments of applicable laws governing the Partnership; and

(vi)    any amendment to this Agreement that the General Partner reasonably determines is necessary or advisable in connection with Partnership's efforts to receive a license to operate as an SBIC; provided, however, that such consent with respect to any such amendment is contingent on the General Partner having reasonably determined that such amendment will not subject any Private Limited Partner (or any limited partner of any Private Limited Partner) to any material adverse economic consequences, alter or waive the right to receive allocations and distributions that otherwise would be made to any Private Limited Partner (or any limited partner of any Private Limited Partner), or alter or waive in any material respect the duties and obligations of the General Partner to the Partnership or any Private Limited Partner (or any limited partner of any Private Limited Partner).

(d)    The General Partner must distribute to each Private Limited Partner, Preferred Limited Partner and SBA a copy of:

(i)    any Certificate of Amendment to the Certificate of Limited Partnership, and

(ii)    any amendment to this Agreement.

(e)    Copies of any Certificate of Amendment to the Certificate of Limited Partnership, and any amendment to this Agreement must be distributed in the same manner as provided for notices in Section 10.05.

Section 10.09 <u>Power of Attorney</u>.

(a)     Each Private Limited Partner appoints the General Partner, and each member of the General Partner, as its true and lawful representative and attorney-in-fact, in its name, place and stead, to make, execute, sign and file:

    (i)     any amendments of this Agreement necessary to reflect:

        (A)     the transfer of a Partner's interest in accordance with Section 10.01;

        (B)     the admission of a substituted Private Limited Partner under Section 10.01;

        (C)     the admission of an Additional Private Limited Partner under Section 5.06;

        (D)     an amendment of this Agreement adopted by the Partners under Section 10.08; and

    (ii)     all instruments, documents and certificates which, from time to time, may be required by the law of the United States of America, the State of Delaware or any other state in which the Partnership determines to do business, or any political subdivision or agency thereof, to execute, implement and continue the valid and subsisting existence of the Partnership and in conformance to the provisions of this Agreement.

(b)     The General Partner and its partners, as representatives and attorneys-in-fact, do not have any rights, powers or authority to amend or modify this Agreement when acting in such capacity, except as expressly provided in this Agreement. This power of attorney is coupled with an interest and will continue in full force and effect notwithstanding the subsequent death or incapacity of such party.

Section 10.10 <u>Applicable Law</u>.

This Agreement is governed by, and construed in accordance with, applicable Federal laws and the laws of the State of Delaware.

Section 10.11 <u>Severability</u>.

If any one or more of the provisions contained in this Agreement, or any application of any such provision, is invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and all other applications of any such provision will not in any way be affected or impaired.

\\\DC - 83555/0001 - 1386423 v8

**Section 10.12  <u>Entire Agreement</u>.**

This Agreement, and all other written agreements executed by or on behalf of the General Partner and/or the Private Limited Partners and executed or approved by SBA, up to and including the date of this Agreement (such other written agreements, collectively, the **"SBA Agreements"**), state the entire understanding among the parties relating to the subject matter of this Agreement and the SBA Agreements.  Any and all prior conversations, correspondence, memoranda or other writings are merged in, and replaced by this Agreement and the SBA Agreements, and are without further effect on this Agreement and the SBA Agreements.  No promises, covenants, representations or warranties of any character or nature other than those expressly stated in this Agreement and the SBA Agreements have been made to induce any party to enter into this Agreement or any SBA Agreement.

\\\DC - 83555/0001 - 1386423 v8

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement as of the date first written above.

GENERAL PARTNER:

GKM SBIC, LLC

By: _____
     Jonathan R. Bloch
     Managing Member

PRIVATE LIMITED PARTNERS:

Class A Limited Partner:

GKM Venture Partners, L.P.

By:    GKM Management, LLC
       Its General Partner

By: _____
     Jonathan R. Bloch

[Signatures of the Class B Limited Partners appear on the following page.]

WDC - 83555/0001 - 1386423 v8

# GKM SBIC, L.P.

## CLASS B LIMITED PARTNER SIGNATURE PAGE

The undersigned Class B Limited Partners hereby execute the Agreement of Limited Partnership of GKM SBIC, L.P., and hereby authorize this signature page to be attached to a counterpart of such document executed by the General Partner of GKM SBIC, L.P.

| | | |
|---|---|---|
| Albert Schneider | Richard and Nancy Bloch Family Trust | GKW Unified Holdings, LLC |
| Clifton K.Chang | Frank J.Thomas | Brian Mason |
| John Glanville | The Boberg Family Revocable Living Trust | KIE, LLC |
| Deemer Community Property Trust | | GKM Partners I, L.P. |
| Rosenblum Living Trust | Lakeside Enterprises, L.P. | WJB Insurance Company |
| Benjamin L.Padnos | LFC Delta Fund, Ltd | Shoemaker Family Partners, LP |
| Corley Family Living Trust | O.S. II, Inc. (Merged with Lakeside Enterprises, L.P.) | MPP Holdings, LLC |
| Eric & Lynne Siegel Revocable Trust | Stanford Miller IRA | Wilshire Blvd. Partners VII, LLC |
| Peter H. Neuwirth Trust | TCW Leveraged Inc Trust II, L.P. | Environmental Entrepreneurs Venture Endowment LLC |
| Narang Family Partnership L.P. | TCW Leveraged Inc Trust IV, L.P. | R&M GKM Investors |
| Greater Bay Bancorp | TCW Leveraged Income Trust, L.P. | Thunderhill Associates, LLC |
| Marc Jones | TCW Shared Opportunity Fund II, L.P. | GKM Management, LLC |
| Roger Phillips | | |
| Roger Wayne Roberts Revocable Trust | TCW Shared Opportunity Fund III, L.P. | |
| Steiny Family Trust | DeMayo Family Trust, Ltd. | |

By:    **GKM SBIC, LLC**
As Attorney In Fact

By: _____
Jonathan R. Bloch
Managing Member

58

WDC - 83555/0001 - 1386423 v8

## EXHIBIT I

## PARTNERS AND COMMITMENTS

| PARTNERS | COMMITMENTS |
|---|---|
| **General Partner:** | |
| GKM SBIC, LLC | $0 |
| | |
| **Private Limited Partners:** | |
| *Class A Limited Partners:* | |
| GKM Venture Partners, L.P.* | $16,000,000 |
| **Total** | **$16,000,000** |
| | |

\* The Proportionate Shares of the Class B Limited Partners are listed in a chart on the following page.

EXHIBIT I (cont'd)

Proportionate Shares of Class B Limited Partners

| Class B Limited Partner | Proportionate Share |
|---|---|
| The Boberg Family Revocable Living Trust | 2.0% |
| Steiny Family Trust | 1.25% |
| Rosenblum Living Trust | .25% |
| Roger Wayne Roberts Revocable Trust | 1.25% |
| Richard and Nancy Bloch Family Trust | 1.5% |
| Peter H. Neuwirth Trust | .5% |
| O.S. II, Inc. | 2.5% |
| Narang Family Partnership, L.P. | .625% |
| LFC Delta Fund Ltd | 2.5% |
| Lakeside Enterprises, L.P. | 2.5% |
| KIE, LLC | 10% |
| Greater Bay Bancorp | 1.25% |
| GKM Partners I, L.P. | 14.075% |
| Eric & Lynne Siegel Revocable Trust | .5% |
| DeMayo Family Trust, Ltd. | 5% |
| Corley Family Living Trust | .5% |
| GKW Unified Holdings, LLC | 5% |
| TCW Shared Opportunity Fund III, L.P. | 3% |
| TCW Shared Opportunity Fund II, L.P. | 3% |
| TCW Leveraged Income Trust, L.P. | 3% |
| TCW Leveraged Inc Trust IV, L.P. | 3% |
| TCW Leveraged Inc Trust II, L.P. | 3% |
| Brian Mason | 7.5% |
| Frank Thomas | 2% |
| Roger Phillips | 1.25% |
| Marc Jones | 1.25% |
| John Glanville | .25% |
| Albert Schnieder | .25% |
| Ben Padnos | .3% |
| Clifton Chang | .25% |
| Deemer Community Property Trust | .25% |
| Environmental Entrepreneurs Venture Endowment LLC | 1.25% |
| GKM Management, LLC | 1% |
| WJB Insurance Company | .25% |
| Shoemaker Family Partners, LP | .25% |
| Wilshire Blvd. Partners IVV, LLC | .5% |
| R&M GKM Investors | 1.75% |
| Thunderhill Associates, LLC | 2.5% |
| MPP Holdings, LLC | .5% |
| | |
| Total: | 87.5% |

Exhibit I-A

I.D. Control # _____
License # _____

## Instrument of Admission or Increase in
## Commitment for Preferred Limited Partner

1. **Partnership Name:** _____

2. **Amount of Preferred Limited Partner's Capital Contribution:** _____

3. **Effective Date of Admission or Increase:** _____ **(the "Settlement Date")**

**Short Term Period Provisions:**

For the period beginning on the Settlement Date and ending on _____ (the "Scheduled Pooling Date"), the following terms shall apply:

4. **Short Term Rate of Prioritized Payment:** _____

5. **Short Term Payment Date:** __the Business Day before the Scheduled Pooling Date_____

6. **Short Term Calculation Method:** For the Short Term Period, Prioritized Payments will be calculated on the basis of a year of 360 days, for the actual number of days elapsed (including the first day but excluding the last day) from the Settlement Date to the Scheduled Pooling Date (and, if extended by SBA, from the Scheduled Pooling Date to the Pooling Date (as defined below)).

---

**Short Term Period Extension Provisions:**
If the Scheduled Pooling Date is extended one or more times by SBA, the following terms will apply during the extension period(s):

| | | (a) | (b) | (c) |
|---|---|---|---|---|
| 7. | Extension Period from and including: | (a) | (b) | (c) |
| | to but excluding: | (a) | (b) | (c) |
| 8. | Extension Period Rates of Prioritized Payment: | (a) | (b) | (c) |
| 9. | Extension Period Payment Dates: | (a) | (b) | (c) |

---

**Long Term Period Provisions:**

For the period beginning on _____ (the "Pooling Date"), and ending on the date set forth in item 12 below, the following terms shall apply:

10. **Long Term Rate of Prioritized Payment:** _____

11. **Long Term Payment Dates:** February 1, May 1, August 1, November 1_____

12. **Maturity Date:** _____

13. **Long Term Calculation Method:** For the Long Term Period, Prioritized Payments will be calculated on the basis of a year of 365 days, for the actual number of day elapsed (including the first day but excluding the last) from the Pooling Date to the Maturity Date.

Instrument of Admission or Increase

**Provisions Applicable to Short Term and Long Term Periods:**

If this is the first capital contribution by the Preferred Limited Partner in the partnership, the undersigned hereby is admitted and agrees to become a Preferred Limited Partner pursuant to the terms of the partnership's Agreement of Limited Partnership and to be bound by and comply with the terms of such Agreement. If the undersigned has already been admitted as a Preferred Limited Partner, the increase in the Preferred Limited Partner's capital contribution will be in the amount set forth in item 2 above effective on the Settlement Date.

The Prioritized Payment payable with respect to this capital contribution shall be at the rate(s) set forth above.

**An additional charge of 1% per annum shall be payable to the Preferred Limited Partner under the same terms and conditions as are applicable to the payment of Prioritized Payments.**

This Instrument shall have the same force and effect as if the undersigned parties had executed a counterpart of the partnership's Agreement of Limited Partnership. Capitalized terms used in this Instrument shall have the respective meanings set forth in such Agreement of Limited Partnership.

**IN WITNESS WHEREOF the undersigned have executed this instrument as of** _____ ____, _____.

**Partnership:**

_____
(Partnership Name)

By: _____
(Name of General Partner)

By: _____
(Signature of Officer or General Partner)

Name: _____

Title: _____

**Preferred Limited Partner:**

_____ U.S. Small Business Administration _____
(Name of Preferred Limited Partner)

By: _____
(Signature of Authorized Person)

Name: _____
Title: _____

Address:   U.S. Small Business Administration
Investment Division, 409 Third Street, S.W.
Washington, D.C. 20416

# EXHIBIT II

## Valuation Guidelines

### General

The General Partner has sole responsibility for determining the Asset Value of each of the Loans and Investments and of the portfolio in the aggregate.

Loans and Investments shall be valued individually and in the aggregate at least semi-annually - as of the end of the second quarter of the fiscal year-end and as of the end of the fiscal year. Fiscal year-end valuations are audited as set forth in SBA's Accounting Standards and Financial Reporting Requirements for Small Business Investment Companies.

This Valuation Policy is intended to provide a consistent, conservative basis for establishing the Asset Value of the portfolio. The Policy presumes that Loans and Investments are acquired with the intent that they are to be held until maturity or disposed of in the ordinary course of business.

### Interest-Bearing Securities

Loans shall be valued in an amount not greater than cost with Unrealized Depreciation being recognized when value is impaired. The valuation of loans and associated interest receivables on interest-bearing securities should reflect the portfolio concern's current and projected financial condition and operating results, its payment history and its ability to generate sufficient cash flow to make payments when due.

When a valuation relies more heavily on asset versus earnings approaches, additional criteria should include the seniority of the debt, the nature of any pledged collateral, the extent to which the security interest is perfected, the net liquidation value of tangible business assets, and the personal integrity and overall financial standing of the owners of the business. In those instances where a loan valuation is based on an analysis of certain collateralized assets of a business or assets outside the business, the valuation should, at a minimum, consider the net liquidation value of the collateral after reasonable selling expenses. Under no circumstances, however, shall a valuation based on the underlying collateral be considered as justification for any type of loan appreciation.

Appropriate unrealized depreciation on past due interest which is converted into a security (or added to an existing security) should be recognized when collection is doubtful. Collection is presumed to be in doubt when one or both of the following conditions occur: (i) interest payments are more than 120 days past due; or (ii) the small concern is in bankruptcy, insolvent, or there is substantial doubt about its ability to continue as a going concern.

The carrying value of interest bearing securities shall not be adjusted for changes in interest rates.

1

Valuation of convertible debt may be adjusted to reflect the value of the underlying equity security net of the conversion price.

## Equity Securities - Private Companies

Investment cost is presumed to represent value except as indicated elsewhere in these guidelines.

Valuation should be reduced if a company's performance and potential have significantly deteriorated. If the factors which led to the reduction in valuation are overcome, the valuation may be restored.

The anticipated pricing of a Small Concern's future equity financing should be considered as a basis for recognizing Unrealized Depreciation, but not for Unrealized Appreciation. If it appears likely that equity will be sold in the foreseeable future at a price below the Licensee's current valuation, then that prospective offering price should be weighed in the valuation process.

Valuation should be adjusted to a subsequent significant equity financing that includes a meaningful portion of the financing by a sophisticated, unrelated new investor. A subsequent significant equity financing that includes substantially the same group of investors as the prior financing should generally not be the basis for an adjustment in valuation. A financing at a lower price by a sophisticated new investor should cause a reduction in value of the prior securities.

If substantially all of a significant equity financing is invested by an investor whose objectives are in large part strategic, or if the financing is led by such an investor, it is generally presumed that no more than 50% of the increase in investment price compared to the prior significant equity financing is attributable to an increased valuation of the company.

Where a company has been self-financing and has had positive cash flow from operations for at least the past two fiscal years, Asset Value may be increased based on a very conservative financial measure regarding P/E ratios or cash flow multiples, or other appropriate financial measures of similar publicly-traded companies, discounted for illiquidity. Should the chosen valuation cease to be meaningful, the valuation may be restored to a cost basis, or if of significant deterioration in performance or potential, to a valuation below cost to reflect impairment.

With respect to portfolio companies that are likely to face bankruptcy or discontinue operations for some other reason, liquidating value may be employed. This value may be determined by estimating the realizable value (often through professional appraisals or firm offers to purchase) of all assets and then subtracting all liabilities and all associated liquidation costs.

Warrants should be valued at the excess of the value of the underlying security over the exercise price.

2

**Equity Securities - Public Companies**

Public securities should be valued as follows:  (a) For over-the-counter stocks, take the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, take the average of the close for the valuation date and the preceding two days.

The valuation of public securities that are restricted should be discounted appropriately until the securities may be freely traded.  Such discounts typically range from 10% to 40%, but the discounts can be more or less, depending upon the resale restrictions under securities laws or contractual agreements.

When the number of shares held is substantial in relation to the average daily trading volume, the valuation should be discounted by at least 10%, and generally by more.

3

## EXHIBIT III
### Definition of Institutional Investor
### (13 C.F.R. § 107.50)

Institutional Investor means:

(1)    *Entities.*  Any of the following entities if the entity has a net worth (exclusive of unfunded commitments from investors) of at least $1 million, or such higher amount as is specified in paragraph (1) of this definition.  (See also § 107.230(b)(4) for limitations on the amount of an Institutional Investor's commitment that may be included in Private Capital.)

(i)    A State or National bank, trust company, savings bank, or savings and loan association.

(ii)    An insurance company.

(iii)    A 1940 Act Investment Company or Business Development Company (each as defined in the Investment Company Act of 1940, as amended (15 U.S.C. 8a-1 *et seq.*)).

(iv)    A holding company of any entity described in paragraph (1)(i), (ii) or (iii) of this definition.

(v)    An employee benefit or pension plan established for the benefit of employees of the Federal government, any State or political subdivision of a State, or any agency or instrumentality of such government unit.

(vi)    An employee benefit or pension plan (as defined in the Employee Retirement Income Security Act of 1974, as amended (Pub. L. 93-406, 88 Stat. 829), excluding plans established under section 401(k) of the Internal Revenue Code of 1986 (26 U.S.C. 401(k), as amended).

(vii)    A trust, foundation or endowment exempt from Federal income taxation under the Internal Revenue Code of 1986, as amended.

(viii)    A corporation, partnership or other entity with a net worth (exclusive of unfunded commitments from investors) of more than $10 million.

(ix)    A State, a political subdivision of a State, or an agency or instrumentality of a State or its political subdivision.

(x)    An entity whose primary purpose is to manage and invest non-Federal funds on behalf of at least three Institutional Investors described in paragraphs (1)(i) through (1)(ix) of this definition, each of whom must have at least a 10 percent ownership interest in the entity.

(xi)    Any other entity that SBA determines to be an Institutional Investor.

\\\DC - 83555/0001 - 1386423 v8

(2)    *Individuals.*

    (i)    Any of the following individuals if he/she is also a permanent resident of the United States:

        (A)    An individual who is an Accredited Investor (as defined in the Securities Act of 1933, as amended (15 U.S.C. 77a-77aa)) and whose commitment to the Licensee is backed by a letter of credit from a State or National bank acceptable to SBA.

        (B)    An individual whose personal net worth is at least $2 million and at least ten times the amount of his or her commitment to the Licensee. The individual's personal net worth must not include the value of any equity in his or her most valuable residence.

        (C)    An individual whose personal net worth (determined in accordance with paragraph (2)(i)(B) of this definition) is at least $10 million.

    (ii)    Any individual who is not a permanent resident of the United States but who otherwise satisfies paragraph (2)(i) of this definition *provided* such individual has irrevocably appointed an agent within the United States for the service of process.

2

# GKM SBIC, L.P.

## AGREEMENT OF LIMITED PARTNERSHIP

Dated as of February 28, 2002

# GKM SBIC, L.P.

## Table of Contents

| | | |
|---|---|---|
| **ARTICLE 1** | **GENERAL PROVISIONS** | **1** |
| Section 1.01 | Definitions. | 1 |
| Section 1.02 | Name. | 9 |
| Section 1.03 | Principal Office; Registered Office; and Qualification. | 9 |
| Section 1.04 | Commencement and Duration. | 10 |
| Section 1.05 | Admission of Partners. | 10 |
| Section 1.06 | Representations of Partners. | 11 |
| Section 1.07 | Notices With Respect to Representations by Private Limited Partners. | 12 |
| Section 1.08 | Liability of Partners. | 13 |
| **ARTICLE 2** | **PURPOSE AND POWERS** | **13** |
| Section 2.01 | Purpose and Powers. | 13 |
| Section 2.02 | Restrictions on Powers. | 14 |
| Section 2.03 | Unrelated Business Taxable Income. | 14 |
| Section 2.04 | Venture Capital Operating Company. | 14 |
| **ARTICLE 3** | **MANAGEMENT** | **15** |
| Section 3.01 | Authority of General Partner. | 15 |
| Section 3.02 | Authority of the Private Limited Partners. | 16 |
| Section 3.03 | Authority of the Preferred Limited Partners. | 16 |
| Section 3.04 | Acknowledgement of SBA Authority. | 16 |
| Section 3.05 | The Investment Adviser/Manager. | 16 |
| Section 3.06 | Restrictions on Other Activities of the General Partner and its Affiliates. | 17 |
| Section 3.07 | Management Compensation. | 17 |
| Section 3.08 | Payment of Management Compensation. | 18 |
| Section 3.09 | Partnership Expenses. | 19 |
| Section 3.10 | Valuation of Assets. | 20 |
| Section 3.11 | Standard of Care. | 21 |
| Section 3.12 | Indemnification. | 21 |
| **ARTICLE 4** | **SMALL BUSINESS INVESTMENT COMPANY MATTERS** | **24** |
| Section 4.01 | SBIC Act. | 24 |
| Section 4.02 | Consent or Approval of, and Notice to, SBA. | 24 |
| Section 4.03 | Provisions Required by the SBIC Act for Issuers of Participating Securities. | 24 |
| Section 4.04 | Provisions Required by the SBIC Act for Issuers of Debentures. | 25 |
| Section 4.05 | Effective Date of Incorporated SBIC Act Provisions. | 25 |
| Section 4.06 | Admission of Preferred Limited Partners and Increased Commitments. | 26 |
| Section 4.07 | Redemption and Withdrawal of Preferred Limited Partners. | 26 |
| Section 4.08 | Assignment of Right to Distributions by a Preferred Limited Partner. | 27 |

i

| Section 4.09 | Priority of Preferred Limited Partnership Interests on Liquidation. | 27 |
| Section 4.10 | SBA as Third Party Beneficiary. | 28 |
| Section 4.11 | Interest of the General Partner After Withdrawal. | 28 |
| **ARTICLE 5** | **PARTNERS' CAPITAL CONTRIBUTIONS** | **28** |
| Section 5.01 | Capital Commitments. | 28 |
| Section 5.02 | Capital Contributions by the Class A Limited Partners. | 28 |
| Section 5.03 | Capital Contributions by the Class B Limited Partners | 29 |
| Section 5.04 | Capital Contributions by Preferred Limited Partners. | 29 |
| Section 5.05 | Capital Contributions by the General Partner. | 29 |
| Section 5.06 | Additional Private Limited Partners and Increased Commitments. | 30 |
| Section 5.07 | Additional, Substitute and Transferee Class A Limited Partners. | 30 |
| Section 5.08 | Conditions to the Commitments of the General Partner and the Private Limited Partners. | 31 |
| Section 5.09 | Termination of the Obligation to Contribute Capital. | 31 |
| Section 5.10 | Notice and Opinion of Counsel. | 32 |
| Section 5.11 | Cure, Termination of Capital Contributions and Withdrawal. | 32 |
| Section 5.12 | Failure to Make Required Capital Contributions. | 32 |
| Section 5.13 | Notice and Consent of SBA with respect to Capital Contribution Defaults. | 32 |
| Section 5.14 | Interest on Overdue Contributions. | 33 |
| Section 5.15 | Termination of a Private Limited Partner's Right to Make Further Capital   Contributions | 34 |
| Section 5.16 | Forfeiture of a Private Limited Partner's Interest in the Partnership. | 34 |
| Section 5.17 | Withholding and Application of a Private Limited Partner's Distributions. | 35 |
| Section 5.18 | Required Sale of a Private Limited Partner's Interest in the Partnership. | 35 |
| **ARTICLE 6** | **ADJUSTMENT OF CAPITAL ACCOUNTS** | **37** |
| Section 6.01 | Establishment of Capital Accounts. | 37 |
| Section 6.02 | Time of Adjustment of Capital Accounts. | 37 |
| Section 6.03 | Adjustments to Capital Accounts. | 38 |
| Section 6.04 | Tax Matters. | 39 |
| **ARTICLE 7** | **DISTRIBUTIONS** | **41** |
| Section 7.01 | Distributions to Partners. | 41 |
| Section 7.02 | Distributions of Noncash Assets in Kind. | 42 |
| Section 7.03 | Apportionment of Distributions Among the General Partner and Private Limited Partners. | 43 |
| Section 7.04 | Distributions for Payment of Tax. | 43 |
| Section 7.05 | Distributions Violative of the Act Prohibited. | 43 |
| **ARTICLE 8** | **DISSOLUTION, LIQUIDATION, WINDING UP AND WITHDRAWAL** | **44** |
| Section 8.01 | Dissolution. | 44 |

ii

Section 8.02    Winding Up. ....................................................................45
Section 8.03    Withdrawal of the General Partner. ....................................45
Section 8.04    Continuation of the Partnership After the Withdrawal of the General Partner. ................................................................46
Section 8.05    Withdrawals of Capital. ....................................................46
Section 8.06    Withdrawal by ERISA Regulated Pension Plans. ..............46
Section 8.07    Withdrawal by Government Plans Complying with State and Local Law. ....................................................................47
Section 8.08    Withdrawal by Government Plans Complying with ERISA. ...........47
Section 8.09    Withdrawal by Tax Exempt Private Limited Partners. .................47
Section 8.10    Withdrawal by Registered Investment Companies. ...................47
Section 8.11    Distributions on Withdrawal. ...........................................48
**ARTICLE 9**    **ACCOUNTS, REPORTS AND AUDITORS** ...............................**48**
Section 9.01    Books of Account. ...........................................................48
Section 9.02    Audit and Report. ............................................................49
Section 9.03    Fiscal Year. ....................................................................50
**ARTICLE 10**    **MISCELLANEOUS** .........................................................**50**
Section 10.01    Assignability. ................................................................50
Section 10.02    Assignability of Class B Limited Partnership Interests. .................51
Section 10.03    Binding Agreement. .......................................................51
Section 10.04    Gender. ........................................................................51
Section 10.05    Notices. ........................................................................52
Section 10.06    Consents and Approvals. .................................................52
Section 10.07    Counterparts. ................................................................52
Section 10.08    Amendments. ................................................................53
Section 10.09    Power of Attorney. ........................................................54
Section 10.10    Applicable Law. ............................................................55
Section 10.11    Severability. .................................................................55
Section 10.12    Entire Agreement. .........................................................55

## EXHIBITS

Exhibit I        -        Partners and Commitments
Exhibit I-A      -        Instrument of Admission or Increase in Commitment for a Preferred Limited Partner
Exhibit II       -        Valuation Guidelines
Exhibit III      -        Definition of Institutional Investor

\\\DC - 83555/1 - #1386423 v5

## GKM SBIC, L.P.

This AGREEMENT OF LIMITED PARTNERSHIP is dated and effective as of February __, 2002, among GKM SBIC Management, LLC, a Delaware limited liability company (in its capacity as a general partner of the Partnership), GKM Venture Partners, L.P., a Delaware limited partner (in its capacity as the sole private limited partner of the Partnership), and the preferred limited partner, as amended from time to time.

The parties, in consideration of their mutual agreements stated in this Agreement, agree to become partners and to form a limited partnership under the Act. The purpose of the Partnership is to operate as a small business investment company under the SBIC Act, licensed by SBA for the period and upon the terms and conditions stated in this Agreement. The parties further agree as follows:

## ARTICLE 1
## GENERAL PROVISIONS

**Section 1.01    Definitions.**

For the purposes of this Agreement, the following terms have the following meanings:

"**Act**" means the Delaware Revised Uniform Limited Partnership Act.

"**Accumulated Prioritized Payments**" has the meaning stated in the SBIC Act.

"**Additional Private Limited Partners**" has the meaning stated in Section 5.06.

"**Adjustments**" has the meaning stated in the SBIC Act.

"**Advisory Committee**" means the advisory committee of the Partnership established pursuant to Section 3.13.

"**Affiliate**" has the meaning stated in the SBIC Act.

"**Agreement**" means this agreement of limited partnership, as amended from time to time. References to this Agreement will be deemed to include all provisions incorporated in this Agreement by reference.

"**Assets**" means common and preferred stock (including warrants, rights and other options relating to such stock), notes, bonds, debentures, trust receipts and other obligations, instruments or evidences of indebtedness, and other properties or interests commonly regarded as securities, and in addition, interests in real property, whether improved or unimproved, and interests in personal property of all kinds (tangible or intangible), choses in action, and cash, bank deposits and so-called "money market instruments".

1

**"Assets Under Management"** means, as of any specified date, the value of all Assets owned by the Partnership (the value to be determined as provided in this Agreement), including contributions requested and due from Partners and uncalled amounts of Commitments that are included in the Partnership's Regulatory Capital, less the amount of any liabilities of the Partnership, determined in accordance with generally accepted accounting principles, consistently applied.

**"Associate"** has the meaning stated in the SBIC Act.

**"Back-Up Limited Partner"** means those individuals and entities so designated on Exhibit I to this Agreement and such other individuals and entities admitted to the Partnership after the date hereof as Back-Up Private Limited Partners pursuant to this Agreement, which individuals and entities are obligated to meet the Capital Contribution obligations of a designated Primary Partner in the event such Primary Partner defaults under its obligation to make a Capital Contribution to the Partnership.

**"Capital Account"** means the account of each Partner that reflects its interest in the Partnership determined in accordance with Section 6.03.

**"Capital Contribution"** means a contribution of capital to the Partnership by a Partner.

**"Certificate of Limited Partnership"** means the certificate of limited partnership with respect to the Partnership filed for record in the office of the Secretary of State of the State of Delaware.

**"Charge"** has the meaning stated in the SBIC Act.

**"Class A Limited Partner"** means the Parent Fund and such other individuals and entities admitted to the Partnership after the date hereof as Class A Limited Partners pursuant to this Agreement.

**"Class B Limited Partners"** means those individuals and entities so designated on Exhibit I to this Agreement and such other individuals and entities admitted to the Partnership after the date hereof as Class B Limited Partners pursuant to this Agreement. Initially, Class B Limited Partners shall be partners of the Parent Fund.

**"Closing Capital Account"** means, with respect to any fiscal period, the Opening Capital Account of each Partner for the fiscal period after allocations have been made to the Capital Account in accordance with Section 6.03.

**"Code"** means the Internal Revenue Code of 1986, as amended, and the regulations thereunder and interpretations thereof promulgated by the Internal Revenue Service, as in effect from time to time.

2

**"Commitments"** means the capital contributions to the Partnership that the Preferred Limited Partners have made and the other Partners have made or are obligated to make to the Partnership. The amounts and terms of the Commitments of the General Partner, the Private Limited Partners, and the Preferred Limited Partners will be as stated in this Agreement.

**"Control Person"** has the meaning stated in the SBIC Act.

**"Debentures"** has the meaning stated in the SBIC Act.

**"Designated Party"** means any of the General Partner, any Investment Adviser/ Manager, and any partner, member, manager, stockholder, director, officer, employee or Affiliate of the General Partner and any Investment Adviser/ Manager.

**"Director Fees"** means the fees and the value (determined by the Advisory Committee at the time of receipt) of any options, warrants or other non-cash compensation paid by a portfolio company to the General Partner or its Affiliates (other than the Partnership or the Parent Fund) for services rendered by the General Partner or any of its members, employees or Affiliates for (a) serving as a director (or similar person) of the portfolio company (but not including any reimbursement of expenses of any such person by the Portfolio Company) or (b) advising, monitoring, consulting, or the provision of similar services to a Portfolio Company (but not including fees paid to GKM by a Portfolio Company for investment banking, consulting or similar services rendered by GKM); provided, however, that Director Fees and Transaction Fees (other than to the extent such fees are described in 13 C.F.R. § 107.860) shall not include a cumulative total of up to $200,000 of such fees or non-cash compensation actually paid to the General Partner or any of its members, employees or Affiliates plus the value of any options or warrants paid by HelloNetwork.com, Inc. or any of its Affiliates to Lance Horn under any agreement entered into on or before December 31, 2001. Notwithstanding the foregoing, the Partners hereby acknowledge and agree that GKM shall transfer its entire interest in that certain Warrant No. 0-1 dated October 31, 2000 to purchase 100,000 shares of common stock of HelloNetwork.com, Inc. to the Partnership and such warrant shall not be treated as Director Fees or Transaction Fees hereunder and shall not be treated as paid to the General Partner or any of its members, employees or Affiliates for purposes of the exclusion in the preceding sentence.

**"Distributable Security"** has the meaning stated in the SBIC Act.

**"Earned Prioritized Payments"** has the meaning stated in the SBIC Act.

**"Earmarked Assets"** has the meaning stated in the SBIC Act.

3

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder and interpretations thereof promulgated by the Department of Labor, as in effect from time to time.

**"Exchange Act"** means the Securities Exchange Act of 1934, as amended, and the regulations thereunder and interpretations thereof promulgated by the Securities and Exchange Commission, as in effect from time to time.

**"General Partner"** means the general partner or general partners of the Partnership, as set forth in this Agreement.

**"GKM"** means Gerard Klauer Mattison & Co., Inc. or any of its subsidiaries.

**"Indemnifiable Costs"** means all costs, expenses, damages, claims, liabilities, fines and judgments (including the reasonable cost of the defense, and any sums which may be paid with the consent of the Partnership in settlement), incurred in connection with or arising from a claim, action, suit, proceeding or investigation, by or before any court or administrative or legislative body or authority.

**"Investment Advisers Act"** means the Investment Advisers Act of 1940, as amended, and the regulations thereunder and interpretations thereof promulgated by the Securities and Exchange Commission, as in effect from time to time.

**"Investment"** means the securities acquired by the Partnership in any other corporation, partnership, limited liability company, or any or business or concern in which the Partnership becomes an investor in accordance with the provisions of this Agreement, including capital stock, partnership interests, bonds, notes, debentures, warrants, trust receipts, futures and other obligations and instruments or evidences of indebtedness, as well as rights and options to purchase, sell or invest in the foregoing. Except where the context requires otherwise, any reference to an "Investment" shall refer to all securities acquired by the Partnership with respect to a portfolio company in a single or a series of related transactions.

**"Investment Company Act"** means the Investment Company Act of 1940, as amended, and the regulations thereunder and interpretations thereof promulgated by the Securities and Exchange Commission, as in effect from time to time.

**"Investment Adviser/Manager"** has the meaning stated in the SBIC Act.

**"Investment Management Agreement"** means the Investment Management Agreement dated as of the date hereof among the Partnership, the General Partner and _____, the initial Investment Adviser/Manager.

**"Leverage"** has the meaning stated in the SBIC Act.

4

**"Management Compensation"** means the amounts payable by the Partnership to the General Partner or Investment Adviser/Manager, as provided in Section 3.07.

**"Maximum Tax Liability"** has the meaning stated in the SBIC Act.

**"Net Losses"** means, with respect to any fiscal period, the excess, if any, of:

   (i) all expenses and losses incurred during the fiscal period by the Partnership from all sources over

   (ii) the aggregate revenue, income and gains realized during the fiscal period by the Partnership from all sources.

For purposes of determining Net Losses:

   (A)   items will be taken into account to the extent that (1) they are includable as items of income, credit, loss or deduction for Federal income tax purposes (including items described in Section 705(a)(2)(B) of the Code, or treated as so described in Treasury Regulation § 1.704-1(b)(2)(iv)(i)) or, (2) in the case of items of income, they constitute income that is exempt from Federal income tax; and

   (B)   if any Noncash Asset is distributed in kind, it will be deemed sold at the value established at the most recent valuation of the Noncash Asset under this Agreement (or such other valuation date as is required under the SBIC Act) and any unrealized appreciation or depreciation with respect to the Noncash Asset will be deemed realized and included in the determination of Net Losses.

**"Net Profits"** means, with respect to any fiscal period, the excess, if any, of:

   (i) the aggregate revenue, income and gains realized during the fiscal period by the Partnership from all sources over

   (ii) all expenses and losses incurred during the fiscal period by the Partnership from all sources.

For purposes of determining Net Profits:

   (A)   items will be taken into account to the extent that (1) they are includable as items of income, credit, loss or deduction for Federal income tax purposes (including items described in Section 705(a)(2)(B) of the Code, or treated as so described in Treasury Regulation § 1.704-1(b)(2)(iv)(i)) or, (2) in the case of income, constitute income that is exempt from Federal income tax; and

(B)    if any Noncash Asset is distributed in kind, it will be deemed sold at the value established at the most recent valuation of the Noncash Asset under this Agreement (or such other valuation date as is required under the SBIC Act) and any unrealized appreciation or depreciation with respect to the Noncash Asset will be deemed realized and included in the determination of Net Profits.

**"Noncash Asset"** means any Asset of the Partnership other than cash.

**"Optionor"** shall have the meaning set forth in <u>Section 5.18</u>.

**"Optionees"** shall have the meaning set forth in <u>Section 5.18</u>.

**"Optioned Partnership Interest"** shall have the meaning set forth in <u>Section 5.18</u>.

**"Option Price"** shall have the meaning set forth in <u>Section 5.18(a)</u>.

**"Opening Capital Account"** with respect to any fiscal period, means:

(i)    with respect to any Partner admitted during the fiscal period, the Partners initial capital contribution (or in the case of any Partner admitted as a transferee of all or part of the interest in the Partnership of another Partner, with respect to such transferred interest in the Partnership, that portion of the transferor's initial capital contribution transferred to the transferee); and

(ii)    with respect to any Partner admitted during any prior fiscal period (other than a Partner who has withdrawn as of the last day of the preceding fiscal period), the Partner's Closing Capital Account for the preceding fiscal period (or in the case of any Partner admitted as a transferee of all or part of the interest in the Partnership of another Partner, with respect to such transferred interest in the Partnership, that portion of the transferor's Closing Capital Account transferred to the transferee).

**"Organization Expenses"** shall mean all organizational and syndication costs, fees, and expenses incurred by or on behalf of the General Partner in connection with the formation, organization, marketing and licensing of the Partnership and the formation and organization of the General Partner, which include, without limitation, all interest expense, accounting and legal fees, any fees associated with placing interests in the Partnership, all costs incurred in connection with making, registering and selling Partnership investments, including but not limited to, travel, meeting, printing, telephone, office and support staff costs, and the cost of meetings held in connection therewith (including reimbursement of the General Partner and the members, officers and employees of the General Partner for such expenses).

**"Outstanding Leverage"** means the total amount of outstanding securities (including, but not limited to, Debentures and Participating Securities) issued by the Partnership that qualify as Leverage and have not been redeemed or repaid as provided in the SBIC Act.

**"Parent Fund"** means GKM Venture Partners, L.P.

**"Parent Fund Advisory Committee"** means the advisory committee of the Parent Fund established pursuant to the Parent Fund Agreement.

**"Parent Fund Agreement"** means the Agreement of Limited Partnership of GKM Venture Partners, L.P. dated as of March 17, 2000 among GKM Venture Partners, L.P. and the partners named therein, as amended.

**"Participating Security"** has the meaning stated in the SBIC Act.

**"Partners"** means the General Partner, the Private Limited Partners and the Preferred Limited Partners, if any.

**"Partnership"** means the limited partnership established by this Agreement.

**"_____ percent (__%) in interest of the Private Limited Partners"** means Private Limited Partners whose capital contributions represent such percentage of the capital contributions of all Private Limited Partners as of the time of determination.

**"Percentage Interest"** means the percentage determined for each Partner (other than any Preferred Limited Partner) by dividing (i) the aggregate Capital Contributions credited to such Partner's Capital Account as provided in Section 6.03 below at the time of any relevant calculation, by (ii) the aggregate Capital Contributions credited to the Capital Accounts of all the Partners (other than any Preferred Limited Partner) at such time. The sum of the respective Percentage Interests shall at all times equal one hundred percent (100%).

**"Permitted Distributions"** means any distribution made under 13 C.F.R. § 107.1570 which reduces Regulatory Capital and any distribution made under 13 C.F.R. § 107.585 which reduces Regulatory Capital by no more than two percent or which SBA approves for inclusion in the management fee calculation.

**"Primary Partner"** means a Partner in respect of which a designated Back-Up Private Limited Partner is obligated to meet the Capital Contribution obligations in the event such Primary Partner defaults under its obligation to make a Capital Contribution to the Partnership.

7

**"Preferred Limited Partner"** means SBA, in its capacity as the holder of a Preferred Limited Partnership Interest, or any successor in interest to SBA in its capacity as a Preferred Limited Partner.

**"Preferred Limited Partnership Interest"** means a preferred limited partnership interest in the Partnership which qualifies as a Participating Security.

**"Prioritized Payment"** has the meaning stated in the SBIC Act.

**"Private Capital"** has the meaning stated in the SBIC Act.

**"Private Limited Partners"** means the Class A Limited Partner, the Class B Limited Partners and the Back-Up Limited Partners, but does not include the Preferred Limited Partner.

**"Profit Participation"** has the meaning stated in the SBIC Act.

**"Proportionate Share"** means the percentage set forth on Exhibit I to this Agreement.

**"Qualified Nonprivate Funds"** has the meaning stated in the SBIC Act.

**"Remaining Portion"** shall have the meaning set forth in Section 5.18(b).

**"Regulatory Capital"** has the meaning stated in the SBIC Act.

**"Retained Earnings Available for Distribution"** has the meaning stated in the SBIC Act.

**"SBA"** means the United States Small Business Administration.

**"SBA Agreements"** has the meaning stated in Section 10.12.

**"SBIC"** means a small business investment company licensed under the SBIC Act.

**"SBIC Act"** means the Small Business Investment Act of 1958, as amended, and the rules and regulations thereunder and interpretations thereof promulgated by SBA, as in effect from time to time.

**"SEC"** means the Securities and Exchange Commission.

**"Securities Act"** means the Securities Act of 1933, as amended, and the regulations thereunder and interpretations thereof promulgated by the SEC, as in effect from time to time.

**"Special Private Limited Partner"** has the meaning stated in Section 8.03(c).

8

"**Transaction Fees**" shall mean any fees received by the General Partner or its Affiliates (other than the Partnership) that are related to services performed or actions taken by the General Partner or any of its members, employees or Affiliates in connection with an Investment, the Partnership's failure to consummate a proposed Investment, or the ongoing operations of a portfolio company (but not including fees paid to GKM by a portfolio company of the Partnership for investment banking, consulting or similar services rendered by GKM). The fees would include breakup fees, transaction fees, advisory fees, consulting fees, management fees, and any fees for investment banking services, subject to the exclusion set forth under the definition of Director Fees set forth above.

**Section 1.02   Name.**

(a)   The name of the Partnership will be "GKM SBIC, L.P."

(b)   Subject to the prior approval of SBA, the General Partner has the power at any time to:

    (i)   change the name of the Partnership; and

    (ii)   qualify the Partnership to do business under any name when the Partnership's name is unavailable for use, or may not be used, in a particular jurisdiction.

(c)   The General Partner will give prompt notice of any action taken under this Section to each Partner and SBA.

**Section 1.03   Principal Office; Registered Office; and Qualification.**

(a)   The principal office of the Partnership will be at 11150 Santa Monica Boulevard, Suite 800, Los Angeles, CA 90025, or such other place as may from time to time be designated by the General Partner, subject to the approval of SBA.

(b)   The registered office of the Partnership in the State of Delaware will be located at [1209 Orange Street, Wilmington, Delaware, 19801]. The name of the registered agent for the Partnership will be [The Corporation Trust Center]. The General Partner may from time to time change the registered agent and registered office of the Partnership.

(c)   The General Partner will qualify the Partnership to do business in each jurisdiction where the activities of the Partnership make such qualification necessary.

(d)   The General Partner will give prompt notice of any action taken under this Section to each Partner and SBA.

\\\DC - 83555/1 - #1386423 v5

**Section 1.04    Commencement and Duration.**

(a)    The Partnership will commence upon the filing for record of the Certificate of Limited Partnership in the office of the Secretary of State of the State of Delaware.

(b)    The Partnership will be dissolved and wound up at the time and in the manner provided for in Article 8.

**Section 1.05    Admission of Partners.**

(a)    No person may be admitted as a General Partner or a Private Limited Partner without subscribing and delivering to the Partnership a counterpart of this Agreement, or other written instrument, which sets forth:

(i)    the name and address of the Partner,

(ii)    the Commitment of the Partner, and

(iii)    the agreement of the Partner to be bound by the terms of this Agreement.

(b)    Without the prior approval of SBA, no person may be admitted as:

(i)    a General Partner, or

(ii)    a Private Limited Partner with an ownership interest of ten percent (10%) or more of the Partnership's capital.

(c)    No one may be admitted as a Preferred Limited Partner without subscribing and delivering to the Partnership an executed Instrument of Admission substantially in the form of Exhibit I-A attached to this Agreement.

(d)    The General Partner will compile, and amend from time to time as necessary, Exhibit I to this Agreement, which will list (i) the name and address of the General and each Private Limited Partner and (ii) the Commitment of the General Partner and each Private Limited Partner to the Partnership, and shall indicate for each Back-Up Private Limited Partner, the Primary Partner with respect to which such Back-Up Private Limited Partner has a back-up Capital Contribution obligation.

(e)    The addition to the Partnership at any time of one or more Partners will not be a cause for dissolution of the Partnership, and all the Partners will continue to be subject to the provisions of this Agreement in all respects.

\\\DC - 83555/1 - #1386423 v5

**Section 1.06    Representations of Partners.**

(a)    This Agreement is made with the General Partner in reliance upon the General Partner's representation to the Partnership, each Preferred Limited Partner and SBA, that:

    (i)    it is duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to do business under the laws of each state where such qualification is required to carry on the business of the Partnership;

    (ii)    it has full power and authority to execute and deliver this Agreement and to act as General Partner under this Agreement;

    (iii)    this Agreement has been authorized by all necessary actions by it, has been duly executed and delivered by it, and is a legal, valid and binding obligation of it, enforceable according to its terms; and

    (iv)    the execution and delivery of this Agreement and the performance of its obligations under this Agreement will not conflict with, or result in any violation of, or default under, any provision of any governing instrument applicable to it, or any agreement or other instrument to which it is a party or by which it or any of its properties are bound, or any provision of law, statute, rule or regulation, or any ruling, writ, order, injunction or decree of any court, administrative agency or governmental body applicable to it.

(b)    This Agreement is made with each Private Limited Partner in reliance upon each Private Limited Partner's representation to the General Partner, the Partnership, each Preferred Limited Partner and SBA, that:

    (i)    it has full power and authority to execute and deliver this Agreement and to act as a Private Limited Partner under this Agreement; this Agreement has been authorized by all necessary actions by it; this Agreement has been duly executed and delivered by it; and this Agreement is a legal, valid and binding obligation of it, enforceable against it according to its terms;

    (ii)    the execution and delivery of this Agreement and the performance of its obligations under this Agreement do not require the consent of any third party not previously obtained, and will not conflict with, or result in any violation of, or default under, any provision of any governing instrument applicable to it, or any agreement or other instrument to which it is a party or by which it or any of its properties are bound, or any provision of law, statute, rule or regulation, or any ruling, writ, order, injunction or decree of any court, administrative agency or governmental body applicable to it;

(iii)   if the Private Limited Partner is a bank (as the term is used in the SBIC Act, at 15 U.S.C. § 682(b)), the total amount of such Private Limited Partner's investments in SBICs, including such Private Limited Partner's interest in the Partnership, does not exceed five percent (5%) of such Private Limited Partner's capital and surplus;

(iv)   unless otherwise disclosed to the Partnership in writing, the Partner is a citizen or permanent resident of the United States, an entity organized under the laws of the United States or a state within the United States or an entity engaged in a trade or business within the United States; and

(v)   unless otherwise disclosed to the Partnership in writing, the Partner is not subject to Title I of ERISA.

(c)   Each Partner who has disclosed to the Partnership in writing that it is not a person described in Section 1.06(b)(iv), agrees to provide the Partnership with any information or documentation necessary to permit the Partnership to fulfill any tax withholding or other obligation relating to the Partner, including but not limited to any documentation necessary to establish the Partner's eligibility for benefits under any applicable tax treaty.

(d)   With respect to actions under this Agreement that require the approval of the Private Limited Partners, the Parent Fund shall exercise its rights in a manner that produces the same result that would be produced if (i) the Parent Fund were not a Partner and (ii) each limited partner of the Parent Fund were a Private Limited Partner that had made aggregate Capital Contributions equal to the product of (x) the aggregate Capital Contributions of the Parent Fund and (y) a fraction, the numerator of which equals the aggregate capital contributions made by such limited partner to the Parent Fund and the denominator of which equals the aggregate capital contributions made by all of the partners of the Parent Fund to the Parent Fund.

**Section 1.07**   <u>**Notices With Respect to Representations by Private Limited Partners.**</u>

(a)   If any representation made by a Private Limited Partner in Section 1.06(b)(i), (ii) or (iii) ceases to be true, then the Private Limited Partner will promptly provide the Partnership with a correct separate written representation as provided in each such Section.

(b)   The Partnership will give each Preferred Limited Partner and SBA prompt notice of any corrected representation received from any Private Limited Partner under Section 1.07(a).

12

**Section 1.08    Liability of Partners.**

    (a)    Losses, liabilities and expenses incurred by the Partnership during any fiscal year will be allocated among the Partners in accordance with the procedures for allocating Net Losses as provided in Section 6.03.

    (b)    The General Partner has the liability for the liabilities of the Partnership provided for in the Act and the SBIC Act. The General Partner will not:

        (i)    be obligated to restore by way of capital contribution or otherwise any deficits in the respective Capital Accounts of the Private Limited Partners or Preferred Limited Partners should such deficits occur, or

        (ii)    have any greater obligation with respect to any Outstanding Leverage than is required by the SBIC Act or by SBA.

    (c)    Except as otherwise required under the Act and the SBIC Act, no Private Limited Partner nor any Preferred Limited Partner will be liable for any loss, liability or expense whatsoever of the Partnership. Notwithstanding the preceding sentence, a Private Limited Partner will remain liable for any portion of such Private Limited Partner's Commitment not paid to the Partnership.

    (d)    If a Private Limited Partner is required to return to the Partnership, for the benefit of creditors of the Partnership, amounts previously distributed to the Private Limited Partner, the obligation of the Private Limited Partner to return any such amount to the Partnership will be the obligation of the Private Limited Partner and not the obligation of the General Partner. No Private Limited Partner will be liable under this Agreement for the obligations under this Agreement of any other Partner.

    (e)    Nothing in this Agreement limits any liability of any Partner under any agreement between the Partner and SBA.

## ARTICLE 2
## PURPOSE AND POWERS

**Section 2.01    Purpose and Powers.**

    (a)    The Partnership is organized solely for the purpose of operating as a small business investment company under the SBIC Act and conducting the activities described under Title III of the SBIC Act. The Partnership has the powers and responsibilities, and is subject to the limitations, provided in the SBIC Act. The operations of the Partnership and the actions taken by the Partnership and the Partners will be conducted and taken in compliance with the SBIC Act.

13

(b)    Subject to Section 2.01(a), the Partnership may make, manage, own and supervise investments of every kind and character in conducting its business as a small business investment company.

(c)    Subject to the provisions of the SBIC Act, the Partnership has all powers necessary, suitable or convenient for the accomplishment of the purposes set forth in Section 2.01(a) and Section 2.01(b), alone or with others, as principal or agent, including, without limitation, the following:

(i)    to locate, analyze and invest in equity and equity-oriented securities, including securities convertible into or exercisable or exchangeable for equity securities;

(ii)    to hold, and to sell, distribute or otherwise dispose of its Investments in accordance with this Agreement over such period as the General Partner determines to be in the best interest of the Partners; and

(iii)    to engage in any lawful act or activity for which limited partnerships may be organized under the Act.

## Section 2.02    Restrictions on Powers.

Notwithstanding any provision of Section 2.01(b), the Partnership will not (i) make investments precluded under 13 C.F.R. § 107.720, including but not limited to foreign investments described therein, (ii) without the prior approval of the SBA, make any investment that exceeds the diversification limitation that is described in 13 C.F.R. § 107.740, (iii) make investments precluded under 13 C.F.R. § 107.530, or (iv) take any action that, if taken by the Parent Fund directly, would violate Section 2.6 of the Parent Fund Agreement.

## Section 2.03    Unrelated Business Taxable Income.

The Partnership will use its best efforts to ensure that no Partner (or any limited partner or member of a Partner) exempt from income taxation under Sections 501(a) or 501(c)(3) of the Code will be deemed to have "unrelated business taxable income" (as that term is defined in Section 512 of the Code) as a result of the activities of the Partnership.

## Section 2.04    Venture Capital Operating Company.

If directed by the Parent Fund, the Partnership will use its best efforts to ensure that the Parent Fund qualifies as a "venture capital operating company" (within the meaning of Department of Labor Regulation § 2510.3-101(d), 51 Fed. Reg. 41,281 (November 13, 1986) or any amendment or successor regulation).  In furtherance thereof and pursuant Department of Labor Opinion No. 95-04A, the Parent Fund shall be provided with management rights to substantially participate in, or substantially influence the conduct of, the management of a sufficient number of the Partnership's portfolio companies in

14

order for the Parent Fund to qualify as a "venture capital operating company." Such rights shall be provided in the Partnership's investment contracts with its portfolio companies, and the Parent Fund will be named as the holder of such rights in such contracts. Such management rights shall flow directly to the Parent Fund and the Parent Fund shall have the right to independently enforce such management rights.

## ARTICLE 3
## MANAGEMENT

**Section 3.01    Authority of General Partner.**

(a)    The management and operation of the Partnership and the formulation of investment policy is vested exclusively in the General Partner.

(b)    The act of the General Partner in carrying on the business of the Partnership will bind the Partnership.

(c)    In the case of any General Partner other than a natural person, at any time that the Partnership is licensed as an SBIC, the General Partner will not allow any person to serve as a general partner, director, officer or manager of the General Partner, unless such person has been approved by SBA.

(d)    So long as the General Partner remains the general partner of the Partnership:

    (i)    it will comply with the requirements of the SBIC Act, including, without limitation, 13 C.F.R. § 107.160(a) and (b), as in effect from time to time; and

    (ii)    in the case of any General Partner other than a natural person, except as set forth in Section 3.01(d)(iii), it will devote all of its activities to the conduct of the business of the Partnership and will not engage actively in any other business, unless its engagement is related to and in furtherance of the affairs of the Partnership.

    (iii)    The General Partner may, however:

        (A)    act as the general partner or Investment Adviser/Manager for one or more other SBICs, and

        (B)    receive, hold, manage and sell Assets received by it from the Partnership (or other SBIC for which it acts as general partner or Investment Adviser/Manager), or through the exercise or exchange of Assets received by it from the Partnership (or other SBIC for which it acts as general partner or Investment Adviser/Manager).

**Section 3.02    Authority of the Private Limited Partners.**

The Private Limited Partners will take no part in the control of the business of the Partnership, and the Private Limited Partners will not have any authority to act for or on behalf of the Partnership except as is specifically permitted by this Agreement.

**Section 3.03    Authority of the Preferred Limited Partners.**

The Preferred Limited Partners will take no part in the control of the business of the Partnership, and the Preferred Limited Partners will not have any authority to act for or on behalf of the Partnership except as is specifically permitted by this Agreement.

**Section 3.04    Acknowledgement of SBA Authority.**

(a)    The Partners acknowledge that, in addition to the rights of SBA under this Agreement in SBA's capacity as a Preferred Limited Partner, SBA also has regulatory authority over the Partnership as a licensed small business investment company under the provisions of the SBIC Act. SBA exercises its regulatory authority over the Partnership under the SBIC Act independent of and separate from its rights and actions in its capacity as a Preferred Limited Partner, and actions taken by SBA under its regulatory authority will not be deemed to be actions taken in SBA's capacity as a Preferred Limited Partner of the Partnership.

(b)    The Partners acknowledge that in addition to the rights of SBA under this Agreement in SBA's capacity as a Preferred Limited Partner, SBA may also have additional rights with respect to the Partnership and any Partner or Partners under separate agreements between SBA and the Partnership or such Partner or Partners. The exercise of rights by SBA under any such other agreement will not be deemed to be actions taken by SBA in its capacity as a Preferred Limited Partner of the Partnership unless the other agreement expressly so provides.

**Section 3.05    The Investment Adviser/Manager.**

(a)    Subject to the SBIC Act, the General Partner may delegate any part of its authority to an Investment Adviser/Manager.

(b)    Any agreement delegating any part of the authority of the General Partner to an Investment Adviser/Manager will:

(i)    be in writing, executed by the General Partner, the Partnership and the Investment Adviser/Manager,

(ii)    specify the authority so delegated, and

(iii)    expressly require that such delegated authority will be exercised by the Investment Adviser/Manager in conformity with the terms and conditions of such agreement, this Agreement and the SBIC Act.

16

(c)    Each agreement with an Investment Adviser/Manager made pursuant to this Section 3.05(a) will be binding upon the General Partner and any succeeding General Partner in accordance with its terms.

(d)    Each agreement with an Investment Adviser/Manager, and any material amendment to any such agreement, is subject to the prior approval of SBA.

(e)    [_____] is the initial Investment Adviser/Manager pursuant to the Investment Management Agreement.

**Section 3.06    Restrictions on Other Activities of the General Partner and its Affiliates.**

Except as provided in the SBIC Act and as otherwise specifically provided in this Agreement, no provision of this Agreement will be construed to preclude any (i) Partner, (ii) Investment Adviser/Manager, or (iii) Affiliate, general partner, member, manager or stockholder of any Partner or Investment Adviser/Manager, from engaging in any activity whatsoever or from receiving compensation therefor or profit from any such activity. Such activities may include, without limitation, (A) receiving compensation from issuers of securities for investment banking services, (B) managing investments, (C) participating in investments, brokerage or consulting arrangements or (D) acting as an adviser to or participant in any corporation, partnership, limited liability company, trust or other business person.

**Section 3.07    Management Compensation.**

(a)    During the five year period commencing on the date hereof, Management Compensation with respect to each year during such period commencing on the same day and month as the date hereof will be 2.5% of the sum of (i) the Partnership's Regulatory Capital, (ii) any previous Permitted Distributions under Section 7.03, and (iii) an assumed two tiers of Outstanding Leverage on the amounts described in clauses (i) and (ii).

(b)    During the period commencing on the first day following the fifth anniversary hereof, Management Compensation with respect to each year during such period commencing on the same day and month as the date hereof will be 2.5% of the Partnership's Combined Capital. In addition, during this period, the Partnership shall pay an additional $125,000 per fiscal year as compensation for management services, unless such Combined Capital equals or exceeds Twenty Million Dollars ($20,000,000).

(c)    The Management Compensation shall not be modified in any respect except (i) upon the approval of 66 2/3% in interest of the Private Limited Partners and (ii) with the prior written approval of SBA.

(d)    If the Partnership fails to pay any Management Compensation provided herein, due to the SBIC Act or otherwise, the unpaid amount shall continue to be due and payable or shall become due and payable at the earliest date on which the

17

payment of such amount or any portion thereof could be made without violation of the SBIC Act. Until paid, the unpaid amount shall accrue interest that shall be compounded on a monthly basis at the highest prime rate reported in The Wall Street Journal, from time to time, during the period of non-payment.

(e)     Transaction Fees and Director Fees will be paid solely to the General Partner or to an Affiliate of the General Partner entitled to them, subject to the following provisions. Management Compensation otherwise payable for any quarterly period will be reduced by (i) 100% of any Transaction Fees, as determined and calculated at the time Management Compensation is due, and (ii) 100% of Director Fees, received during the quarterly period immediately before the date a Management Compensation payment is due. Any such amounts under clauses (i) and (ii), to the extent not used in full to reduce any Management Compensation payment, will be carried forward until all of them are applied as reductions of subsequent Management Compensation payments; provided, however, that except with respect to Transaction Fee described in 13 C.F.R. § 107.860, which shall offset Management Compensation under all circumstances, no such reduction of Management Compensation shall occur if and to the extent the management fee payable by the Parent Fund is reduced as a result of the payment of such remuneration to the Parent Fund by the general partner of the Parent Fund or an Affiliate of the general partner of the Parent Fund. The General Partner will use its reasonable efforts to manage the Partnership so that there are no Transaction Fees or Director Fees that cannot eventually be used to reduce management fee payments by either the Partnership or the Parent Fund. If, however, there is any balance of fees not offset by the reduction of Management Compensation before the dissolution of the Partnership, that balance will be paid over to the Partnership by the General Partner and allocated among all Partners in proportion to their respective Percentage Interests.

(f)     The Partnership will not pay any Management Compensation with respect to any fiscal year in excess of the amount of Management Compensation approved by SBA.

**Section 3.08    Payment of Management Compensation.**

(a)     The Management Compensation will be paid by the Partnership to the Investment Adviser/Manager.

(b)     Management Compensation will be paid in advance in four quarterly installments on the first business day of each quarter of each year commencing on the same day and month as the date hereof. The amount to be paid in each such quarterly installment initially shall be determined in accordance with Section 3.07, based upon (i) the amounts of Regulatory Capital the Partnership reasonably expects to have during such fiscal quarter and (ii) during the period starting on the fifth anniversary hereof, the amounts of Leverage, if any, the Partnership reasonably expects to have outstanding during such fiscal quarter; provided, however, that such amount shall be subject to adjustment in accordance with Section 3.08(c).

18

With respect to partial quarters (such as the final quarter of the Partnership), Management Compensation shall be pro rated based on the number of days in such quarters.

(c)    Within thirty (30) days after (i) the end of each quarter of each year commencing on the same day and month as the date hereof, (ii) the date of the Partnership's dissolution, and (iii) the date a person ceases to be an Investment Adviser/Manager, appropriate adjustment (by way of payment or refund) will be made so that Management Compensation paid with respect to such quarter then ended or the period from the end of the last quarter to the date set forth in clause (ii) or (iii) will be equal to Management Compensation that would have resulted had it been calculated on a daily basis under Section 3.07(a) or Section 3.07(b) for such period.

**Section 3.09    Partnership Expenses.**

(a)    The Investment Adviser/Manager will pay:

(i)    the compensation of all professional and other employees of the Partnership, the General Partner or an Investment Adviser/Manager who provide services to the Partnership;

(ii)    except as provided in Section 3.09(b), the cost of providing support and general services to the Partnership, including, without limitation:

(A)    office expenses,

(B)    travel,

(C)    business development,

(D)    office and equipment rental,

(E)    bookkeeping, and

(F)    the development, investigation and monitoring of investments; and

(iii)    all other expenses of the Partnership not authorized to be paid by the Partnership under Section 3.09(b).

(b)    The Partnership will pay the following Partnership expenses:

(i)    all interest and expenses payable by the Partnership on any indebtedness incurred by the Partnership;

19

(ii)    all amounts payable to SBA under the SBIC Act, and all amounts payable in connection with any Leverage commitment and any Outstanding Leverage;

(iii)    taxes payable by the Partnership to Federal, state, local and other governmental agencies;

(iv)    Management Compensation;

(v)    expenses incurred in the actual or proposed acquisition or disposition of Assets, including without limitation, accounting fees, brokerage fees, legal fees, transfer taxes and costs related to the registration or qualification for sale of Assets;

(vi)    legal, insurance (including any insurance as contemplated in Section 3.12(m)), accounting and auditing expenses;

(vii)    all expenses incurred by the Partnership in connection with commitments for or issuance of Leverage;

(viii)    fees or dues in connection with the membership of the Partnership in any trade association for small business investment companies or related enterprises; and

(ix)    Organization Expenses up to but not exceeding $300,000.

(c)    All Partnership expenses paid by the Partnership will be made against appropriate supporting documentation. The payment by the Partnership of Partnership expenses will be due and payable as billed.

**Section 3.10    Valuation of Assets.**

(a)    The Partnership will adopt written guidelines for determining the value of its Assets. Assets held by the Partnership will be valued by the General Partner in a manner consistent with the Partnership's written guidelines and the SBIC Act. The Valuation Guidelines attached to this Agreement as Exhibit II are the Partnership's written guidelines for valuation.

(b)    To the extent that the SBIC Act requires any Asset held by the Partnership to be valued other than as provided in this Agreement, the General Partner will value the Asset in such manner as it determines to be consistent with the SBIC Act.

(c)    Assets held by the Partnership will be valued at least annually (or more often, as SBA may require), and will be valued at least semi-annually (or more often, as SBA may require) at any time that the Partnership has Outstanding Leverage.

**Section 3.11    <u>Standard of Care</u>.**

(a)    No Designated Party will be liable to the Partnership or any Partner for any action taken or omitted to be taken by it or any other Partner or other person in good faith and in a manner it reasonably believed to be in or not opposed to the best interests of the Partnership, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.

(b)    Neither any Private Limited Partner, nor any member of any Partnership committee or board who is not an Affiliate of the General Partner, will be liable to the Partnership or any Partner as the result of any decision made in good faith by the Private Limited Partner or member, in its capacity as such.

(c)    Any Designated Party, any Private Limited Partner and any member of a Partnership committee or board, may consult with reputable legal counsel selected by it and will be fully protected, and will incur no liability to the Partnership or any Partner, in acting or refraining to act in good faith in reliance upon the opinion or advice of such counsel.

(d)    This Section does not constitute a modification, limitation or waiver of Section 314(b) of the SBIC Act, or a waiver by SBA of any of its rights under Section 314(b).

(e)    In addition to the standards of care stated in this Section, this Agreement may also provide for additional (but not alternative) standards of care that must also be met.

**Section 3.12    <u>Indemnification</u>.**

(a)    The Partnership will indemnify and hold harmless, but only to the extent of Assets Under Management (less any Outstanding Leverage not included as a liability in the computation of Assets Under Management), any Designated Party, from any and all Indemnifiable Costs which may be incurred by or asserted against such person or entity, by reason of any action taken or omitted to be taken on behalf of the Partnership and in furtherance of its interests.

(b)    The Partnership will indemnify and hold harmless, but only to the extent of Assets Under Management (less any Outstanding Leverage not included as a liability in the computation of Assets Under Management), the Private Limited Partners, and members of any Partnership committee or board who are not Affiliates of the General Partner or any Investment Adviser/Manager from any and all Indemnifiable Costs which may be incurred by or asserted against such person or entity, by any third party on account of any matter or transaction of the Partnership, which matter or transaction occurred during the time that such person has been a Private Limited Partner or member of any Partnership committee or board.

\\\DC - 83555/1 - #1386423 v5

(c)     The Partnership has power, in the discretion of the General Partner, to agree to indemnify on the same terms and conditions applicable to persons indemnified under Section 3.12(b), any person who is or was serving, under a prior written request from the Partnership, as a consultant to, agent for or representative of the Partnership as a director, manager, officer, employee, agent of or consultant to another corporation, partnership, limited liability company, joint venture, trust or other enterprise, against any liability asserted against such person and incurred by the person in any such capacity, or arising out of the person's status as such.

(d)     No person may be entitled to claim any indemnity or reimbursement under Section 3.12(a), (b) or (c) in respect of any Indemnifiable Cost that may be incurred by such person which results from the failure of such person to act in accordance with the provisions of this Agreement and the applicable standard of care stated in Section 3.11.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, will not, of itself, preclude a determination that such person acted in accordance with the applicable standard of care stated in Section 3.11.

(e)     To the extent that a person claiming indemnification under Section 3.12(a), (b) or (c) has been successful on the merits in defense of any action, suit or proceeding referred to in Section 3.12(a), (b) or (c) or in defense of any claim, issue or matter in any such action, suit or proceeding, such person must be indemnified with respect to such matter as provided in such Section.  Except as provided in the foregoing sentence and as provided in Section 3.12(h) with respect to advance payments, any indemnification under this Section 3.12 will be paid only upon determination that the person to be indemnified has met the applicable standard of conduct stated in Section 3.11(a) or Section 3.11(b), as applicable.

(f)     A determination that a person to be indemnified under this Section has met the applicable standard stated in Section 3.11(a) or Section 3.11(b) may be made by (i) the General Partner, with respect to the indemnification of any person other than a person claiming indemnification under Section 3.12(a), (ii) a committee of the Partnership whose members are not affiliated with the General Partner or any Investment Adviser/Manager with respect to indemnification of any person indemnified under Section 3.12(a) or (iii) at the election of the General Partner, independent legal counsel selected by the General Partner, with respect to the indemnification of any person indemnified under this Section, in a written opinion.

(g)     In making any determination with respect to indemnification under subsection (f) above, the General Partner, a committee of the Partnership whose members are not affiliated with the General Partner or any Investment Adviser/Manager or independent legal counsel, as the case may be, is authorized to make the determination on the basis of its evaluation of the records of the General Partner, the Partnership or any Investment Adviser/Manager to the Partnership and of the statements of the party seeking indemnification with respect to the matter in question and is not required to perform any independent investigation in

22

connection with any determination. Any party making any such determination is authorized, however, in its sole discretion, to take such other actions (including engaging counsel) as it deems advisable in making the determination.

(h)     Expenses incurred by any person in respect of any Indemnifiable Cost may be paid by the Partnership before the final disposition of any such claim or action upon receipt of an undertaking by or on behalf of such person to repay such amount unless it is ultimately determined as provided in Section 3.12(e) or (f) that the person is entitled to be indemnified by the Partnership as authorized in this Section 3.12.

(i)     The rights provided by this Section 3.12 will inure to the benefit of the heirs, executors, administrators, successors, and assigns of each person eligible for indemnification under this Agreement.

(j)     The rights to indemnification provided in this Section 3.12 are the exclusive rights of all Partners to indemnification by the Partnership. No Partner may have any other rights to indemnification from the Partnership or enter into, or make any claim under, any other agreement with the Partnership (whether direct or indirect) providing for indemnification.

(k)     The Partnership may not enter into any agreement with any person (including, without limitation, any Investment Advisor/Manager, Partner or any person that is an employee, officer, director, partner or shareholder, or an Affiliate, Associate or Control Person of any Partner) providing for indemnification of any such person (i) except as provided for under this Section 3.12, and (ii) unless such agreement provides for a determination with respect to the indemnification as provided under Section 3.12(f).

(l)     The provisions of this Section 3.12 do not apply to indemnification of any person that is not at the expense (whether in whole or in part) of the Partnership.

(m)     The Partnership may purchase and maintain insurance on its own behalf, or on behalf of any person or entity, with respect to liabilities of the types described in this Section 3.12. The Partnership may purchase such insurance regardless of whether the person is acting in a capacity described in this Section 3.12 or whether the Partnership would have the power to indemnify the person against such liability under the provisions of this Section.

## Section 3.13    Advisory Committee.

The General Partner shall establish an advisory committee (the "**Advisory Committee**"). The Advisory Committee shall consist of the persons who serve on the advisory committee of the Parent Fund (the "**Parent Fund Advisory Committee**"). Except with respect to the determination of the valuation of Investments, the determination of which shall be made by the General Partner pursuant to the Valuation Guidelines set forth on Exhibit II hereto, the Partnership shall not take any action without the consent of the

Advisory Committee that could not be taken directly by the Parent Fund under the Parent Fund Agreement without the consent of the Parent Fund Advisory Committee. The Partnership will reimburse each member for his or her reasonable out-of-pocket expenses.

# ARTICLE 4
# SMALL BUSINESS INVESTMENT COMPANY MATTERS

**Section 4.01    SBIC Act.**

The provisions of this Agreement must be interpreted to the fullest extent possible in a manner consistent with the SBIC Act. If any provision of this Agreement conflicts with any provision of the SBIC Act (including, without limitation, any conflict with respect to the rights of SBA or the respective Partners under this Agreement), the provisions of the SBIC Act will control.

**Section 4.02    Consent or Approval of, and Notice to, SBA.**

(a)    The requirements of the prior consent or approval of, and notice to, SBA in this Agreement will be in effect at any time that the Partnership is licensed as an SBIC, has Outstanding Leverage or owns Earmarked Assets. These requirements will not be in effect if the Partnership is not licensed as an SBIC, does not have any Outstanding Leverage, and does not own any Earmarked Assets.

(b)    Except as provided in the SBIC Act, a consent or approval required to be given by SBA under this Agreement will be deemed given and effective for purposes of this Agreement only if the consent or approval is (i) given by SBA in writing and (ii) delivered by SBA to the party requesting the consent or approval in the manner provided for notices to such party under Section 10.05.

**Section 4.03    Provisions Required by the SBIC Act for Issuers of Participating Securities.**

(a)    The provisions of 13 C.F.R. § 107.1820 are incorporated by reference in this Agreement as if fully stated in this Agreement.

(b)    The Partnership and the Partners consent to the exercise by SBA of all of the rights of SBA under 13 C.F.R. § 107.1820, and agree to take all actions that SBA may require in accordance with 13 C.F.R. § 107.1820.

(c)    This Section 4.03 will be in effect at any time that the Partnership has outstanding Participating Securities or owns Earmarked Assets, and will not be in effect at any time that the Partnership neither has outstanding Participating Securities nor owns Earmarked Assets.

24

(d)     Nothing in this Section may be construed to limit the ability or authority of SBA to exercise its regulatory authority over the Partnership as a licensed small business investment company under the SBIC Act.

**Section 4.04    Provisions Required by the SBIC Act for Issuers of Debentures.**

(a)     The provisions of 13 C.F.R. § 107.1810(i) are incorporated by reference in this Agreement as if fully stated in this Agreement.

(b)     The Partnership and the Partners consent to the exercise by SBA of all of the rights of SBA under 13 C.F.R. § 107.1810(i), and agree to take all actions that SBA may require in accordance with 13 C.F.R. § 107.1810(i).

(c)     This Section will be in effect at any time that the Partnership has outstanding Debentures, and will not be in effect at any time that the Partnership does not have outstanding Debentures.

(d)     Nothing in this Section may be construed to limit the ability or authority of SBA to exercise its regulatory authority over the Partnership as a licensed small business investment company under the SBIC Act.

**Section 4.05    Effective Date of Incorporated SBIC Act Provisions.**

(a)     Any section of this Agreement which relates to Participating Securities or Debentures issued by the Partnership and incorporates or refers to the SBIC Act or any provision of the SBIC Act (including, without limitation, 13 C.F.R. §§ 107.1810(i), 107.1820, and 107.1830 - 107.1850)) will, with respect to each Participating Security or Debenture, be deemed to refer to the SBIC Act or such SBIC Act provision as in effect on the date on which the capital contribution with respect to the Participating Security was made to the Partnership or the Debenture was purchased from the Partnership, as the case may be.

(b)     Section 4.05(a) will not be construed to apply to:

(i)     the provisions of the SBIC Act which relate to the regulatory authority of SBA under the SBIC Act over the Partnership as a licensed small business investment company; or

(ii)    the rights of SBA under any other agreement between the Partnership and SBA.

(c)     The parties acknowledge that references in this Agreement to the provisions of the SBIC Act relating to SBA's regulatory authority refer to the provisions as in effect from time to time.

25

**Section 4.06**    **Admission of Preferred Limited Partners and Increased Commitments.**

The Partnership may, from time to time after the date of this Agreement, admit one or more Preferred Limited Partners under the following terms and conditions:

(a)    Each Preferred Limited Partner must execute and deliver to the Partnership an instrument substantially in the form attached to this Agreement as Exhibit I-A, or other form satisfactory to the Partnership and the Preferred Limited Partner, evidencing the Preferred Limited Partner's agreement to be bound by and comply with the terms and provisions of this Agreement as if the Preferred Limited Partner were an original signatory to this Agreement, and setting forth the Preferred Limited Partner's name and Commitment.

(b)    Each Preferred Limited Partner will be admitted to the Partnership as of the date that the first such instrument is executed by the Preferred Limited Partner and the General Partner. Each Preferred Limited Partner must pay, on the date of its admission to the Partnership, a capital contribution equal to 100% of the amount of its Commitment as of such date.

(c)    At the time that any Preferred Limited Partner increases its Commitment, it must execute an instrument as provided in Section 4.06(a) setting forth the amount of such increase in its Commitment. Each Preferred Limited Partner must pay, on the date it increases its Commitment, a capital contribution equal to 100% of the amount of such increase in its Commitment.

(d)    The amount of any user, commitment or other fees deducted by SBA from the proceeds of any Preferred Limited Partnership interest issued by the Partnership will be deemed a capital contribution to the Partnership by such Preferred Limited Partner.

**Section 4.07**    **Redemption and Withdrawal of Preferred Limited Partners.**

(a)    The redemption of the Preferred Limited Partnership Interest under the SBIC Act will not cause the withdrawal of the Preferred Limited Partner from the Partnership, and any Preferred Limited Partner whose Preferred Limited Partnership Interest is redeemed under the SBIC Act will remain a Preferred Limited Partner of the Partnership notwithstanding the redemption, until such time as the Preferred Limited Partner is deemed to have withdrawn under Section 4.07(d).

(b)    If before the redemption date of a Preferred Limited Partnership Interest under the SBIC Act the Preferred Limited Partner has not received on a cumulative basis the amount provided under the SBIC Act with respect to such Preferred Limited Partnership Interest, then on the redemption date the Partnership will distribute to the Preferred Limited Partner such amount as is required so that as of the redemption date the Preferred Limited Partner has received on a cumulative basis

26

the amount provided under the SBIC Act with respect to the Preferred Limited Partnership Interest.

(c)    If at the time any Preferred Limited Partner's Preferred Limited Partnership Interest has been redeemed under the SBIC Act the Partnership has not (i) paid all Earned Prioritized Payments, earned Adjustments and earned Charges in full, and (ii) sold or otherwise disposed of all assets which are Earmarked Assets, then the Partnership's obligation to pay Earned Prioritized Payments, earned Adjustments and earned Charges will continue and payment will be made as provided in the SBIC Act. The Partnership's obligation to pay Profit Participation with respect to Earmarked Assets will continue until such time as all Earmarked Assets are disposed of.    If on disposition of all Earmarked Assets there remain any Accumulated Prioritized Payments, unearned Adjustments and unearned Charges, the obligation to make such payments will be extinguished.

(d)    A Preferred Limited Partner will be deemed to have withdrawn from the Partnership at such time as the Preferred Limited Partnership Interest of the Preferred Limited Partner has been redeemed under the SBIC Act, the Partnership no longer owns any assets which are Earmarked Assets, and all amounts due from the Partnership to the Preferred Limited Partner with respect to its Preferred Limited Partnership Interest (including, without limitation, all allocated Profit Participation) have been paid to the Preferred Limited Partner or the obligation to pay such amounts has been extinguished as provided in <u>Section 4.07(c)</u> or the SBIC Act.

**Section 4.08    <u>Assignment of Right to Distributions by a Preferred Limited Partner.</u>**

A Preferred Limited Partner may assign to a designee all or part of its right to receive any distribution or payment from the Partnership with respect to its Preferred Limited Partnership Interest.  Upon receipt of written notice from the Preferred Limited Partner as to such an assignment, the Partnership will pay any such assigned distribution or payment directly to the designee.  Any assignment made solely under this <u>Section 4.08</u> will not be deemed an assignment of a partnership interest or the substitution of a designee as a Partner, and will not be deemed to give the designee any rights or interest in the Partnership as a Partner in the Partnership.

**Section 4.09    <u>Priority of Preferred Limited Partnership Interests on Liquidation.</u>**

If the Partnership is liquidated under the SBIC Act, the Preferred Limited Partnership Interests will be senior in priority for all purposes to all other partnership interests (or other equity interests) in the Partnership to the extent of the amount determined, with respect to each Preferred Limited Partnership Interest, as provided in the SBIC Act.

\\\DC - 83555/1 - #1386423 v5

**Section 4.10   SBA as Third Party Beneficiary.**

SBA will be deemed an express third party beneficiary of the provisions of this Agreement to the extent of the rights of the Preferred Limited Partners and SBA under this Agreement and under the Act SBA will be entitled to enforce the provisions (including, without limitation, the obligations of each Partner to make capital contributions to the Partnership) for the benefit of the Preferred Limited Partners and for its benefit, as if SBA were a party to this Agreement.

**Section 4.11   Interest of the General Partner After Withdrawal.**

If the General Partner withdraws as a general partner of the Partnership by notice from SBA as provided in the SBIC Act or otherwise, then the entire interest of the General Partner in the Partnership will be converted into an interest as a Special Private Limited Partner on the terms provided in Section 8.03(c).

# ARTICLE 5
# PARTNERS' CAPITAL CONTRIBUTIONS

**Section 5.01   Capital Commitments.**

(a)    The Private Limited Partners and the General Partner commit to make Capital Contributions to the Partnership in the amounts set forth by their respective names on Exhibit I to this Agreement (and its counterparts) executed by each such Partner; provided, however, that the Commitment of a Back-Up Private Limited Partner shall be reduced as and to the extent that the Primary Partner, in respect of which the Back-Up Limited Partner has made a Commitment, funds its own Commitment.

(b)    Notwithstanding Section 5.01(a), a Back-Up Limited Partner shall be required to make Capital Contributions to the Partnership only to the extent that the Primary Partner, with respect to whom the Back-Up Limited Partner has been admitted to the Partnership, fails to timely make a Capital Contribution.

(c)    The Commitment of a Preferred Limited Partner includes only the amount the Preferred Limited Partner has actually contributed to the Partnership, and does not include any amount under any agreement by the Preferred Limited Partner or SBA to provide Leverage to the Partnership that has not been contributed to the Partnership.  The amount of the actual contribution by a Preferred Limited Partner to the Partnership will be set forth on Exhibit I-A attached to this Agreement.

**Section 5.02   Capital Contributions by the Class A Limited Partners.**

The Class A Limited Partners will contribute to the capital of the Partnership in cash the aggregate amount that is set forth opposite their respective names on Exhibit I payable in

28

such installments, as specified by the General Partner in its sole discretion, from time to time, upon not less than ten (10) business days' prior notice; provided that the time requirement for such notice may be waived by a Class A Limited Partner.

**Section 5.03    Capital Contributions by the Class B Limited Partners**

If at any time (and only at such time) the Parent Fund fails to make a Capital Contribution as required by this Agreement, then the Class B Limited Partners shall contribute to the capital of the Partnership in cash an amount equal to the Parent Fund Capital Contribution then in default, with each such Class B Limited Partner being required to contribute its Proportionate Share of the Capital Contribution then in default; provided, however, that the obligation of each Class B Limited Partner to contribute to the capital of the Partnership shall be several, and not joint, and in no event shall any Class B Limited Partner be required to contribute to the Partnership an amount greater than the then unpaid amount that such Class B Limited Partner has agreed to contribute to the capital of the Parent Fund. The amount of each such Capital Contribution shall be made to the Partnership upon ten (10) business days advance written notice by the General Partner with respect to each contribution. Simultaneously with a contribution to the Partnership of any capital by a Class B Limited Partner, such Class B Limited Partner shall transfer to the Parent Fund the interest in the Partnership so acquired with a corresponding credit to the Parent Fund's Capital Account and reduction in the Parent Fund's unpaid Commitment to the Partnership, and the Parent Fund shall in turn credit such Class B Limited Partner with an additional capital contribution to the Parent Fund pursuant to the Parent Fund Agreement (which shall serve to correspondingly reduce the amount of such Class B Limited Partner's commitment to the Parent Fund). No Capital Contribution by a Class B Limited Partner pursuant to this Agreement shall give it any right to receive any distributions or allocations pursuant to this Agreement or give rise to a Capital Account for such Class B Limited Partner.

**Section 5.04    Capital Contributions by Preferred Limited Partners.**

Each Preferred Limited Partner will contribute the entire amount of its initial Commitment to the Partnership on the date of its admission to the Partnership as a Preferred Limited Partner. On the date that any Preferred Limited Partner increases its Commitment, it will pay a capital contribution equal to 100% of the amount of the increase in its Commitment. Any capital contribution by a Preferred Limited Partner with respect to its initial Commitment or increase in its Commitment will be deemed to include any portion of any such Commitment contributed as provided in Section 4.06(d).

**Section 5.05    Capital Contributions by the General Partner.**

(a)    All Capital Contributions to the Partnership by the General Partner must be in cash, except as provided in this Agreement and approved by SBA.

(b)    The General Partner must pay its Commitment in installments at the same times as the Private Limited Partners. The ratio of the Capital Contributions made by the General Partner to the aggregate Capital Contributions made by the Private

29

Limited Partners shall be equal to the ratio of the Commitment of the General Partner to the Commitment of the Class A Limited Partners.

(c)     If the Commitment of the General Partner is increased as a result of an increase in the Commitment of the Private Limited Partners or the admission of any Additional Private Limited Partner, the amount of the increased Commitment will be payable by the General Partner in installments, the first of which will be due upon the effectiveness of the increased Commitment and each subsequent installment will be due at the same times and in the same percentage amounts as the Private Limited Partners.

**Section 5.06    Additional Private Limited Partners and Increased Commitments.**

From time to time after the date of this Agreement, the General Partner, in its sole discretion, may admit one or more new Private Limited Partners (the **"Additional Private Limited Partners"**) or permit any Private Limited Partner to increase its Commitment under the following terms and conditions:

(a)     Each Additional Private Limited Partner (and Private Limited Partner increasing its Commitment) must execute and deliver to the Partnership a counterpart of this Agreement, or other written instrument, which sets forth (i) the name and address of the Partner, (ii) the Commitment of the Partner and (iii) in the case of an Additional Private Limited Partner, the agreement of the Partner to be bound by the terms of this Agreement.   Exhibit I attached to this Agreement will be amended to reflect such Additional Private Limited Partner's name, address and Commitment (or the increase in the Private Limited Partner's Commitment, as the case may be).

(b)     [Notwithstanding the other provisions of this Section 5.06, except in connection with a transfer of an interest in the Partnership, the General Partner will not admit any Additional Private Limited Partners or allow for the increase of a Private Limited Partner's Commitment after the period of time specified in Section 5.6 of the Parent Fund Agreement has expired; provided, however, that this restriction shall not apply to the admission or the increase in Commitment of a Back-Up Private Limited Partner.]

**Section 5.07    Additional, Substitute and Transferee Class A Limited Partners.**

No person or entity shall be admitted as a substituted Class A Limited Partner with respect to the interest held by the Parent Fund nor shall the Parent Fund transfer any interest in the Partnership without the prior written approval of SBA and, further, unless the limited partners or equity owners of the substituted Class A Limited Partner or of the transferee Class A Limited Partner simultaneously become Class B Limited Partners.

**Section 5.08**    **Conditions to the Commitments of the General Partner and the Private Limited Partners.**

(a)    Notwithstanding any provision in this Agreement to the contrary, on the earlier of (i) the completion of the liquidation of the Partnership or (ii) one year from the commencement of the liquidation, the General Partner and the Private Limited Partners will be obligated to contribute any amount of their respective Commitments, not previously contributed to the Partnership, if and to the extent that the other Assets of the Partnership have not been sufficient to permit at that time the redemption of all Outstanding Leverage, the payment of all amounts due with respect to the Outstanding Leverage as provided in the SBIC Act, and the payment of all other amounts owed by the Partnership to SBA.

(b)    Notwithstanding any provision in this Agreement to the contrary, if the Partnership is subject to restricted operations (as that term is used in the SBIC Act) and before the liquidation of the Partnership SBA requires the General Partner and the Private Limited Partners to contribute any amount of their respective Commitments not previously contributed to the Partnership, the obligation to make such contributions will not be subject to any conditions stated in this Agreement other than limitations on the amount of capital which a Partner is obligated to contribute (i) within any specified time period or (ii) before any specified date.

(c)    The provisions of this Section do not apply to the Commitment of any Private Limited Partner whose obligation to make capital contributions has been terminated or who has withdrawn from the Partnership, with the consent of SBA, under a provision of this Article 5 or Article 8 or any agreement, release, settlement or action under any provision of this Agreement. No Private Limited Partner or General Partner has any right to delay, reduce or offset any obligation to contribute capital to the Partnership called under this Section by reason of any counterclaim or right to offset by the Partner or the Partnership against SBA or any Preferred Limited Partner.

**Section 5.09**    **Termination of the Obligation to Contribute Capital.**

(a)    Any Private Limited Partner may elect to terminate its obligation in whole or in part to make a capital contribution required under this Agreement, or upon demand by the General Partner, will no longer be entitled to make such capital contribution, if the Private Limited Partner or the General Partner obtains an opinion of counsel as provided under Section 5.10 to the effect that making such contribution would require the Private Limited Partner to withdraw from the Partnership under Section 8.06 through Section 8.10.

(b)    Upon receipt by the General Partner of a notice and opinion as provided under Section 5.10, unless cured within the period provided under Section 5.11, the Commitment of the Private Limited Partner delivering the opinion will be deemed to be reduced by the amount of such unfunded capital contribution and this

31

Agreement will be deemed amended to reflect a corresponding reduction of aggregate Commitments to the Partnership.

## Section 5.10   Notice and Opinion of Counsel.

(a)   A copy of any opinion of counsel issued as described in Section 5.09 or Section 8.06 through Section 8.10 must be sent by the General Partner to SBA, together with (i) the written notice of the election of the Private Limited Partner or (ii) the written demand of the General Partner, to which the opinion relates.

(b)   An opinion rendered to the Partnership as provided in Section 5.09 or Section 8.06 through Section 8.10 will be deemed sufficient for the purposes of those Sections only if the General Partner and SBA each approve (i) the counsel rendering the opinion, and (ii) the form and substance of the opinion.

## Section 5.11   Cure, Termination of Capital Contributions and Withdrawal.

(a)   Unless within ninety (90) days after the giving of written notice and opinion of counsel, as provided in Section 5.10, the Private Limited Partner or the Partnership eliminates the necessity for termination of the obligation of the Private Limited Partner to make further capital contributions or for the withdrawal of the Private Limited Partner from the Partnership in whole or in part to the reasonable satisfaction of the Private Limited Partner and the General Partner, the Private Limited Partner will withdraw from the Partnership in whole or in part to the extent required, effective as of the end of the ninety (90) day period.

(b)   Subject to the provisions of Section 5.13, in its discretion the General Partner may waive all or any part of the ninety (90) day cure period and cause such termination of capital contributions or withdrawal to be effective at an earlier date as stated in the waiver.

(c)   Any distributions made to a Private Limited Partner with respect to such Partner's withdrawal under this Section will be subject to and made as provided in Section 8.11.

## Section 5.12   Failure to Make Required Capital Contributions.

The Partnership is entitled to enforce the obligations of each Partner to make the contributions to capital specified in this Agreement.  The Partnership has all rights and remedies available at law or equity if any such contribution is not so made.

## Section 5.13   Notice and Consent of SBA with respect to Capital Contribution Defaults.

(a)   The Partnership must give SBA prompt written notice of any failure by a Private Limited Partner to make any capital contribution to the Partnership required under

this Agreement when due, which failure continues beyond any applicable grace period specified in this Agreement.

(b)     Unless SBA has given its prior consent or the provisions of subsection (c) of this Section have become applicable, the Partnership will not (i) take any action (including entering into any agreement (whether oral or written), release or settlement with any Partner) which defers, reduces, or terminates the obligations of the Partner to make contributions to the capital of the Partnership, or (ii) commence any legal proceeding or arbitration, which seeks any such deferral, reduction or termination of such obligation. Without the consent of SBA (including SBA's deemed consent under subsection (c) of this Section) no such agreement, release, settlement or action taken will be effective with respect to the Partnership or any Partner.

(c)     If the Partnership has given SBA thirty (30) days prior written notice of any proposed legal proceeding, arbitration or other action described under subsection (b) of this Section with respect to any default by a Private Limited Partner in making any capital contribution to the Partnership, and the Partnership has not received written notice from SBA that it objects to the proposed action within the thirty (30) day period, then SBA will be deemed to have consented to the proposed Partnership action.

(d)     Any notice given by the Partnership to SBA under this Section must:

(i)     be given by separate copies directed to each of the Investment Division and the Office of the General Counsel of SBA;

(ii)     explicitly state in its caption or first sentence that the notice is being given with respect to a specified default by a Private Limited Partner in making a capital contribution to the Partnership and a proposed legal proceeding, arbitration, agreement, release, settlement or other action with respect to that default; and

(iii)     state the nature of the default, the identity of the defaulting Private Limited Partner, and the nature and terms of the proposed legal proceeding, arbitration, agreement, release, settlement or other action with respect to that default.

**Section 5.14    Interest on Overdue Contributions.**

In the event that any Private Limited Partner fails to make a contribution required under this Agreement within ten (10) days after the date such contribution is due, then the General Partner may, in its sole discretion, elect to charge such Private Limited Partner interest at an annual rate equal to the then current prime rate published in The Wall Street Journal dated the business day preceding the tenth day after such contribution is due, plus two percent (2%) per annum on the amount due from the date such amount became due until the earlier of (i) the date on which such payment is received by the Partnership from

such Private Limited Partner or (ii) the date of any notice given to such Private Limited Partner by the General Partner pursuant to Section 5.15 or Section 5.16, or (iii) the date on which such payment is received by the Partnership under Section 5.17 or Section 5.18. Any distributions to which such Private Limited Partner is entitled shall be reduced by the amount of such interest, and such interest shall be deemed to be income to the Partnership.

**Section 5.15    Termination of a Private Limited Partner's Right to Make Further Capital Contributions.**

In the event that any Private Limited Partner (other than the Parent Fund) fails to make a contribution required under this Agreement within ten (10) days after the date such contribution is due, the General Partner may, in its sole discretion (but only with the consent of SBA given as provided in Section 5.13), elect to declare, by notice to such Private Limited Partner, that:

(a)     Such Private Limited Partner's Commitment shall be deemed to be reduced to the amount of any contributions of capital timely made pursuant to this Agreement; and

(b)     Upon such notice (i) such Private Limited Partner shall have no right to make any capital contribution thereafter (including the contribution as to which the default occurred and any contribution otherwise required to be made thereafter pursuant to the terms of this Agreement) and (ii) to this Agreement shall be deemed amended to reflect such reduced Commitment.

**Section 5.16    Forfeiture of a Private Limited Partner's Interest in the Partnership.**

In the event that any Private Limited Partner (other than the Parent Fund) fails to make a contribution required under this Agreement, within ten (10) days after notice by the General Partner to such Private Limited Partner that it has failed to make its contribution on the date such contribution was due, the General Partner may in its sole discretion (but only with the consent of SBA given as provided in Section 5.13) declare, by notice of forfeiture to such Private Limited Partner, that [one hundred percent (100%)] of the interest of such Private Limited Partner in the Partnership (including amounts in its Capital Account as well as any interest in future profits, losses or distributions of the Partnership) is forfeited, effective as of the date of such Private Limited Partner's failure to make such required contribution, in which event, as of the date of such notice of forfeiture (i) the Private Limited Partner shall cease to be a Partner with respect to such forfeited interest; provided, however, that such forfeited Private Limited Partner shall cease to have any liability for the payment of the forfeited percentage of any capital contributions due at such time or in the future and (ii) the forfeited percentage of such Private Limited Partner's Capital Account shall be held by the Partnership and reallocated among the Capital Accounts of the Partners, pro rata in proportion to their respective Percentage Interests (other than such forfeited Private Limited Partner) to be apportioned among such Private Limited Partners in accordance with their respective aggregate capital contributions.

34

**Section 5.17** <u>Withholding and Application of a Private Limited Partner's Distributions</u>.

No part of any distribution shall be paid to any Private Limited Partner (other than the Parent Fund) from which there is then due and owing to the Partnership, at the time of such distribution, any amount required to be paid to the Partnership. At the election of the General Partner, which it may make in its sole discretion, the Partnership may either (i) apply all or part of any such withheld distribution in satisfaction of the amount then due to the Partnership from such Private Limited Partner or (ii) withhold such distribution until all amounts then due are paid to the Partnership by such Private Limited Partner. Upon payment of all amounts due to the Partnership (by application of withheld distributions or otherwise), the General Partner shall distribute any unapplied balance of any such withheld distribution to such Private Limited Partner. No interest shall be payable on the amount of any distribution withheld by the Partnership pursuant to this Section.

**Section 5.18** <u>Required Sale of a Private Limited Partner's Interest in the Partnership</u>.

In the event that any Private Limited Partner (other than the Parent Fund) fails to make a contribution required under this Agreement within ten (10) days after notice by the General Partner to such Private Limited Partner that it has failed to make its contribution on the date such contribution is due, unless the General Partner has acted pursuant to <u>Section 5.15</u> or <u>Section 5.16</u>, the General Partner may, in its sole discretion, (and with the consent of SBA given as provided in <u>Section 5.13</u>) elect to declare such Private Limited Partner in default. If the General Partner so elects to declare such Private Limited Partner in default (such Private Limited Partner being hereinafter referred to as the **"Optionor"**), then the other Private Limited Partners of the Partnership which are not in default (the **"Optionees"**) and the General Partner shall have the right and option to acquire one hundred percent (100%) of the Partnership interest, which shall include one hundred percent (100%) of the Capital Account (the **"Optioned Partnership Interest"**) of the Optionor on the following terms:

(a)     The General Partner shall give the Partners notice promptly after declaration of any such default. Such notice shall advise each Optionee of the portion of the Optioned Partnership Interest available to it and the price therefor. The portion available to each Optionee shall be that portion of the Optioned Partnership Interest that bears the same ratio to the Optioned Partnership Interest as each Optionee's capital contributions to the Partnership bears to the aggregate capital contributions to the Partnership, exclusive of the capital contributions to the Partnership of the Optionor. The aggregate price for the Optioned Partnership Interest shall be the assumption of the unpaid Commitment obligation (both that portion then due and amounts due in the future) of the Optionor (the **"Option Price"**). The Option Price for each Optionee shall be prorated according to the portion of the Optioned Partnership Interest purchased by each such Optionee so that the percentage of the unpaid Commitment assumed by each Optionee is the same as the percentage of the Optioned Partnership Interest purchased by such Optionee. The option granted hereunder shall be exercisable by each Optionee in whole only at any time within ten (10) days of the date of the notice from the

General Partner by the delivery to the General Partner of (i) a notice of exercise of option, and (ii) the capital contribution due in accordance with Section 5.18(e)(i) below.  The General Partner shall forward the above notices of exercise of option received to the Optionor.

(b)      Should any Optionee not exercise its option within the period provided in Section 5.18(a), the General Partner, within ten (10) days of the end of such period, shall notify the other Optionees who have previously exercised their options in full, which Optionees shall have the right and option ratably among them to acquire the portion of the Optioned Partnership Interest not so acquired (the **"Remaining Portion"**) within ten (10) days of the date of the notice specified in this subsection on the same terms as provided in Section 5.18(a).

(c)      The amount of the Remaining Portion not acquired by the Optionees pursuant to Section 5.18(b) may be acquired by the General Partner within ten (10) days of the expiration of the period specified in Section 5.18(b) on the same terms as set forth in Section 5.18(a).

(d)      The amount of the Remaining Portion not acquired by the Optionees and the General Partner pursuant to Section 5.18(c)  may, if the General Partner deems it in the best interest of the Partnership, be sold to any other corporations, partnerships, individuals or other entities on terms not more favorable to such purchaser than the Optionees' option (and the General Partner may admit any such third party purchaser as a Private Limited Partner, subject to the approval of SBA, if required under the SBIC Act).  Any consideration received by the Partnership for such amount of the Optionor's interest in the Partnership in excess of the Option Price therefor shall be retained by the Partnership and allocated among the Partners' Capital Accounts in proportion to the respective Partners' capital contributions.

(e)      Upon exercise of any option hereunder, such Optionee (or the General Partner, if it has exercised its rights pursuant to Section 5.18(c)) shall be deemed to have assumed that portion of the Optionor's unpaid Commitment representing the Option Price of the purchased portion of the Optioned Partnership Interest and shall be obligated (i) to contribute to the Partnership the portion of the capital contribution then due from the Optionor equal to the percentage of the Optioned Partnership Interest purchased by such Optionee and (ii) to pay the same percentage of any further contributions which would have otherwise been due from such Optionor.

(f)      Upon the purchase by the General Partner of any portion of the Optioned Partnership Interest in the Partnership pursuant to Section 5.18(c), the General Partner shall also become a Private Limited Partner to the extent of such interest.

(g)      Upon the purchase of any portion of any Optioned Partnership Interest by an Optionee, the General Partner or other person pursuant to this Section, the

36

Optionor shall have no further rights or obligations under this Agreement with respect to such portion.

(h)    Upon the purchase of any portion of the Optioned Partnership Interest, for purposes of computing such purchaser's aggregate capital contributions, such purchaser shall be deemed to have aggregate capital contributions (or the aggregate capital contributions of any Optionee, shall be increased by an amount) equal to the percentage of the defaulting Private Limited Partner's aggregate capital contribution which the purchased portion of the Optioned Partnership Interest represents of the defaulting Private Limited Partner's entire Partnership interest, and the aggregate capital contributions of such defaulting Private Limited Partner shall be reduced by a corresponding amount.

**ARTICLE 6**
**ADJUSTMENT OF CAPITAL ACCOUNTS**

**Section 6.01    Establishment of Capital Accounts.**

There will be established on the books of the Partnership an Opening Capital Account for each Partner in accordance with the definitions and methods of allocation prescribed in this Agreement. The Partnership shall not establish a Capital Account for any Back-Up Private Limited Partner until the Back-Up Private Limited Partner makes a Capital Contribution to the Partnership; provided, however, that if a Back-Up Private Limited Partner makes a Capital Contribution with respect to a Class B Limited Partner, the final sentence of Section 5.03 of this Agreement shall control.

**Section 6.02    Time of Adjustment of Capital Accounts.**

Allocations will be made to the Opening Capital Account of each Partner in accordance with Section 6.03, as of the following dates:

(i)    the close of each fiscal year of the Partnership;

(ii)    the day before the date of the admission of an Additional Private Limited Partner, increase in any Private Limited Partner's Commitment, admission of any Preferred Limited Partner or increase in the Commitment of any Preferred Limited Partner;

(iii)    the day before the dissolution of the Partnership;

(iv)    the date of a distribution; and

(v)    such other dates as this Agreement may provide.

**Section 6.03    Adjustments to Capital Accounts.**

(a)    As of the times stated in Section 6.02, allocations will be made to the Opening Capital Accounts of the Partners to arrive at each Partner's Closing Capital Account for the period in the following order and amounts:

    (i)    The amount of any capital contributions paid by each Partner during such period will be credited to the Partner's Opening Capital Account (other than capital contributions referred to in clause (i) of the definition of Opening Capital Account in Article 1); provided, however, that any such capital contribution will be credited to the Partner's Opening Capital Account on the later of the date the capital contribution was due or the date on which the capital contribution was actually received by the Partnership;

    (ii)    The amount of any distributions made to each Partner during the period will be debited against the Partner's Opening Capital Account;

    (iii)    Net Profits will be credited and Net Losses will be debited to the Opening Capital Accounts of the Preferred Limited Partners in such amount and in such manner as is required to allocate to the Preferred Limited Partners the amount of the Earned Prioritized Payments and earned Adjustments and earned Charges to which the Preferred Limited Partners are then entitled (determined as provided in the SBIC Act), to be apportioned among them as required under the SBIC Act;

    (iv)    The balance of any Net Profits will be credited, and the balance of any Net Losses will be debited, to the Opening Capital Accounts of the Partners as follows:

        (A)    to the Preferred Limited Partners in such amount as is required to allocate to the Preferred Limited Partners the amount of the Profit Participation to which the Preferred Limited Partners are then entitled (determined as provided in the SBIC Act), to be apportioned among them as required under the SBIC Act; and

        (B)    the balance to the General Partner and the Private Limited Partners to be apportioned among the General Partner and the Private Limited Partners, pro rata in proportion to their respective Percentage Interests.

(b)    Notwithstanding the provisions of Section 6.03(a)(iv):

    (i)    at such time as the Capital Account of the General Partner or any Private Limited Partner is reduced to an amount equal to the aggregate capital contributions of such Partner (less all distributions to such Partner), the balance of all Net Losses will be allocated:

38

(A) first, to the remaining Capital Accounts of the General Partner and Private Limited Partners which have not been reduced to zero (to be apportioned among them in accordance with their respective positive Capital Accounts);

(B) second, after the Capital Accounts of the General Partner and all Private Limited Partners have been reduced to zero, then to the remaining Capital Accounts of the Preferred Limited Partners which have not been reduced to zero (to be apportioned among them according to their respective Capital Accounts); and

(C) third, after the Capital Accounts of all Private Limited Partners and Preferred Limited Partners have been reduced to zero, then the balance to the General Partner.

(ii) If Net Losses are allocated in accordance with the foregoing clause (i), any Net Profits that are required to be allocated after such special allocation of Net Losses as provided in the foregoing clause will be allocated:

(A) first, to the General Partner until the effect of the special allocation of Net Losses under clause (i)(C) is reversed and eliminated;

(B) second, to all of the Preferred Limited Partners to whom the allocation of such Net Losses has been made under clause (i)(B) until the effect of such special allocation of Net Losses has been reversed and eliminated; and

(C) third, to the General Partner and Private Limited Partners to whom the allocation of such Net Losses has been made under clause (i)(A) until the effect of such special allocation of Net Losses has been reversed and eliminated.

(c) To the extent not otherwise accomplished by the provisions of Section 6.03(a) and Section 6.03(b), the Opening Capital Accounts of the Partners will be adjusted to effect any allocation of any item of income, gain, loss, deduction or credit to a Partner required by the Code.

**Section 6.04   Tax Matters.**

(a) If at the end of a fiscal year of the Partnership, a Private Limited Partner or any Preferred Limited Partner unexpectedly receives an adjustment, allocation, or distribution described in clauses (4), (5) and (6) of Treasury Regulation § 1.704 - l(b)(2)(ii) and that adjustment, allocation, or distribution reduces that Private Limited Partner's or Preferred Limited Partner's Opening Capital Account below zero (0), then the Private Limited Partner or Preferred Limited Partner will be allocated all items of income and gain of the Partnership for that year and for all subsequent fiscal years until the deficit balance has been eliminated as provided in

39

Treasury Regulation § 1.704 -l(b)(2)(ii)(d), as quickly as possible. If any such unexpected adjustment, allocation or distribution creates a deficit balance in the Opening Capital Accounts of more than one Private Limited Partner or Preferred Limited Partner in any fiscal year, all items of income and gain of the Partnership for the fiscal year and all subsequent fiscal years will be allocated among all such Private Limited Partners and Preferred Limited Partners in proportion to their respective deficit balances until such balances have been eliminated. If any allocation is made pursuant to this paragraph, subsequent allocations shall be made (in a manner consistent with this paragraph) to offset the effects of such prior allocation. This provision is intended to qualify as a "qualified income offset" within the meaning of Treasury Regulation § l.704-1(b)(2)(ii)(d).

(b)     For Federal, state and local income tax purposes, each item of Partnership income, credit, gain or loss will be allocated among the Partners as provided in Section 6.03.

(c)     The General Partner has the power, limited as provided in the following sentence, to make such allocations and to take such actions necessary under the Code or other applicable law to effect and to maintain the substantial economic effect of allocations made to the Partners under Section 704(b) of the Code. The preceding sentence does not give the General Partner any power to make any allocation or take any other action that affects the rights or preferences of, or allocations or distributions to, any Preferred Limited Partner. All allocations made and other actions taken by the General Partner under this paragraph will be consistent to the maximum extent possible with the provisions of this Agreement.

(d)     The General Partner is the "tax matters partner," as the term is used in the Code.

(e)     The General Partner is expressly authorized to (i) elect that the Partnership be classified as a partnership for federal tax purposes, and (i) to make any election or other action on behalf of the Partnership permitted under the Code with respect to the election of that tax classification.

(f)     The General Partner must keep the Partners informed of all administrative and judicial proceedings with respect to Partnership tax returns or the adjustment of Partnership items. Any Partner who enters into a settlement agreement with respect to Partnership items must promptly give the General Partner notice of the settlement agreement and terms that relate to Partnership items.

(g)     In the event of any admission of any Additional Private Limited Partner or Preferred Limited Partner or transfer by any Private Limited Partner of its Partnership interest, the General Partner will allocate items of income, credit, gain or loss in accordance with the Code and may make such elections under the Code as the General Partner determines to be necessary or appropriate.

(h)     Anything contained in this Agreement to the contrary notwithstanding, if the Partnership is deemed liquidated within the meaning of Treasury Regulation

§ 1.704-1(b)(2)(ii)(g) but has not dissolved under <u>Section 8.01(a)</u>, then the assets of the Partnership will, after provision for payment to creditors, be deemed distributed to the Partners in accordance with Treasury Regulation §1.704-1(b)(2)(ii)(b)(2) and immediately recontributed to the Partnership and the General Partner must make the contributions contemplated by <u>Section 5.04(d)</u>.

**ARTICLE 7**
**DISTRIBUTIONS**

**Section 7.01**    <u>Distributions to Partners.</u>

(a)    The Partnership must make distributions of cash and/or property, if any, at such times as the SBIC Act requires and may make distributions of cash and/or property at such other times as the SBIC Act permits and as are determined under this Agreement.

(b)    All distributions must be made in the following order and amounts:

(i)    to the Preferred Limited Partners in an amount up to any unpaid Earned Prioritized Payments, earned Adjustments and earned Charges to which any Preferred Limited Partners are entitled (as determined under the SBIC Act), to be apportioned among them as required by the SBIC Act;

(ii)    if all amounts required to be distributed under clause (i) have been distributed, then at the election of the General Partner, to the Partners (whether or not each Partner is a taxpayer or is a tax exempt entity) in an amount up to the Maximum Tax Liability of the Partners, to be apportioned between the Preferred Limited Partners on the one hand and the General Partner and the Private Limited Partners on the other hand, as required by the SBIC Act;

(iii)    if all amounts required to be distributed under clause (i) and clause (ii) (if the General Partner has elected to make a distribution under clause (ii)) have been distributed, then to the Partners in an amount up to the amount of the Retained Earnings Available for Distribution of the Partnership, to be apportioned among them in the following ratios:

(A)    if as of the date of the distribution there is Outstanding Leverage, then in the ratios stated in the SBIC Act; and

(B)    if as of the date of the distribution there is no Outstanding Leverage, then any amount to be distributed under this clause (iii) will be apportioned to the Preferred Limited Partners up to the amount of any Profit Participation payable to the Preferred Limited Partners following the redemption of their Preferred Limited

41

Partnership Interests under the SBIC Act, if any, and the balance will be apportioned to the General Partner and the Private Limited Partners;

(iv)    if all amounts required to be distributed under clauses (i) (ii) (if the General Partner has elected to make a distribution under clause (ii)), and (iii) have been distributed, then any additional amount will be distributed and apportioned among the Partners in the following ratios:

    (A)    if as of the date of the distribution there is Outstanding Leverage then in the ratios stated in the SBIC Act; and

    (B)    if as of the date of the distribution there is no Outstanding Leverage, then any amount to be distributed under this clause (iv) will be distributed one hundred percent (100%) to the General Partner and the Private Limited Partners.

**Section 7.02**    <u>**Distributions of Noncash Assets in Kind.**</u>

(a)    Subject to the provisions of the SBIC Act (including, without limitation, 13 C.F.R. § 107.1580), the prior approval of SBA and the provisions of this Section, the Partnership at any time may distribute Noncash Assets in kind.

(b)    Except as provided in the next sentence, any distribution of Noncash Assets will be made pro rata between the Preferred Limited Partners on the one hand and the General Partner and Private Limited Partners on the other hand (based upon the respective amounts which each of the two groups would be entitled to receive if the distribution were made in cash) with respect to the distribution of each Noncash Asset. With the prior approval of SBA, the Partnership may distribute cash to the Preferred Limited Partners in lieu of all or part of any Noncash Assets that they would otherwise receive in such distribution.

(c)    Distributions of Noncash Assets in kind before the redemption of all Preferred Limited Partnership Interests will only be made if the Noncash Assets are Distributable Securities. Distributions in kind of Noncash Assets which are Earmarked Assets after the redemption of all Preferred Limited Partnership Interests will be made only (i) if the Noncash Assets are Distributable Securities or (ii) if the Noncash Assets are not Distributable Securities, then with the prior approval of SBA (which must include the approval of the valuation of the Noncash Assets).

(d)    At any time that any amount due to a Preferred Limited Partner whose Preferred Limited Partnership Interest has been redeemed for purposes of the SBIC Act has not been paid in full, the Partnership will not make any distribution of Noncash Assets in kind unless the Partnership distributes to the Preferred Limited Partner such amount, up to the amount of the unrealized appreciation on the Noncash

\\\DC - 83555/1 - #1386423 v5

Assets to be distributed, as may be necessary to pay in full the amounts due to the Preferred Limited Partner under Section 4.07(c).

(e)     Subject to the SBIC Act, Noncash Assets distributed in kind under this Section 7.02 will be subject to such conditions and restrictions as are legally required, including, without limitation, such conditions and restrictions required to assure compliance by the Partners and/or the Partnership with the aggregation rules and volume limitations under Rule 144 promulgated under the Securities Act.

**Section 7.03    Apportionment of Distributions Among the General Partner and Private Limited Partners.**

All amounts to be distributed to the General Partner and the Private Limited Partners will be apportioned among the General Partner and the Private Limited Partners, pro rata, in proportion to their respective Percentage Interests.

**Section 7.04    Distributions for Payment of Tax.**

(a)     Notwithstanding anything contained in this Agreement to the contrary, at any time when the Partnership does not have any Outstanding Leverage, own any Earmarked Assets and all payments due with respect to any previously issued Outstanding Leverage have been made, (i) the General Partner and the Private Limited Partners will be entitled to receive cash distributions from the Partnership (after taking into account any other distributions received by the General Partner and the Private Limited Partners in that fiscal year) in amounts sufficient to enable the General Partner and the Private Limited Partners (and the partners or members of the General Partner and the Private Limited Partners, if any) to discharge any Federal, state and local tax liability excluding penalties arising as a result of the General Partner's and the Private Limited Partners' interest in the Partnership. Such distributions will be debited to the General Partner's and the Private Limited Partners' Capital Accounts, as provided in Section 6.03(a)(ii).

(b)     Subject to the SBIC Act, the Partnership will at all times be entitled to make tax withholding payments with respect to any Private Limited Partner in amounts required to discharge any legal obligation of the Partnership to make payments to any governmental authority with respect to any Federal, state or local tax liability of the Partner arising as a result of the Partner's interest in the Partnership. Each such payment will be debited to such Partner's Capital Account, as provided in Section 6.03(a)(ii).

**Section 7.05    Distributions Violative of the Act Prohibited.**

Notwithstanding anything contained in this Agreement to the contrary, no distribution may be made by the Partnership if and to the extent that such distribution would violate Section 17-607 of the Act.

43

## ARTICLE 8
## DISSOLUTION, LIQUIDATION, WINDING UP AND WITHDRAWAL

**Section 8.01**   **Dissolution.**

(a)   The Partnership will be dissolved upon the first to occur of the following:

    (i)   subject to Section 8.04 of this Agreement, an event of withdrawal (as defined in Section 17-101(3) and 17-402 of the Act) of the General Partner;

    (ii)   the later of:

        (A)   ten (10) years from the date of formation of the Partnership; or

        (B)   two years after all Preferred Limited Partners have withdrawn from the Partnership and all Outstanding Leverage has matured; or

    (iii)   the determination of the Partners to dissolve and terminate the Partnership as provided in Section 8.01(c).

(b)   The Partnership will not dissolve upon the withdrawal, dissolution, bankruptcy, death or adjudication of incompetence or insanity of any Private Limited Partner or Preferred Limited Partner.

(c)   The General Partner may elect to dissolve the Partnership by giving notice to each Partner and SBA of the election.   Any notice of an election to dissolve the Partnership may only be given:

    (i)   on or after the tenth (10th) anniversary of the date hereof;

    (ii)   if all Outstanding Leverage has been repaid or redeemed; and

    (iii)   if all amounts due the Preferred Limited Partners, SBA, its agent or trustee have been paid.

Any election to dissolve the Partnership given under this Section 8.01(c) will not be effective until the later of:   (A) thirty (30) days from the date the notice is given to all parties or (B) the effective date of dissolution stated in the notice.

(d)   The General Partner may elect to extend the date set forth in Section 8.0l(a)(ii)(A) and Section 8.01(c)(i) at any time within ninety (90) days prior to such date.   Such date can be extended by any such election for up to three (3) additional successive periods of one (3) year each.

44

**Section 8.02    Winding Up.**

(a)    Subject to the SBIC Act and Section 8.03, when the Partnership is dissolved, the property and business of the Partnership will be liquidated by the General Partner or if there is no General Partner or the General Partner is unable to act, a person designated by the holders of **[fifty-one percent (51%)]** in interest of the Private Limited Partners.

(b)    Within a reasonable period (and subject to the requirements of Treasury Regulation §§ 1.704-l(b)(ii)(g) and 1.704-l(b)(2)(ii)(b)(2)) after the effective date of dissolution of the Partnership, the affairs of the Partnership will be wound up and the Partnership's assets will be distributed as follows:

(i)    First, to the payment of the debts and liabilities of the Partnership and the expenses of liquidation;

(ii)    Second, to the setting up of any reserves that the General Partner may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or of the Partners arising out of or in connection with the Partnership;

(iii)    Third, to the distribution to each of the Partners of the amounts in their respective Capital Accounts or, if the amount available is less than the aggregate amount of such Capital Accounts, then pro rata to the Partners in proportion to the amounts in their respective Capital Accounts; and

(iv)    Any balance remaining shall be distributed among the Partners, pro rata in proportion their respective Percentage Interests.

**Section 8.03    Withdrawal of the General Partner.**

(a)    Except as provided in Section 4.03 and Section 4.04, the General Partner may not withdraw as the general partner of the Partnership without the approval of fifty-one percent (51%) in interest of the Private Limited Partners.

(b)    To the extent required by the SBIC Act, no transfer of the interest of the General Partner, or any portion of such interest, will be effective without the consent of SBA.

(c)    Subject to the limitations set forth in Section 8.03(b), Section 10.01(b), Section 10.01(d), and Section 10.01(f), any person who acquires the interest of the General Partner, or any portion of such interest, in the Partnership, will not be a General Partner but will become a special private limited partner (a **"Special Private Limited Partner"**) upon his written acceptance and adoption of all the terms and provisions of this Agreement. Such person will acquire no more than the interest of the General Partner in the Partnership as it existed on the date of the transfer, but will not be entitled to any priority given to the Private Limited

45

Partners, their successors and assigns, in respect of the interest. No such person will have any right to participate in the management of the affairs of the Partnership or to vote with the Private Limited Partners, and the interest acquired by such person will be disregarded in determining whether any action has been taken by any percentage of the limited partnership interests.

(d)     Upon an event of withdrawal of the General Partner without continuation of the Partnership as provided in <u>Section 8.04</u>, the affairs of the Partnership will be wound up in accordance with the provisions of <u>Section 8.02</u>.

## Section 8.04   <u>Continuation of the Partnership After the Withdrawal of the General Partner.</u>

Upon the occurrence of an event of withdrawal (as defined in the Act) of the General Partner, the Partnership will not be dissolved, if, within ninety (90) days after the event of withdrawal, fifty-one percent (51%) in interest of the Private Limited Partners agree in writing to continue the business of the Partnership and to the appointment of one or more additional general partners (subject to the approval of SBA), effective as of the date of withdrawal of the General Partner.

## Section 8.05   <u>Withdrawals of Capital.</u>

Except as specifically provided in this Agreement, withdrawals by a Partner of any amount of its Capital Account are not permitted.

## Section 8.06   <u>Withdrawal by ERISA Regulated Pension Plans.</u>

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is (x) an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, or (y) any other Person, any of the assets of which constitute "plan assets" of an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable the Private Limited Partner to avoid a violation of, or breach of the fiduciary duties of any person under ERISA (other than a breach of the fiduciary duties of any such person based upon the investment strategy or performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership (as opposed to the Private Limited Partner's partnership interest) constitute assets of the Private Limited Partner for purposes of ERISA and are subject to the provisions of ERISA to substantially the same extent as if owned directly by the Private Limited Partner.

**Section 8.07    Withdrawal by Government Plans Complying with State and Local Law.**

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that as a result of state statutes, regulations, case law, administrative interpretations or similar authority applicable to the "government plan", the withdrawal of such Private Limited Partner from the Partnership to such extent is required to enable the Private Limited Partner or the Partnership to avoid a violation (other than a violation based upon the investment performance of the Partnership) of the applicable state law.

**Section 8.08    Withdrawal by Government Plans Complying with ERISA.**

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, if the "government plan" obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the "government plan" from the Partnership to such extent would be required if it were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, to enable the "government plan" to avoid a violation of, or breach of the fiduciary duties of any person under ERISA (other than a breach of the fiduciary duties of any such person based upon the investment strategy or performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership would constitute assets of the "government plan" for the purposes of ERISA, if the "government plan" were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA and would be subject to the provisions of ERISA to substantially the same extent as if owned directly by the "government plan."

**Section 8.09    Withdrawal by Tax Exempt Private Limited Partners.**

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is exempt from taxation under Section 501(a) or 501(c)(3) of the Code may elect to withdraw from the Partnership in whole or in part, if the Private Limited Partner obtains an opinion of counsel to the effect that as a result of applicable statutes, regulations, case law, administrative interpretations or similar authority, the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable the tax exempt Private Limited Partner to avoid loss of its tax exempt status under Section 501(a) or 501(c)(3) of the Code.

**Section 8.10    Withdrawal by Registered Investment Companies.**

Notwithstanding any other provision of this Agreement, any Private Limited Partner that is an "investment company" subject to registration under the Investment Company Act, may elect to withdraw from the Partnership in whole or in part, or upon demand by the

General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of the Investment Company Act, the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable such Private Limited Partner or the Partnership to avoid a violation of applicable provisions of the Investment Company Act or the requirement that the Partnership register as an investment company under the Investment Company Act.

**Section 8.11    Distributions on Withdrawal.**

(a)    Subject to the provisions of <u>Section 8.11(b)</u>, upon withdrawal under any provision of this Agreement, a Private Limited Partner will have the rights to distributions provided in the Act with respect to distributions to be made to limited partners upon withdrawal from a limited partnership.

(b)    The Partnership will not make any distribution to any Partner in connection with its withdrawal under any provision of this Agreement or the Act, unless the distribution is permitted by the SBIC Act and SBA has given its consent to such distribution before the distribution is made.

(c)    Except in the case of distributions made as permitted under subsection (b), the right of the General Partner or any Private Limited Partner to receive any distribution from the Partnership as a result of such Partner's withdrawal, including any right any such Partner may have as a creditor of the Partnership with respect to the amount of any such distribution, is subordinate to any amount due to a Preferred Limited Partner or SBA by the Partnership.

**ARTICLE 9**
**ACCOUNTS, REPORTS AND AUDITORS**

**Section 9.01    Books of Account.**

(a)    The Partnership must maintain books and records in accordance with the provisions of the SBIC Act regarding financial accounts and reporting and, except as otherwise provided in this Agreement, generally accepted accounting principles.

(b)    The books and records of the Partnership must be kept at the principal place of business of the Partnership. Each Partner will have access, upon reasonable notice and during regular business hours, to all books and records of the Partnership for all proper purposes as a Partner of the Partnership. Each Partner will have the right to receive copies of such books and records, subject to payment of the reasonable costs of such copies.

48

(c)     The Partnership will not be required to disclose, however, any confidential or proprietary information received by the Partnership in connection with its investment operations, except for any disclosure to SBA required by the SBIC Act.

**Section 9.02    Audit and Report.**

(a)     The financial statements of the Partnership must be audited and certified as of the end of each fiscal year by a firm of independent certified public accountants selected by the Partnership.

(b)     Within three (3) months of the end of each fiscal year, the Partnership must prepare and mail to each Partner a report prepared in accordance with the provisions of the SBIC Act regarding financial reporting, setting forth as at the end of the fiscal year:

(i)     a balance sheet of the Partnership;

(ii)    a statement of operations for the year;

(iii)   a statement of cash flows;

(iv)    a statement of changes in partners' capital, and such Partner's Closing Capital Account;

(v)     a statement of the Assets, valued as provided under this Agreement;

(vi)    the amount of such Partner's share in the Partnership's taxable income or loss for the year, in sufficient detail to enable it to prepare its Federal, state and other tax returns;

(vii)   any other information the General Partner, after consultation with any Private Limited Partner requesting the same, deems necessary or appropriate;

(viii)  upon request by any Partner, such other information as is needed by such Partner in order to enable it to file any of its tax returns; and

(ix)    such other information as any Partner may reasonably request for the purpose of enabling it to comply with any reporting or filing requirements imposed by any statute, rule, regulation or otherwise by any governmental agency or authority.

The items set forth in clauses (i), (ii), (iii), (iv), (v) and (vi) of this Section 9.02(b) will be certified by the firm of independent certified public accountants selected by the Partnership

(c)     Within forty-five (45) days of the end of each of the first three fiscal quarters, the Partnership will prepare and mail to each Partner a report of the General Partner prepared in accordance with the provisions of the SBIC Act regarding financial reporting setting forth the information described in Section 9.02(b) (i) – (iv) identifying the securities held by the Partnership and stating the amount of each security held and the cost and value thereof as determined under Section 3.10.

### Section 9.03    Fiscal Year.

The fiscal year of the Partnership will be a twelve-month year (except for the first and last partial years, if any) ending on December 31.

# ARTICLE 10
# MISCELLANEOUS

### Section 10.01    Assignability.

(a)     No Private Limited Partner may assign, pledge or otherwise grant a security interest in its or his interest in the Partnership or in this Agreement, except with the prior written consent of the General Partner (which consent may be withheld in the absolute discretion of the General Partner).

(b)     No General Partner or Private Limited Partner may transfer any interest of ten percent (10%) or more in the capital of the Partnership without the prior approval of SBA.

(c)     The General Partner may not assign, pledge or otherwise grant a security interest in its interest in the Partnership or in this Agreement, except with the prior consent of SBA and the prior approval of fifty percent (50%) in interest of the Private Limited Partners.

(d)     No transfer of any interest in the Partnership will be allowed if such transfer or the actions to be taken in connection with that transfer would:

   (i)     result in any violation of the SBIC Act;

   (ii)    result in a violation of any law, rule or regulation by the Partnership;

   (iii)   cause the termination or dissolution of the Partnership;

   (iv)    cause the Partnership to be classified other than as a partnership for Federal income tax purposes;

   (v)     result in the transfer of a limited partnership interest with a cost of less than $20,000 or cause the Partnership to be classified as a "publicly traded

partnership" within the meaning of Section 469(k)(2) of the Code or for the purposes of Section 512(c)(2) of the Code;

(vi)    result in a violation of the Securities Act;

(vii)   require the Partnership to register as an investment company under the Investment Company Act;

(viii)  require the Partnership, the General Partner or the Investment Adviser/Manager to register as an investment adviser under the Investment Advisers Act; or

(ix)    result in a termination of the Partnership for Federal or state income tax purposes.

(e)    If a natural person Private Limited Partner dies or become incapacitated, his or her legal representative will, upon execution of a counterpart of this Agreement, be substituted as a Private Limited Partner, subject to all the terms and conditions of this Agreement.

(f)    Any transferee of any interest in the Partnership by a transfer in compliance with this Section will become a substituted Partner under this Agreement upon delivery and execution of a counterpart of this Agreement, will have the same rights and responsibilities under this Agreement as its assignor and will succeed to the Capital Account and balances thereof.

**Section 10.02  Assignability of Class B Limited Partnership Interests.**

In addition to the limitations on assignment imposed by Section 10.01 or any other Section of this Agreement, no Class B Limited Partner may transfer, sell, pledge, assign or otherwise dispose of its interest in the Partnership as a Class B Limited Partner or in this Agreement unless such Class B Limited Partner simultaneously transfers its interest in the Parent Fund to the transferee of such interest.

**Section 10.03  Binding Agreement.**

Subject to the provisions of Section 10.01, this Agreement is binding upon, and inures to the benefit of, the heir, successor, assign, executor, administrator, committee, guardian, conservator or trustee of any Partner.

**Section 10.04  Gender.**

As used in this Agreement, masculine, feminine and neuter pronouns include the masculine, feminine and neuter; and the singular includes the plural.

**Section 10.05  <u>Notices</u>.**

(a)  All notices under this Agreement must be in writing and may be given by personal delivery, telex, telegram, private courier service or registered or certified mail.

(b)  A notice is deemed to have been given:

    (i)  by personal delivery, telex, telegram, or private courier service, as of the day of delivery of the notice to the addressee; and

    (ii)  by mail, as of the fifth (5th) day after the notice is mailed.

(c)  Notices must be sent to:

    (i)  the Partnership, at the address of the General Partner in the Certificate of Limited Partnership, or such other address or addresses as to which the Partners have been given notice;

    (ii)  the Private Limited Partners, at the addresses in Exhibit I attached to this Agreement (as Exhibit I may be amended from time to time) or such other addresses as to which the Partnership has been given notice;

    (iii)  the Preferred Limited Partner, at the address of the Investment Division of SBA or such other addresses as to which the Partnership has been given notice; and

    (iv)  SBA, at the address of the Investment Division of SBA and, if so required under any Section of this Agreement, in duplicate at the address of the Office of the General Counsel of SBA.

**Section 10.06  <u>Consents and Approvals</u>.**

A consent or approval required to be given by any party under this Agreement will be deemed given and effective for purposes of this Agreement only if the consent or approval is:

    (i)  given by such party in writing, and

    (ii)  delivered by such party to the party requesting the consent or approval in the manner provided for notices to such party under <u>Section 10.05</u>.

**Section 10.07  <u>Counterparts</u>.**

This Agreement and any amendment to this Agreement may be executed in more than one counterpart with the same effect as if the parties executed one counterpart as of the day and year first above written on this Agreement or any such amendment.  To be effective, each separate counterpart must be executed by the General Partner.

**Section 10.08  Amendments.**

(a)   This Agreement may not be amended except by an instrument in writing executed by the holders of sixty-six and two-thirds percent (66 2/3%) in interest of the Private Limited Partners who have not withdrawn as of the effective date of that amendment and the General Partner, and approved by SBA.

(b)   In addition to the requirements in Section 10.07 and Section 10.08(a), any amendment that:

(i)    increases the amount of a Private Limited Partner's Commitment requires that Partner's consent;

(ii)   may cause a Private Limited Partner or Preferred Limited Partner to become liable as a general partner of the Partnership requires the written consent of all Partners;

(iii)  amends this Section requires the consent of all Partners; or

(iv)   dilutes the relative interest of any Private Limited Partner in the profits or capital of the Partnership or in allocations or distributions attributable to the ownership of such interest requires that Partner's consent;

(c)   Each Private Limited Partner consents to:

(i)    the admission of Additional Private Limited Partners and the increase in any Private Limited Partner's Commitment in accordance with Section 5.06;

(ii)   the admission of any Preferred Limited Partner and the increase in any Preferred Limited Partner's Commitment in accordance with Section 4.05(b);

(iii)  the transfer of a Partner's interest in accordance with Section 10.01 and the admission of a substituted Partner under such transfer;

(iv)   any amendment of this Agreement or the Certificate of Limited Partnership necessary to effect such transfer or admission;

(v)    any amendment of this Agreement or the Certificate of Limited Partnership to comply with or conform to any amendments of applicable laws governing the Partnership; and

(vi)   any amendment to this Agreement that the General Partner reasonably determines is necessary or advisable in connection with Partnership's efforts to receive a license to operate as an SBIC; provided, however, that such consent with respect to any such amendment is contingent on the General Partner having reasonably determined that such amendment will

53

not subject any Private Limited Partner (or any limited partner of any Private Limited Partner) to any material adverse economic consequences, alter or waive the right to receive allocations and distributions that otherwise would be made to any Private Limited Partner (or any limited partner of any Private Limited Partner), or alter or waive in any material respect the duties and obligations of the General Partner to the Partnership or any Private Limited Partner (or any limited partner of any Private Limited Partner).

(d)    The General Partner must distribute to each Private Limited Partner, Preferred Limited Partner and SBA a copy of:

(i)    any Certificate of Amendment to the Certificate of Limited Partnership, and

(ii)    any amendment to this Agreement.

(e)    Copies of any Certificate of Amendment to the Certificate of Limited Partnership, and any amendment to this Agreement must be distributed in the same manner as provided for notices in <u>Section 10.05</u>.

## Section 10.09  <u>Power of Attorney.</u>

(a)    Each Private Limited Partner appoints the General Partner, and each member of the General Partner, as its true and lawful representative and attorney-in-fact, in its name, place and stead, to make, execute, sign and file:

(i)    any amendments of this Agreement necessary to reflect:

(A)    the transfer of a Partner's interest in accordance with <u>Section 10.01</u>;

(B)    the admission of a substituted Private Limited Partner under <u>Section 10.01</u>;

(C)    the admission of an Additional Private Limited Partner under <u>Section 5.06</u>;

(D)    an amendment of this Agreement adopted by the Partners under <u>Section 10.08</u>; and

(ii)    all instruments, documents and certificates which, from time to time, may be required by the law of the United States of America, the State of Delaware or any other state in which the Partnership determines to do business, or any political subdivision or agency thereof, to execute, implement and continue the valid and subsisting existence of the Partnership and in conformance to the provisions of this Agreement.

\\\DC - 83555/1 - #1386423 v5

(b)  The General Partner and its partners, as representatives and attorneys-in-fact, do not have any rights, powers or authority to amend or modify this Agreement when acting in such capacity, except as expressly provided in this Agreement. This power of attorney is coupled with an interest and will continue in full force and effect notwithstanding the subsequent death or incapacity of such party.

**Section 10.10  Applicable Law.**

This Agreement is governed by, and construed in accordance with, applicable Federal laws and the laws of the State of Delaware.

**Section 10.11  Severability.**

If any one or more of the provisions contained in this Agreement, or any application of any such provision, is invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and all other applications of any such provision will not in any way be affected or impaired.

**Section 10.12  Entire Agreement.**

This Agreement, and all other written agreements executed by or on behalf of the General Partner and/or the Private Limited Partners and executed or approved by SBA, up to and including the date of this Agreement (such other written agreements, collectively, the **"SBA Agreements"**), state the entire understanding among the parties relating to the subject matter of this Agreement and the SBA Agreements. Any and all prior conversations, correspondence, memoranda or other writings are merged in, and replaced by this Agreement and the SBA Agreements, and are without further effect on this Agreement and the SBA Agreements. No promises, covenants, representations or warranties of any character or nature other than those expressly stated in this Agreement and the SBA Agreements have been made to induce any party to enter into this Agreement or any SBA Agreement.

\\\DC - 83555/1 - #1386423 v5

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement as of the date first written above.

**GENERAL PARTNER:**

**[NAME]**

By:_____

      General Partner


**PRIVATE LIMITED PARTNERS:**


**<u>Class A Limited Partners:</u>**


**GKM Ventures, L.P.**

By:_____

      Name:

      Title:


**<u>Class B Limited Partners:</u>**


By:_____

      Name:

      Title:

By:_____

      Name:

      Title:

56

## EXHIBIT I

## PARTNERS AND COMMITMENTS

| PARTNERS | COMMITMENTS |
|---|---|
| **General Partner:** | |
| GKM SBIC Management, LLC | $0 |
| **Private Limited Partners:** | |
| *Class A Limited Partners:* | |
| GKM Venture Partners, L.P. | **$16,000,000** |
| | |
| Subtotal | $16,000,000 |
| *Class B Limited Partners:* | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| Subtotal | $16,000,000 |
| TOTAL | $16,000,000 |
| | |

\\\DC - 83555/1 - #1386423 v5

## Exhibit I-A

I.D. Control # _____
License # _____

## Instrument of Admission or Increase in
## Commitment for Preferred Limited Partner

1.   **Partnership Name:** _____

2.   **Amount of Preferred Limited Partner's Capital**
     **Contribution:** _____

3.   **Effective Date of Admission or Increase:** _____ **(the "Settlement Date")**

**Short Term Period Provisions:**

For the period beginning on the Settlement Date and ending on _____ (the "Scheduled Pooling Date"), the following terms shall apply:

4.   **Short Term Rate of Prioritized Payment:** _____

5.   **Short Term Payment Date:**  the Business Day before the Scheduled Pooling Date

6.   **Short Term Calculation Method:**  For the Short Term Period, Prioritized Payments will be calculated on the basis of a year of 360 days, for the actual number of days elapsed (including the first day but excluding the last day) from the Settlement Date to the Scheduled Pooling Date (and, if extended by SBA, from the Scheduled Pooling Date to the Pooling Date (as defined below)).

---

**Short Term Period Extension Provisions:**
If the Scheduled Pooling Date is extended one or more times by SBA, the following terms will apply during the extension period(s):

7.   **Extension Period from and including:**      (a) _____  (b) _____  (c) _____
     to but excluding:                            (a) _____  (b) _____  (c) _____
8.   **Extension Period Rates of Prioritized Payment:**  (a) _____  (b) _____  (c) _____
9.   **Extension Period Payment Dates:**           (a) _____  (b) _____  (c) _____

---

**Long Term Period Provisions:**

For the period beginning on _____ (the "Pooling Date"), and ending on the date set forth in item 12 below, the following terms shall apply:

10.  **Long Term Rate of Prioritized Payment:** _____

11.  **Long Term Payment Dates:** February 1, May 1, August 1, November 1

12.  **Maturity Date:** _____

13.  **Long Term Calculation Method:** For the Long Term Period, Prioritized Payments will be calculated on the basis of a year of 365 days, for the actual number of day elapsed (including the first day but excluding the last) from the Pooling Date to the Maturity Date.

**Instrument of Admission or Increase**

**Provisions Applicable to Short Term and Long Term Periods:**

If this is the first capital contribution by the Preferred Limited Partner in the partnership, the undersigned hereby is admitted and agrees to become a Preferred Limited Partner pursuant to the terms of the partnership's Agreement of Limited Partnership and to be bound by and comply with the terms of such Agreement. If the undersigned has already been admitted as a Preferred Limited Partner, the increase in the Preferred Limited Partner's capital contribution will be in the amount set forth in item 2 above effective on the Settlement Date.

The Prioritized Payment payable with respect to this capital contribution shall be at the rate(s) set forth above.

**An additional charge of 1% per annum shall be payable to the Preferred Limited Partner under the same terms and conditions as are applicable to the payment of Prioritized Payments.**

This Instrument shall have the same force and effect as if the undersigned parties had executed a counterpart of the partnership's Agreement of Limited Partnership. Capitalized terms used in this Instrument shall have the respective meanings set forth in such Agreement of Limited Partnership.

**IN WITNESS WHEREOF the undersigned have executed this instrument as of** _____ ____, _____.

**Partnership:**

_____
(Partnership Name)

By: _____
(Name of General Partner)

By: _____
(Signature of Officer or General Partner)

Name: _____

Title: _____

**Preferred Limited Partner:**

____U.S. Small Business Administration____
(Name of Preferred Limited Partner)

By: _____
(Signature of Authorized Person)

Name: _____
Title: _____

Address:     U.S. Small Business Administration
            Investment Division, 409 Third Street, S.W.
            Washington, D.C. 20416

# EXHIBIT II

## Valuation Guidelines

### General

The General Partner has sole responsibility for determining the Asset Value of each of the Loans and Investments and of the portfolio in the aggregate.

Loans and Investments shall be valued individually and in the aggregate at least semi-annually - as of the end of the second quarter of the fiscal year-end and as of the end of the fiscal year. Fiscal year-end valuations are audited as set forth in SBA's Accounting Standards and Financial Reporting Requirements for Small Business Investment Companies.

This Valuation Policy is intended to provide a consistent, conservative basis for establishing the Asset Value of the portfolio. The Policy presumes that Loans and Investments are acquired with the intent that they are to be held until maturity or disposed of in the ordinary course of business.

### Interest-Bearing Securities

Loans shall be valued in an amount not greater than cost with Unrealized Depreciation being recognized when value is impaired. The valuation of loans and associated interest receivables on interest-bearing securities should reflect the portfolio concern's current and projected financial condition and operating results, its payment history and its ability to generate sufficient cash flow to make payments when due.

When a valuation relies more heavily on asset versus earnings approaches, additional criteria should include the seniority of the debt, the nature of any pledged collateral, the extent to which the security interest is perfected, the net liquidation value of tangible business assets, and the personal integrity and overall financial standing of the owners of the business. In those instances where a loan valuation is based on an analysis of certain collateralized assets of a business or assets outside the business, the valuation should, at a minimum, consider the net liquidation value of the collateral after reasonable selling expenses. Under no circumstances, however, shall a valuation based on the underlying collateral be considered as justification for any type of loan appreciation.

Appropriate unrealized depreciation on past due interest which is converted into a security (or added to an existing security) should be recognized when collection is doubtful. Collection is presumed to be in doubt when one or both of the following conditions occur: (i) interest payments are more than 120 days past due; or (ii) the small concern is in bankruptcy, insolvent, or there is substantial doubt about its ability to continue as a going concern.

The carrying value of interest bearing securities shall not be adjusted for changes in interest rates.

1

Valuation of convertible debt may be adjusted to reflect the value of the underlying equity security net of the conversion price.

## Equity Securities - Private Companies

Investment cost is presumed to represent value except as indicated elsewhere in these guidelines.

Valuation should be reduced if a company's performance and potential have significantly deteriorated. If the factors which led to the reduction in valuation are overcome, the valuation may be restored.

The anticipated pricing of a Small Concern's future equity financing should be considered as a basis for recognizing Unrealized Depreciation, but not for Unrealized Appreciation. If it appears likely that equity will be sold in the foreseeable future at a price below the Licensee's current valuation, then that prospective offering price should be weighed in the valuation process.

Valuation should be adjusted to a subsequent significant equity financing that includes a meaningful portion of the financing by a sophisticated, unrelated new investor. A subsequent significant equity financing that includes substantially the same group of investors as the prior financing should generally not be the basis for an adjustment in valuation. A financing at a lower price by a sophisticated new investor should cause a reduction in value of the prior securities.

If substantially all of a significant equity financing is invested by an investor whose objectives are in large part strategic, or if the financing is led by such an investor, it is generally presumed that no more than 50% of the increase in investment price compared to the prior significant equity financing is attributable to an increased valuation of the company.

Where a company has been self-financing and has had positive cash flow from operations for at least the past two fiscal years, Asset Value may be increased based on a very conservative financial measure regarding P/E ratios or cash flow multiples, or other appropriate financial measures of similar publicly-traded companies, discounted for illiquidity. Should the chosen valuation cease to be meaningful, the valuation may be restored to a cost basis, or if of significant deterioration in performance or potential, to a valuation below cost to reflect impairment.

With respect to portfolio companies that are likely to face bankruptcy or discontinue operations for some other reason, liquidating value may be employed. This value may be determined by estimating the realizable value (often through professional appraisals or firm offers to purchase) of all assets and then subtracting all liabilities and all associated liquidation costs.

Warrants should be valued at the excess of the value of the underlying security over the exercise price.

2

**Equity Securities - Public Companies**

Public securities should be valued as follows:  (a) For over-the-counter stocks, take the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, take the average of the close for the valuation date and the preceding two days.

The valuation of public securities that are restricted should be discounted appropriately until the securities may be freely traded.  Such discounts typically range from 10% to 40%, but the discounts can be more or less, depending upon the resale restrictions under securities laws or contractual agreements.

When the number of shares held is substantial in relation to the average daily trading volume, the valuation should be discounted by at least 10%, and generally by more.

## EXHIBIT III
### Definition of Institutional Investor
### (13 C.F.R. § 107.50)

Institutional Investor means:

(1)      *Entities.*  Any of the following entities if the entity has a net worth (exclusive of unfunded commitments from investors) of at least $1 million, or such higher amount as is specified in paragraph (1) of this definition.  (See also § 107.230(b)(4) for limitations on the amount of an Institutional Investor's commitment that may be included in Private Capital.)

(i)      A State or National bank, trust company, savings bank, or savings and loan association.

(ii)     An insurance company.

(iii)    A 1940 Act Investment Company or Business Development Company (each as defined in the Investment Company Act of 1940, as amended (15 U.S.C. 8a-1 *et seq.*)).

(iv)     A holding company of any entity described in paragraph (1)(i), (ii) or (iii) of this definition.

(v)      An employee benefit or pension plan established for the benefit of employees of the Federal government, any State or political subdivision of a State, or any agency or instrumentality of such government unit.

(vi)     An employee benefit or pension plan (as defined in the Employee Retirement Income Security Act of 1974, as amended (Pub. L. 93-406, 88 Stat. 829), excluding plans established under section 401(k) of the Internal Revenue Code of 1986 (26 U.S.C. 401(k), as amended).

(vii)    A trust, foundation or endowment exempt from Federal income taxation under the Internal Revenue Code of 1986, as amended.

(viii)   A corporation, partnership or other entity with a net worth (exclusive of unfunded commitments from investors) of more than $10 million.

(ix)     A State, a political subdivision of a State, or an agency or instrumentality of a State or its political subdivision.

(x)      An entity whose primary purpose is to manage and invest non-Federal funds on behalf of at least three Institutional Investors described in paragraphs (1)(i) through (1)(ix) of this definition, each of whom must have at least a 10 percent ownership interest in the entity.

(xi)     Any other entity that SBA determines to be an Institutional Investor.

1

(2)    *Individuals.*

    (i)    Any of the following individuals if he/she is also a permanent resident of the United States:

        (A)    An individual who is an Accredited Investor (as defined in the Securities Act of 1933, as amended (15 U.S.C. 77a-77aa)) and whose commitment to the Licensee is backed by a letter of credit from a State or National bank acceptable to SBA.

        (B)    An individual whose personal net worth is at least $2 million and at least ten times the amount of his or her commitment to the Licensee. The individual's personal net worth must not include the value of any equity in his or her most valuable residence.

        (C)    An individual whose personal net worth (determined in accordance with paragraph (2)(i)(B) of this definition) is at least $10 million.

    (ii)    Any individual who is not a permanent resident of the United States but who otherwise satisfies paragraph (2)(i) of this definition *provided* such individual has irrevocably appointed an agent within the United States for the service of process.

2

# EXHIBIT C



UNITED STATES SMALL BUSINESS ADMINISTRATION
Receiver for GKM SBIC, L.P.
1100 G Street, N.W., Suite 1100
Washington, D.C. 20005

October 20, 2010

**Certified Mail**
**Return Receipt Requested**

GKM Venture Partners, LP
c/o Jonathan Block
11150 Santa Monica Blvd. Suite 825
Los Angeles, CA 90025

Re:   <u>United States v. GKM SBIC, LP</u>, Case No. 10-4316, United States District Court,
      Central District of California, Western Division
      Demand for Unfunded Capital Commitment

Dear Mr. Bloch:

By letter dated August 26, 2010, you were informed that the United States Small Business Administration ("SBA") has been appointed as the receiver ("the Receiver") of <u>GKM SBIC, LP</u>, ("GKM") by Order of the United States District Court for the Central District of California, Western Division dated July 19, 2010. The Receiver was appointed, in part, to preserve and pursue all of GKM's claims and was granted the authority and powers of the general partner, which was dismissed. In accordance with 13 C.F.R. §17.1820(f)(3) (2010), on or about October 7, 2010, SBA, the federal agency and regulator of GKM, ordered GKM to call all of its outstanding capital commitments Consequently, and as more fully detailed below, the Receiver **hereby makes demand upon you for payment of the sum of $7,645,020 by November 15, 2010** in full satisfaction of your unfunded capital commitment to GKM.

Pursuant to the GKM Second Amended and Restated Agreement of Limited Partnership ("LPA") you committed to invest a total Capital Contribution of **$15,000,000** and are a Partner in GKM. Pursuant to the records in the Receiver's possession produced to the Receiver by GKM, your capital commitment is unfunded in the amount of **$7,645,020**. Therefore, in accordance with Sections 5.02(a) and 5.03(e) of the LPA, the Receiver hereby makes demand upon you for payment of the sum of **$7,645,020** in full satisfaction of your unfunded capital commitment. You are required to forward payment in the full amount to the Receiver for GKM SBIC, L.P. **no later than November 15, 2010**. Payment, in the form of a <u>bank cashier's check</u> payable to *SBA, Receiver for*

*GKM SBIC, L.P.*, must be received by 5pm EST on November 15, 2010 at the following address:

SBA, Receiver for GKM SBIC, L.P.
1100 G Street, N.W., Suite 1100
Washington, D.C. 20005

Your failure to make timely payment in full of your unfunded capital commitment will result in the imposition of interest at the rate of prime plus 2.00 % in accordance with Section 5.15 of the GKM LPA. Your failure to make timely payment in full of your unfunded capital commitment will also cause the Receiver to pursue all available legal rights and remedies, including the institution of civil legal proceedings for the collection of this obligation.

Should you have any questions. please contact me at (202) 272-3617 or via email at LBill@sbicreceivership.com.

Sincerely,
United States Small Business Administration as
Receiver for GKM SBIC, L.P.

By:    Lawrence W. Bill
       Principal Agent for the Receiver

cc:    Charlotte Johnson, SBA, Office of Liquidation
       Arlene M. Embrey, Esq., SBA, Office of General Counsel



UNITED STATES SMALL BUSINESS ADMINISTRATION
Receiver for GKM SBIC, L.P.
1100 G Street, N.W., Suite 1100
Washington, D.C. 20005

December 22, 2010

**Certified Mail**
**Return Receipt Requested**

GKM Venture Partners, LP
C/O Jonathan Bloch
11150 Santa Monica Blvd. Suite 825
Los Angeles, CA 90025

Re:    <u>United States v. GKM SBIC, LP</u>, Case No. 10-4316, United States District Court,
Central District of California, Western Division
**<u>Notice of Default Regarding Final Capital Call</u>**

Dear Mr. Bloch:

By letter dated August 26, 2010, you were informed that the United States Small
Business Administration ("SBA") has been appointed as the receiver ("the Receiver") of
<u>GKM SBIC, LP</u>, ("GKM") by Order of the United States District Court for the Central
District of California, Western Division dated July 19, 2010. The Receiver was
appointed, in part, to preserve and pursue all of GKM's claims and was granted the
authority and powers of the general partner, which was dismissed.

In accordance with 13 C.F.R. §17.1820(f)(3) (2010), on or about October 7, 2010, SBA,
the federal agency and regulator of GKM, ordered GKM to call all of its outstanding
capital commitments. Consequently, and as more fully detailed below, by letter dated
October 27, 2010, the Receiver made demand upon you for payment of the sum of
$7,645,020 on or before November 15, 2010 in full satisfaction of your unfunded capital
commitment to GKM. To date, we have received a portion of that amount totaling
$2,287,134 leaving an unpaid balance of $5,357,886. <u>Full payment on this obligation has
not been received.</u>

Therefore, this letter hereby serves as **<u>written notice of default</u>** for your failure to pay by
November 15, 2010, your entire portion of the final capital call for the GKM SBIC, L.P.

As a consequence of your failure to timely honor your commitment to GKM, the
Receiver is entitled to exercise all rights and remedies available to it in accordance with

Section 5.13 of GKM's Amended Limited Partnership Agreement ('the Agreement"), including the commencement of legal proceedings against you for collection of this obligation. Moreover, in accordance with Section 5.15 of the Agreement, interest on the unpaid amount of your commitment has begun accruing at a rate of 5.25%.

In order to avoid the commencement of legal proceedings, your unfunded commitment of $5,357,886 should be remitted immediately in the form of a cashier's check payable to "SBA, as Receiver for GKM" to the address below:

SBA, Receiver for GKM SBIC, L.P.
Mr. Lawrence W. Bill, Principal Agent for the Receiver
c/o Stephanie Sheridan, Administrative Agent for the Receiver
1100 G. St. N.W., 11th Floor
Washington, D.C 20005

Should you have any questions, you may contact me at (202) 272-3617 or via email at LBill@sbicreceivership.com or your counsel may call the Receiver's counsel, Arlene Embrey, at (202) 205-6976.

Sincerely,


Lawrence W. Bill
Principal Agent for the Receiver
U.S. Small Business Administration
Receiver for GKM SBIC, L.P.